# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### Assigned on Briefs December 18, 2012

## STATE OF TENNESSEE v. JAMES MICHAEL FLINN

**Appeal from the Criminal Court for Anderson County
No.  A6CR0027   David G. Hayes, Senior Judge (trial),
Jon Kerry Blackwood, Senior Judge (pretrial), and
Michael H. Meares, Judge by Interchange (pretrial)**

---

**No.  E2009-00849-CCA-R3-CD - Filed December 3, 2013**

---

The Defendant, James Michael Flinn, was convicted by an Anderson County Criminal Court jury of first degree murder and sentenced to life in prison.  *See* T.C.A. § 39-13-202 (2010). On appeal, the Defendant contends that (1) the evidence is insufficient to support his conviction, (2) the trial court erred in denying his motion to suppress evidence from a warrantless search of his backyard and car, (3) the trial court erred in denying his motion to suppress evidence from his warrantless detention, (4) he was denied the right to counsel at a pretrial hearing, (5) he was denied preliminary hearings after his arrests on two dates, (6) the trial court erred in revoking his bond, (7) he was denied his right to confront witnesses against him by the trial court's admission of the victim's death certificate, (8) he was denied his right to testify by the trial court's exclusion of his testimony regarding the reason he made statements to a witness, (9) the trial court erred in admitting evidence of his purchase of a shotgun, (10) the trial court erred in admitting evidence of vandalism of the victim's house and truck, (11) the trial court erred in receiving as exhibits the no true bills returned by the grand jury regarding a prior incident in which the victim hit the Defendant, (12) the assistant district attorney committed prosecutorial misconduct by commenting on the Defendant's silence when he was detained by the police, (13) the assistant district attorney committed prosecutorial misconduct during closing argument by misstating the evidence, (14) the trial court erroneously instructed the jury regarding admissions against interest, and (15) the trial court violated the Defendant's right to due process by entering judgment and sentencing him on the same day.  We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOSEPH M. TIPTON, P.J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and CAMILLE R. MCMULLEN, JJ., joined.

James Michael Flinn (on appeal), Wartburg, Tennessee, Pro Se; and J. Thomas Marshall, Jr. (at trial), District Public Defender, for the Defendant, James Michael Flinn.

Robert E. Cooper, Jr., Attorney General and Reporter; Renee W. Turner, Senior Counsel; David S. Clark, District Attorney General; and Sandra N.C. Donaghy, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

This case relates to the shooting death of Greig Beggs. At the trial, Lisa Relford testified that she was a dispatcher for the Anderson County Sheriff's Department in July 2005. On July 20 and 21, 2005, she dispatched officers for a call from the victim's wife on 88 West Norris Road. She said that she was on the telephone when another dispatcher talked to the victim's wife, that she told the police to look for the car and the suspect, and that she relayed information to the officers on duty. She said the 9-1-1 calls were recorded digitally and stored in a computer program. She identified the recording of the 9-1-1 call between the victim's wife and Dispatcher Joyce Stringfield.

In the recording, the victim's wife stated that her husband had been shot and was lying in the doorway. The call was transferred to another dispatcher, and the victim's wife stated that someone shot her husband. She was transferred to the first dispatcher, who asked if the victim's wife knew who "did this." She responded, "Mike Flinn." When the dispatcher asked why, the victim's wife responded that the Defendant's daughter lived with her.

On cross-examination, Ms. Relford testified that she was not one of the dispatchers on the recording. She identified a complaint card, which showed the dispatchers' actions that morning, and said she made some of the entries. She said that according to the entry at 5:29 a.m., officer 158 was stationary at the Buzz-In Market. She said the officer was told to look for the Defendant, who was driving a green car, but she could not remember the license plate number she dispatched. She said a later entry reflected that a different officer was on Oak Ridge Highway between Clinton and Oak Ridge. She did not remember telling the police to look for a red Toyota pick-up truck with a chrome grill.

On redirect examination, Ms. Relford testified that the 9-1-1 call was received at 5:22 a.m. She said the possible cars listed were a Buick LeSabre, a gray-blue Oldsmobile Cutlass, a midnight blue Spectra, and a red Toyota pick-up truck with a chrome grill seen by a Norris police officer as he approached the crime scene.

Harry Empging, the chairman and CEO of Ultratek Extrusions, testified that the victim was the Director of Maintenance and Engineering for approximately ten years. He said the

victim was not an engineer by education but by experience. He said he had known the victim for more than ten years, initially as an employee and later as a friend. He said the victim was his best employee, hard-working, loyal, honest, talented, and smart. He said that the victim was humble, kind, and helpful, and was a Christian man. He said the victim, who lived in Norris, worked from 6:00 a.m. to 3:00 p.m. but arrived early and worked late. He said that it took eight to twelve minutes to drive on back roads from the victim's house to Ultratek between 5:15 and 5:45 a.m. and that he knew the time because he used the route. He said the victim did not have problems with other employees.

On cross-examination, Mr. Empging testified that he had never written a statement for the police. He said that the first time he spoke to the police about the case was when the victim's wife called his wife for a safe place to stay and that the victim's wife stayed at his house. He said he did not go to church with the victim but knew he was associated with "some odd religion." He said he had not visited the victim's house socially but had visited with the victim outside the workplace at company functions. He said he never saw the victim react violently.

Norris Public Safety Officer Ronnie Earl Foust testified that his job duties included police, fire, and emergency medical services (EMS) work and that he was trained at a fire academy, at a police academy, and as a first responder. He said that on July 21, 2005, he received a call that the victim had been shot at 88 West Norris Road. He said he arrived around 5:25 a.m. and noticed a "massive blood trail" on the walkway to the house, a coffee mug lying to the right of the walkway, and the victim lying on the front porch. He said that the victim was lying face down with his arm partially through the shattered glass of the storm door and that there was blood on the front porch and steps. He said he walked through the blood on the porch and stepped over the victim to check for others in the house. The victim's wife was on the telephone with the 9-1-1 dispatcher. When he asked if she saw what happened, she said she did not but named a suspect and described the suspect's car. He said other officers were given the information about the suspect and the suspect's car.

Officer Foust testified that because Norris was a small town and did not have much traffic at 5:25 a.m., any car would be of interest at that time. He said that he received information on more than one car and that each time he received more information, he told other officers to look for the car. He remembered placing an alert for a dark-colored Kia, a truck, and possibly one other vehicle. He did not remember the make and model of the truck.

Officer Foust testified that he spoke with and tried to comfort the victim, who could not respond because of his injuries. He said the victim had "agonal" breathing, which he explained was a "gurgling-type sound," but was unable to speak. He said Deputy Carr and EMS personnel arrived about six to eight minutes after he arrived. He said that he searched

the front of the house and asked Deputy Carr to secure the scene by sweeping the back of the house. He did not know at that time if the person who shot the victim was still at the scene. He identified a photograph of a gray Toyota truck, a white car, and a red van in the driveway facing the front of the victim's house. He identified another photograph showing the truck, the red van, the walkway, and the coffee cup by the walkway in front of the victim's house. He said that the driveway at the victim's house was gravel and that the walkway was made of large stones. He identified a photograph of a shotgun shell found at the scene.

Officer Foust testified that the victim was rolled onto a backboard during attempts to revive him. He said the victim was not breathing when they placed him on the backboard. He said that the paramedics attempted to obtain an airway intubation using a plastic tube but that he did not see anyone place heart monitor pads or a neck collar on the victim.

Officer Foust testified that he had been a patrol officer in Norris since October 2004 and was familiar with the roads in Norris. He identified West Norris Road and the victim's address on a map and said he recognized the surrounding streets.

On cross-examination, Officer Foust testified that at 5:25 a.m., he told other officers to look for a dark Kia and a red truck and that he received the information about the red truck from the EMS personnel. He said he went to the victim's house from the police station, which took three to five minutes at most. He said he answered the 9-1-1 telephone call at the station, handed the phone to the dispatcher, and responded to the call. He said that he and the ambulance came from the same direction but that the sheriff's deputies came from the opposite direction. The victim's address was approximately one-quarter mile from the Highway 441 intersection, and the speed limit on West Norris Road was thirty miles per hour.

Officer Foust testified that when he arrived, the wooden front door was partially open and that if someone tried to close the door, it would have hit the victim's head. He said that after emergency personnel arrived, the victim's wife and the children were escorted out the back door to a waiting officer. He said that no one else was inside the house, which was not searched for physical evidence. He said that a shotgun shell was found on the other side of the driveway in the grassy area at the edge of the roadway where the asphalt met the gravel but that he did not find any shotgun pellets. He said that a plant on the front porch was upright when he arrived but was turned over by Deputy Carr and an EMS worker during resuscitation efforts.

On redirect examination, Officer Foust testified that he alerted other officers to the description of the dark blue Kia the victim's wife gave him. He said that because of previous domestic calls to the victim's house, he knew the Defendant owned the Kia. He said that

-4-

when he first arrived at the victim's house, he asked the victim's wife who shot the victim and that she identified the Defendant and described the Kia.

On recross-examination, Officer Foust testified that he asked the victim's wife if she had seen the Defendant at her house and that she responded, "No." He asked her if she had seen where the shooter's vehicle went and said she responded, "No." He said he did not touch the shotgun shell that was found that morning but saw the Tennessee Bureau of Investigation (TBI) agents take it.

Tennessee Highway Patrol Trooper Rusty Carr, a former Anderson County Sheriff's deputy, testified that on July 21, 2005, he was dispatched at 5:22 a.m. to a shooting at 88 West Norris Road. He said he approached the scene cautiously because the call was for a shooting. He said that when he arrived, he saw broken glass from the front door, found Officer Foust, and saw the victim at the front door. He said he later saw the victim's wife and niece. He said he was no more than five or six miles from the scene when he received the call. He said he traveled Highways 61 and 441 to the scene and did not pass the Norris Police Department or Norris City Hall. He said he did not notice any cars leaving the scene and did not have information to look for a car when he went to the scene. He said that he spoke with Officer Foust while EMS personnel worked with the victim and that Officer Foust asked him to speak to the victim's wife and niece, who met him at the side of the house. They could not give him license plate information but gave him descriptions of three vehicles: a gray-blue Oldsmobile Cutlass, a dark-colored Buick LeSabre, and a dark blue Kia Spectra. He relayed the information to dispatchers to alert surrounding agencies. He transported the two women and the children to the Norris Police Department and returned to secure the scene.

On cross-examination, Trooper Carr testified that he remembered passing vehicles on the way to the scene but did not recall their descriptions. He said he did not notice a car going fast because if he did, he would have stopped it.

Anderson County Medical Services Paramedic Darek Shetterly testified that he went to 88 West Norris Road on July 21, 2005. He identified his "run ticket" for the call and explained it was the documentation for the events, times, mileage, vital signs, and treatment. He said he was notified of the call at 5:21 a.m. and arrived at the scene at 5:25 a.m. He said that he was returning from transporting a patient to Knoxville and that when he arrived in Norris, it was very foggy. He said that on the way to the scene, he traveled on Highway 61 and West Norris Road and stopped before reaching the scene to wait for the Norris police. He said that when there was an assault or a shooting, it was standard procedure to "stage" and wait for the police. He said they waited down the street from the house for around five minutes until they were allowed to go to the scene. He said that he did not see anyone and

that no vehicles passed them while they waited. He said that a red Toyota pick-up truck passed them on East Norris Road about one and one-half or two miles from the house. He said that nothing about the vehicle's driving attracted his attention but that he relayed the information to law enforcement.

Mr. Shetterly testified that they parked the ambulance on the street and that he saw the victim lying on the porch on his stomach with his arms and head inside the door. The victim did not appear to breathe or have a pulse, and he saw the victim's gunshot wounds. He said that his partner began chest compressions and that an EMS student established an airway on the victim.

Mr. Shetterly identified a photograph of the victim's head lying on a yellow long spine board. He did not note injuries to the victim's head in his report but testified that in the photograph, several lacerations were on the victim's head as if he had fallen. He said the photograph showed the massive amount of blood on the porch and a heart monitor. He said the victim had no heart beat. He said other photographs showed lacerations and puncture wounds to the victim's arms and a gunshot wound to the victim's chest.

Mr. Shetterly testified that he contacted Dr. White, an emergency room physician with Methodist Medical Center. On Dr. White's advice, they ceased all resuscitation efforts. He said he told Norris Police Chief Humphreys about Dr. White's orders, gathered the emergency equipment except that on the victim, and provided sheets to law enforcement to cover the body. He said that two large planters were on the victim's front porch and that one fell on him when he moved the victim. He said he notified law enforcement that the planters were moved by emergency workers.

On cross-examination, Mr. Shetterly testified that the victim's body was face down when he arrived and that he did not know if the body was moved before his arrival. He said the victim's arms, head, and upper torso were lying inside the house with the storm door opened at a forty-five degree angle against the body. He said broken glass was on the porch and victim.

On redirect examination, Mr. Shetterly testified that he, Paramedic Sweet, and a paramedic student were at the scene. On recross-examination, he said that he drove, that Mr. Sweet was in the passenger seat, that the student was in the captain's seat in the back of the ambulance, and that all three would have seen the red pick-up truck. He said he could not see the driver of the truck.

Anderson County Medical Services Paramedic Nathaniel Sweet testified that on July 21, 2005, he, Mr. Shetterly, and the paramedic student were returning to Anderson County

when they were dispatched to Norris. He said they waited at a split in the road until they had clearance from the police. He said that when they arrived at the scene, they parked on the street. He saw the victim lying on his stomach on the porch by the door. The door was open, and a woman and two children were at the door. After he approached the victim, he realized the victim was not breathing. He and Mr. Potter rolled the victim onto his back, saw he was not breathing, and could not find a pulse. He said that he started chest compressions and that the student assessed the victim's airway and prepared him for intubation.

Mr. Sweet testified that the victim had several small holes scattered across his left, upper chest and a "fairly big" hole a couple of inches wide and long on his left side under his arm near his armpit. He said the chest compressions forced blood out of the holes in the victim's body. He said they performed CPR on the victim for about five to ten minutes. He said the victim did not have a heart rhythm and was not breathing.

Kathleen Thurman testified that her house was five houses up the hill from 88 West Norris Road. She said that on July 21, 2005, she was lying in bed and heard two gunshots two or three seconds apart. She thought someone shot a deer and did not think about the shots until later that day when she saw the crime scene tape. She said that ten to fifteen seconds after the shots, she heard a car drive past her house. She said she did not know the differences in gunshot sounds but thought that the two that morning were from a shotgun or a rifle. She said that she could not see the clock in her room without her glasses and did not look at it that morning but that she thought she heard the shots around 5:00 a.m. because the sky was not "pitch black like nighttime." She said she did not hear voices or screams but heard a car increasing its speed up the hill past her house.

On cross-examination, Ms. Thurman testified that Norris had a "deer problem" and that it was not uncommon to hear gunshots from hunters. She said the victim's house was across the street from a wooded area. She agreed July was not hunting season but said deer ate her flowers in July. She said that the distance between her house and the victim's was about one hundred yards and that the lots were about forty feet wide. She identified a service drive on the map that permitted access to three houses. She said she knew the car was increasing its speed but did not know whether it had a manual or an automatic transmission. She said that the newspaper was typically delivered around 6:00 a.m. but that she was unsure because it was delivered before she woke.

On redirect examination, Ms. Thurman testified that she did not know what type of car the newspaper carrier drove. She reconsidered the size of the lots between her house and the victim's and decided she did not know the size but said the victim's house was close.

Lisa Swisher testified that 88 West Norris Road was directly across from her house. She said that around 5:15 a.m. on July 21, 2005, she was watching the news and heard "a loud boom followed by a second loud boom" and that only a few seconds passed between the sounds, which she said were like a shotgun. She looked out her windows but did not see anything. She did not look out the windows closest to West Norris Road. She said she saw her neighbor, Steve Forbes, in his driveway when she looked out one window and asked him if he heard the same noise. She said it was dark and foggy. She did not hear any cars or voices.

On cross-examination, Ms. Swisher testified that it was uncommon to hear gunshots or people shooting deer around her house. She stated that her windows were not open in July and that she could not determine from which direction the sounds came. She was unsure if 88 West Norris Road was visible from the Forbeses' house and said a bush separated her house and the Forbeses' house.

Ms. Swisher testified that she told TBI Special Agent Corbitt the day after she heard the shots that the shots were between 5:15 and 5:18 a.m. She said she did not hear anything between the two shots. She said that it was dark outside with no light in the eastern sky, although the street lights were on. She said that she had heard shotguns, rifles, and large caliber pistols fired but had never fired a shotgun and that a shotgun sounded different than rifles and large caliber pistols.

Daniel Forbes testified that he lived in Cookeville, Tennessee, during the school year but that his permanent residence was at his parents' house on Orchard Road in Norris. He said that he was familiar with 88 West Norris Road, which he could see from parts of his parents' property. He said that on July 21, 2005, he was awakened at 5:18 a.m. by what he thought were two shotgun blasts a few seconds apart. He said he heard a man scream after each blast and described the screams as "blood curdling" and "terrifying." He said he got out of bed and cracked his window to listen more closely. He said he could not discern from which direction the blasts came, only that the noises were from behind his house. He said that before he opened the window, he heard a car door close and a car drive out of a gravel driveway and up the hill away from his house. He said that once he was certain the danger was gone, he cracked the window and heard women crying and sounds of distress.

Mr. Forbes testified that he and his father went outside and that he saw the front door of the victim's house "shot out" and the victim dead on the front porch. He said that he did not know the victim personally but had driven by the victim's house when the victim was outside and that his family was familiar with the victim. He said that when he heard the car leave, it was traveling on West Norris Road, that its tires did not squeal, and that he did not think the car sounded like it was in a hurry. He said that it was a small car as opposed to a

-8-

large truck or diesel engine and that it sounded like an automatic transmission because he did not hear transitions between gears. He said that he had fired shotguns and rifles before and had heard handguns fired and that the gunshots sounded like shotgun blasts. He said he did not know Niki Buss or the victim's wife.

On cross-examination, Mr. Forbes testified that if he strained, he might be able to see the victim's house from his window but that he did not look that morning because he was being careful. He said that he did not see a flash before the second shot. He did not recall ever speaking to the victim. He could not identify who screamed. He said that he was in his bedroom when he heard the car drive away and that he did not remember hearing the car start. He said that he heard the car door close and that the car drove away without revving the engine. He thought the car was on a gravel driveway and was "pretty confident" the car had an automatic transmission. He said the car sounded like it was gaining speed but could not estimate its speed. He agreed the speed limit on West Norris Road was thirty miles per hour but did not know if the car was speeding. He said he and his father walked up Ms. Swisher's driveway but did not cross the street to the victim's property.

Bret Boundy testified that on July 21, 2005, he, his wife, and his two children were visiting his parents on West Norris Road. He said he was not familiar with 88 West Norris Road but was familiar with the intersection of West Norris Road and Orchard Road and identified his parents' house on a map. On July 21, 2005, at 5:20 a.m., he awoke in an upstairs bedroom and heard two gunshots and a scream or yell. He said a man screamed and sounded "very surprised." He said the two shots were one or two seconds apart. He ran to the window after he heard the shots and scream. He did not turn on the lights because he did not want to draw attention to himself, and he ran to make sure his children and his parents were inside. He said he saw flashing lights and realized the police were already there. He was not certain from which direction the noises came but remembered running first to the window that faced the victim's house. He said he did not know the victim or his wife. On cross-examination, he said he did not hear the scream until after the second shot. He said that his parents had moved to the house recently and that it was his first night staying there.

Former TBI Special Agent James Whitson testified that Police Chief Humphreys called him around 6:00 a.m. on July 21, 2005, and requested the TBI's assistance with a Norris homicide and that it took him about thirty minutes to respond. He said that when he arrived, crime scene tape surrounded the scene and that officers were waiting on the TBI. He said he spoke with the officers, looked around the scene, and waited on Agent Corbitt, who arrived shortly. He said that processing the scene involved locating physical evidence and gathering it to be taken to the laboratory. He said that after Agent Corbitt arrived, they decided Mr. Whitson would assist Agent Corbitt in processing the scene and called for Deputy Bean to assist because of Deputy Bean's education and training in processing crime

scenes. He said he filmed the scene and identified a video recording he made of the scene that day. The recording was played for the jury, and Mr. Whitson narrated. He said he returned evidence from the TBI crime lab, assisted Agent Corbitt in canvassing the neighborhood, and interviewed most of the neighbors.

On cross-examination, Mr. Whitson said he arrived at the crime scene at approximately 6:30 a.m. He said he did not begin filming the scene when he first arrived but discussed what had happened with the officers there and did a walkthrough. He said he did not touch anything during his walkthrough. He said he used a pencil to position the shotgun shell found at the scene to see the type of shell it was. He said the Norris Police Department marked the location of the shell with a cone. He said he did not recall seeing pellet holes in the vehicles in the driveway or "pot marks" in the wall but saw marks from pellets in the wooden door. He said that the driveway was gravel and that a car backing out of a gravel driveway would make noise. He said that the recording did not show tire marks in the driveway and that tire marks would be visible if a driver had spun his wheels in the driveway.

The parties stipulated to the chain of custody for the victim's body, the blood drawn from the victim, his x-rays, clothing, wallet, pocket knife, change, and boots, the shotgun shell, waddings, and pellets, the metal fragments, and the crime scene. The parties agreed that the chain of custody was unbroken, that the witnesses did not have to be called to establish the chain of custody, and that the identity and integrity of the evidence was established.

Anderson County Sheriff's Deputy Colo Homer "C.H." Bean, Jr., a former Norris Police Department sergeant, testified that on July 21, 2005, he was called at about 5:45 a.m. for a homicide at 88 West Norris Road. He said that when he arrived at the scene about 7:00 a.m., several officers were present and that a sheet was across the porch to hide the scene from the public. He said that shortly after arriving, the chief of police told him to help the TBI process the scene.

Deputy Bean testified that he did an initial walkthrough of the scene without touching anything and took notes and that Officer Whitson made a video recording of the scene. They located a spent cartridge and determined that the blood trail began on the gravel driveway a short distance from the cartridge and went across the driveway. In the grass, they found keys, a cell phone and charger, and a coffee cup one-half filled with coffee. He stated that "quite a bit of blood" was on the rock walkway and that blood was on a plant to the side of the walkway. Shotgun wadding with blood on it was found five feet from his "primary reference point," and more wadding was found "some distance back" along the flower bed. He said that a double-aught buckshot pellet was recovered near the bottom of the front door. He said wadding was a plastic housing that held the nine pellets of double-aught buckshot in a

-10-

shotgun shell and that the plastic front and back fell off after the shell was out of the gun, allowing the shot to spread as it traveled. He said the plastic parts were the "carrying agent" that held the pellets together as they traveled through the gun barrel. He said some buckshot cartridges contained more than nine pellets.

Deputy Bean testified that he photographed the scene and that he and Officer Whitson collected the evidence. He said he used the yellow tags in the photographs to identify where the evidence was found, took triangulation measurements, recorded the measurements, and used them to diagram the scene. He said that to determine triangulation measurements, he chose a "primary reference point" and a "secondary reference point" and that the third point in the triangle was the location of the evidence. He said he tried to make the primary and secondary reference points stationary and non-changing in order to allow re-measurement in the future if needed. He said the diagram he prepared depicted the victim's home with the driveway and walkway shown and the location where various evidence was found. He said that a legend on the diagram showed what evidence was found at the yellow tags and that the measurements were shown. The diagram was received as an exhibit.

Deputy Bean testified that three vehicles were in the driveway: a red Chrysler Town & Country van, a white Hyundai Elantra, and a blue Toyota 4-Runner. Deputy Bean identified photographs of the evidence he found at the scene. He identified the twelve-gauge double-aught buckshot shell casing and the pellet found by the door. He said that the writing on the shell casing read, "Federal premium double aught buck three-inch Magnum" and that this type of casing contained nine pellets. He identified the pellet found at the bottom of the door and said it was not round. He also identified part of the shotgun wadding found at the bottom of the steps.

On cross-examination, Deputy Bean testified that he qualified with a twelve-gauge pump shotgun yearly for the police force and that he was only familiar with them from shooting them. He said that the distance an empty shell casing traveled after being ejected from a pump shotgun depended on the mechanism inside the shotgun that ejected the casing. He said that he had no way of knowing how far the shell casing traveled when it was ejected from a shotgun and that he sometimes noticed the casings going five feet or further. He said that the range on which the officers qualified with the shotguns had about seven lanes and that the officers were about eight feet apart. He did not remember if the empty shell casing hit an officer in the lane next to him because he was concerned with shooting the gun, not watching the shell casing eject.

Deputy Bean testified that the pellet he found between the storm door and the front door was not round and that it left a mark where it hit the front door. He did not know the distance from which the pellet was shot. He said that the type of shotgun shell found at the

crime scene held nine pellets, that he did not account for eighteen pellets when processing the scene, and that he did not remember how many were found. He said that if two rounds were shot, eighteen pellets should have been at the scene. He said that when he was processing the scene, the blood was in different consistencies depending on the size of the sample and that he sent samples of the rocks with blood on them to the laboratory. Deputy Bean's report, which included measurements from the diagram, was received as an exhibit.

Referring to the diagram, Deputy Bean testified that in his opinion, the shot that produced the wadding in the corner of the grass near the flower bed and corner of the house was fired from somewhere between the middle of the driveway and the beginning of the walkway. He believed the shot that produced the wadding on the steps was fired from the far side of the driveway. He believed the victim was shot in the driveway near his Toyota 4-Runner. He said the wadding on the steps traveled significantly further than the other wadding because it was on the victim's body when he walked up the walkway and it dropped when he arrived at the steps. He had not read the laboratory reports or seen a report indicating the wadding could have traveled on the victim's body.

On redirect examination, Deputy Bean testified that he had never received any formal training in the ballistic characteristics of shotguns or shotgun waddings and that he had no experience in identifying the point from which a shotgun was fired. He agreed that his opinion of the location from which the shot was fired was based on the location of the wadding. He said that two parts of shotgun wadding were found at the scene, that the two were similar, and that both were shot shell cups. He said that both cups were sent to the laboratory for analysis. He stated that the officers determined if the items collected were evidence and that the items were placed in bags and signed by Officer Whitson. He said Officer Whitson removed leaves and flowers from plants, collected rocks, took swabs of blood, and submitted the evidence for testing. He said he could not determine the location from which a shot was fired based on the location of a shot shell cup. He said that if the cup struck an object, it could travel in different directions and that the direction of travel varied depending on whether the object struck was solid, round, flat, or moving.

Norris Police Investigator Gary Wood testified that he was the custodian of incident reports, offense reports, and other paperwork generated by officers. He said he was familiar with the Defendant through his duties as a police officer and identified him in the courtroom. He said he had responded to complaints and incidents involving the Defendant and had telephone conversations with the Defendant concerning the Defendant's child custody issues. He said he had seen the Defendant and the Defendant's former wife, Nicole "Niki" Buss, exchange custody of their child at the Norris Police Department.

Investigator Wood identified a record that showed calls to which the Norris Police Department responded beginning on March 19, 2005. He said that according to computer records, the Norris police also had contact with the Defendant before March 19. He said two calls concerning the Defendant occurred on March 19. He stated that the first call was from a Campbell County police officer requesting a welfare check on a child who lived at 88 West Norris Road, that the Campbell County officer said the Defendant requested the check, and that the responding officer found the windows of the home and the Toyota 4-Runner were broken. He said that the owners were not home but that they called later to report the vandalism. He said that as the department's investigator, he responded when the vandalism was reported and did the welfare check on the child at that time. He said that the child was in the backyard playing, wore well-kept, clean clothing, and acted happy and that when the child entered the house, she went around the victim and his wife and acted as if nothing was wrong. He said that the broken glass did not appear to be a random act of vandalism and that someone broke the glass intentionally using landscape rocks. He said he was not aware of any other reported vandalism on West Norris Road or in Norris on the day this complaint was received.

On cross-examination, Investigator Wood testified that he did not bring to court the records of the contact with the Defendant before March 19, 2005. He said that he was at the police station on a Friday night where the Defendant and Ms. Buss exchanged their child and that it appeared to him that the Defendant was picking up the child from her mother. He said that before testifying, he reviewed records of the calls before March 19, 2005. He said that one call occurred in 2001, three calls in 2002, and several in 2003 but that his count may not have included all the calls because he began working with the Norris Police Department at the end of 2003 and did not know when the record keeping changed or how it had been kept. He said he did not remember if he found any calls in 2004 or before March 2005. He said his record search did not include any reports made by Ms. Buss or the Defendant at the police station. He said he had not arrested Ms. Buss or the Defendant before July 2005 but found records of the victim's being arrested in 2002.

Investigator Wood testified that he investigated the March 2005 vandalism by canvassing the closest neighbors but never received any information. He said Officer Foust responded to the call from the Campbell County Officer and found the vandalism. He said that at that time, he was the "main detective" for Norris. He said that rocks found inside the house and the Toyota 4-Runner were retrieved as evidence but that the rough surfaces would not allow fingerprint analysis or other testing. He said the records showed that Officer Foust attempted to contact residents inside the house but that no one was there. He said Officer Foust did not locate the child for whom the welfare check was requested.

On redirect examination, Investigator Wood testified that in his conversations with the Defendant, the Defendant used a normal tone of voice in the beginning but became more agitated as he talked. On recross-examination, he said he did not remember the date of the conversation to which he referred but knew it was a telephone conversation. He stated that one of his telephone conversations with the Defendant occurred after March 19, 2005, but that he did not have a log or record of the call.

Officer Foust was recalled by the State and testified that he had seen the Defendant exchange custody of his child about six times at the police station. He identified the Defendant in the courtroom. He said he had brief conversations with the Defendant between March and September 2003. He said he had two or three conversations with the Defendant in which the Defendant complained about custody and visitation issues with his child and recalled the Defendant's coming into the police station to complain about his former wife's being late for the exchange.

Officer Foust testified that he remembered being dispatched to perform a welfare check at 88 West Norris Road but did not remember the date. He said that when he responded, no one was home and that he noticed vandalism to the house and a Toyota truck in the driveway. He said that the front window of the house was broken, that the window of the Toyota truck was smashed, and that a rock was lying on the seat of the truck. He did not go inside the house to examine the damage because it was locked, and he did not collect evidence. He was not aware of any other reported vandalism on West Norris Road or in Norris on the day the complaint was received.

Officer Foust testified that he spoke with the Defendant in mid-June 2005 in the Norris Police Station and that the Defendant was upset about child custody. He said that the Defendant was frustrated the Norris police would not do anything for him and that the police explained to him that child custody was a civil matter. He said the Defendant became "belligerent and upset" and told them he would go the sheriff's department for help.

On cross-examination, Officer Foust testified that he did not speak with an officer from Campbell County about the requested welfare check because he was on patrol but that a dispatcher relayed that a Campbell County officer had requested a welfare check for 88 West Norris Road. He said he performed welfare checks frequently. He said he knew who lived at 88 West Norris Road and did not attempt to call them. He said he did not know where the child spent the day and did not drive to look for her. He said that the dispatcher called the house and that he walked around it, looked in the windows, and ensured no one was injured inside and unable to answer the door.

Officer Foust testified that the six custody exchanges he witnessed at the police station occurred between 5:30 and 7:00 p.m. He said that both parents complained about the child's car seat not being installed properly, that the police gave them a pamphlet on proper installation, and that he ensured the car seat was belted to the seat. He said both parents also made multiple complaints about the other parent being late. He thought the exchanges and complaints occurred in the middle of 2004 and 2005. He said he did not write reports about his interaction with the parents or his observations because it was a civil matter. He said all the disputes he heard between the parents concerned visitation and custody but most were about the other party being late to the exchange.

Nicole Marie Buss testified that she had been married to the Defendant, whom she met at work. She thought they dated a couple of months and said they married on March 10, 2000, and lived together for about six weeks after their marriage. She said they lived about four weeks in Rockwood, Tennessee, and about two weeks in LaFollette, Tennessee. She became pregnant during the marriage.

Ms. Buss testified that the Defendant acted like a different person after they married and that he was "very angry, violent." She stated that about two weeks after they married, he became upset because she did something wrong on the computer and that he hit the keyboard, kicked the chair, took a couple of beers, and left. She said that after a second incident, she moved out of the marital home into a motel and did not return. She said that she lived with the victim and his wife, who were her aunt and uncle, before marrying the Defendant and that she returned to their home at 88 West Norris Road when she left the Defendant.

Ms. Buss testified that her child with the Defendant, M.F., was born on November 27, 2000. She said that she divorced the Defendant and received primary custody of the child. She said the Defendant had visitation every other weekend, alternating holidays, every other Thanksgiving, and four days before or after Christmas. She said the parenting plan was decided after a trial in Campbell County. She said that the trial did not end all their disputes and that the Defendant filed motions for changes in the parenting plan and custody from the time of the divorce until the time of the trial in this case.

Ms. Buss testified that she moved back to the victim's home in April 2000 and that she lived with her older daughter from a previous marriage, M.F., the victim, and his wife. She said she had difficulty with the Defendant regarding visitation from April 2000 until early 2005. She said the Defendant video recorded almost every visitation exchange. She said that during one exchange, she told M.F. she would see her on Sunday and that the Defendant told her she would not see M.F. on Sunday because he was not returning the child. She said she contacted the police on two occasions when the Defendant did not return M.F.

-15-

She said she was contacted by the police when the Defendant filed complaints about her not allowing him visitation after the Defendant changed the weekends on which the exchanges were scheduled.

Ms. Buss testified that she and the Defendant exchanged the child at the police department and the Anderson County Detention Facility because the Defendant and the victim had an altercation at the victim's house after the Defendant would not return M.F. because he claimed the victim and his wife were not related to the child. She said the exchange location was changed from the Norris Police Department to the Anderson County Detention Facility because the detention facility was closer to the Defendant and the Defendant did not believe the Norris police were treating him properly.

Ms. Buss testified that her mother lived in Ohio and was diagnosed with lung cancer in 2004 but entered remission. She said that her mother was diagnosed again in March or April 2005 and that she saw her mother every three or four months before March or April 2005. She said that she was with her mother in Ohio in 2004 when her mother received chemotherapy and radiation and that she returned to Tennessee every two weeks to allow the Defendant his visitation. She said that in May 2005, her mother decided not to undergo further treatment. She said she sent the Defendant certified letters each time she left informing him where she was going and when she would return. She said that the Defendant saw M.F. on Father's Day and that the next scheduled visitation was on July 1, 2005, the day her mother died. She said that her being with her mother at the end of her life and in Ohio following her mother's death caused the Defendant to miss two weekends of visitation. She said the Defendant did not receive visitation between July 17, 2005, the day she returned to the victim's house, and the day of the victim's death. She said that the Defendant regularly called M.F. once or twice a week and that the calls continued when she was in Ohio. She said that the Defendant missed his regular call on July 19, 2005, which was unusual, and that she "had a gut feeling that something was wrong."

Ms. Buss testified that she never heard the Defendant threaten to kill anyone. She said she was driving back from Ohio when the Defendant and the victim had the altercation and did not see it. She said that she was in California visiting her sister in March 2005 when the windows of the victim's house and truck were broken and that M.F. stayed with the victim and his wife when she went to California. She said the Defendant missed one visitation around the time of the vandalism. She said the visitation schedule was the same in 2005 as she described earlier.

Ms. Buss testified that on July 21, 2005, she awoke between 5:15 and 5:30 a.m. to the victim's wife's running through the house and screaming, "He shot him. Oh, my God, he shot him." She said that she did not hear gunshots, a man scream, a car leave, tires squeal,

or any unusual sound and that she did not see anything outside the home before the victim's wife woke her. She said she went with the victim's wife to the living room and saw the victim lying through the storm door where he had fallen with glass shattered around him. She said that the victim's wife had already called 9-1-1 and that she tried to shield her children from seeing the victim. She said her older daughter asked, "Is that my papa? What's wrong with my papa? Is my papa dead?" She said M.F. asked, "Did my daddy shoot my papa?"

Ms. Buss testified that the victim worked at Ultratech Extrusions in Lake City, that he usually left for work between 5:00 and 5:30 a.m., and that he returned home between 3:00 and 3:30 p.m. She said she never knew the Defendant to exercise or take morning walks. She said that the Defendant owned a "silvery smoky blue" Buick and a dark blue Kia Spectra and that M.F. told her the Defendant had a red truck. She said the Defendant primarily drove the blue Kia Spectra in the summer of 2005.

On cross-examination, Ms. Buss testified that she last lived with the Defendant in April 2002 and did not know whether he took walks two years later. She said that the Defendant did not own the Kia when they lived together and that she never drove or looked inside the Kia. She remembered looking into the Defendant's car to see if the Defendant had a proper car seat for M.F. but believed she looked in the Buick.

Ms. Buss testified that she video recorded some of the visitation exchanges. She said she regularly sent letters to the Defendant informing him that she would be out of Tennessee, where she was going, when she was leaving, and when she was returning. She said that other than returning to Tennessee to exchange custody of M.F., she was in Ohio with her mother continuously from May 2005 to July 17, 2005. She said the Defendant was scheduled to have visitation on July 22, 2005, the day after the victim's death.

Regarding the day of the crime, Ms. Buss testified that she looked at the clock when she awoke and heard the victim's wife screaming and that it was 5:15 a.m. She said she spoke to the deputies after they arrived but did not remember telling them the Defendant had been there earlier that morning arguing with her about custody, though it was in a deputy's report. She said she had not read the deputy's report in preparation for her testimony.

Regarding her March 2005 trip to California, Ms. Buss testified that her trip overlapped the Defendant's visitation but that they had made arrangements for him to have extra time with M.F. when Ms. Buss returned. She thought she sent a letter to the Defendant about her leaving the state but said she may have called him. She believed the final outcome of the divorce was joint custody. She did not hear the family's dog barking on July 21, 2005, but said the dog slept on the opposite end of the house from her room.

Trooper Carr was recalled by the State and testified that he was familiar with the Defendant and identified him in court. He said that about one week before the shooting, the Defendant wanted to file a complaint against his former wife for custodial interference and that he was the officer who received the Defendant's complaint. He said the Defendant told him that his former wife was supposed to meet him for the visitation exchange at the Anderson County Detention Facility but that she had taken the child out of the state. He referred the Defendant to the Clinton Police Department because he believed the detention facility was inside the city limits. He said that when the Defendant returned from the police department with information that the detention facility was outside the city limits, he told the Defendant the police would not get involved because it was a civil matter. He said the Defendant did not like the response and became "very agitated, very irate." The Defendant told him that he knew the law and wanted his former wife arrested. Trooper Carr told the Defendant that it was a civil matter and that nothing would be done by the police. He said the Defendant demanded something be done, told Trooper Carr that he did not want to talk to a "street level cop," and asked to speak with the supervisor, Sergeant Therman Baird. He said that he told the Defendant to leave the sheriff's office and that the Defendant stated he did not want to talk to anyone else and "would take care of it himself."

On cross-examination, Trooper Carr testified that the Defendant told him that his child had been taken out of the state in violation of a court order. He said he did not know the necessary elements for custodial interference and did not research the statute. He agreed that he told the Defendant the issue was not one for the sheriff's department, that he referred him to the Clinton Police Department across the street, and that the Defendant returned after a few minutes. He said that he told the Defendant the supervisor would handle the issue, that he was talking with another citizen when Sergeant Baird arrived, and that he did not remember if he saw Sergeant Baird talking to the Defendant. He said he did not know what the Defendant meant when he said he would "take care of it himself." He said he did not send the Defendant to the district attorney's office to determine if the issue was a crime. He said he was at the crime scene on July 21, 2005, and was told the Defendant had been there at 4:00 a.m. that day arguing with his former wife.

Anderson County Sheriff's Department Sergeant Therman Baird testified that he was Trooper Carr's supervisor in July 2005. He said that on July 14, 2005, he was called by dispatch to come to the patrol office and meet the Defendant. He said the Defendant wanted to file a warrant against his former wife for custodial interference because she had taken their daughter to Ohio. He said he reviewed the Defendant's divorce paperwork and found that the mother had primary custody and that nothing prohibited her from taking the child out of the state. He told the Defendant that a criminal act had not taken place, but the Defendant demanded he issue a warrant. He said he discussed the issue with the Defendant for about fifty minutes, advised him to go to the district attorney's office to ask if they recommended

a warrant be filed, and told him that if they recommended a warrant be filed, he would be glad to help him.

Sergeant Baird testified that the Defendant left the sheriff's office and that about fifteen minutes later, he saw the Defendant in the district attorney's office talking with Assistant District Attorney Jan Hicks. He said the Defendant smacked his hand on General Hicks's desk and stated that he wanted something done then. He said that the Defendant and General Hicks had a brief conversation and that the Defendant left.

On cross-examination, Sergeant Baird testified that his meeting with the Defendant occurred on July 14, 2005. Referring to the complaint card, he said that he had not heard of Rockwood Street in Clinton, the address listed on the complaint card. He said that fifty minutes was long enough to discuss the Defendant's issue, that the Defendant was not absorbing the information Sergeant Baird gave him, and that the conversation was not hostile but was demanding. He said that he did not remember the Defendant's cursing or "hollering" but that the Defendant was loud. He said that the Defendant insisted on having a warrant issued and that he sent the Defendant to the district attorney's office. He said he went to the district attorney's office for another reason the same day and saw the Defendant talking to General Hicks but did not recall hearing what General Hicks told the Defendant. He said that the Defendant left before him and that the Defendant "sort of stormed out of the office upset."

The prosecutor read a State Warrant Affidavit of Complaint against the victim to the jury and entered it as an exhibit. The affiant stated that when he arrived at the Defendant's former wife's house on September 8, 2002, the Defendant was holding a baby and complained of pain from an assault by the victim. The officer called Anderson County EMS. He said that the Defendant was exchanging visitation of the child. The victim was arrested for assaulting the Defendant. The case was bound over to a Grand Jury on September 30, 2002, but no indictment was returned.

The prosecutor also read a civil complaint against the victim and the victim's wife filed by the Defendant on November 19, 2002. It alleged that on September 8, 2002, when the Defendant arrived at the victim's house to exchange visitation, he waited in the driveway for his former wife but that the victim came out of the house "with an angry countenance" and assaulted the Defendant, who was holding the child. The Complaint alleged that the Defendant did not fight back, that he attempted to shield himself and his daughter from the attack, that his former wife was there and did not intervene, and that he suffered compensatory and punitive damages. The prosecutor read the victim's Answer to the Complaint filed on December 19, 2002. In it, the victim denied the Defendant's allegations and alleged the comparative fault of the Defendant. The prosecutor read the Order of

Nonsuit filed on December 23, 2004. Counsel for the Defendant filed as an exhibit a letter from the Defendant's attorney in the civil case that was sent to the Anderson County Circuit Court Clerk instructing him to present the Order of Nonsuit to the court for entry. The death certificate was received as an exhibit, which showed that the victim died on July 21, 2005, and that the death was a homicide.

Tammy Coleman testified that she lived in Rockwood and had known the Defendant all her life and that they had been close friends for fifteen to twenty years. She said that the Defendant lived in an apartment at her house but that because they could not communicate at the time of the trial, he was staying with Elizabeth Singley. She said that they spoke on the phone, that she allowed him to borrow her car, and that he drove her to doctor appointments. She said she was with the Defendant when he purchased his blue Kia and knew he sometimes parked it at Victorian Square Assisted Living Facility in Rockwood to enable him to move his second car, an older Buick, out of the carport for M.F. to play.

On cross-examination, Ms. Coleman testified that she drove the Defendant's Kia a couple of times. She did not remember if the gears were difficult to shift because it had not been driven for about three years after it was damaged when it was towed. She said that the Kia was at Ms. Singley's house at the time of the trial and that the Defendant was driving the older Buick. She said that the Buick leaked water, that the Defendant had to refill the water in the Buick to drive thirty minutes to her house, and that it did not have one of the passenger-side windows. She said that the apartment the Defendant used at her house had electricity and cable but no water and that the Defendant came to her house for water, to talk, and to use the computer. She said she considered the Defendant one of her best friends. She said that the Defendant exercised by playing tennis and walking and that he took M.F. to catch bugs when she visited. She said that he walked two or three times per week and that the timing of his walks depended on the weather. She said that he walked early in the morning in July 2005 because it was hot.

John "Duke" Fleming testified that in March 2005, he began supervising the crystal laboratory at AMT Ametek where the Defendant worked. He said he had talked with the Defendant about the Defendant's personal problems and had seen a police report about the victim's assaulting the Defendant. He did not know where the victim lived. He said that the Defendant told him about the argument during which the victim struck the Defendant when he was holding M.F. and broke the Defendant's finger.

Mr. Fleming testified that the Defendant was upset when he told him about his custody dispute and his former wife's taking M.F. out of the state without the court's permission, which the Defendant thought was kidnapping. He said that on July 15, 2005, the Defendant went to Clinton to meet someone about his concerns but was "very unhappy" with

the meetings because he was sent several places. He said the Defendant was "extremely upset" when he returned. He said that a few months before the victim was killed, the Defendant told him he bought a shotgun at Walmart. He said that the Defendant told him he watched the victim's house overnight once and that he encouraged the Defendant not to do it again. He did not know if the Defendant waited on the victim to go to work the morning after he watched the house and said the Defendant did not speak to the victim that night because the victim did not come out of the house. He said that during the time the Defendant was having these issues, the Defendant frequently appeared unshaven and wore the same clothes to work for a few days. He said the Defendant spoke about concerns for M.F. "very frequently," about three days per week. He said he felt the need to deter the Defendant from violence a few times between March and July 2005. He said that with the contentious situation, he thought that the Defendant's being near the victim might result in violence and that he encouraged the Defendant to research other alternatives.

Mr. Fleming testified that on July 18, 2005, the Defendant was calm when he came to work. He said that typically, the Defendant was animated in discussing his problems but that on July 18, the Defendant was "very calm," which seemed unusual. He said that he had read studies about how people who contemplated suicide were often "tortured in their minds" until they made the decision to end their lives and that the Defendant's calmness made him feel like the Defendant had reached a decision. He did not remember the Defendant's exact words but said the Defendant stated that the solution might be to "just take them all out or to kill them or something, that killing all of them would resolve the situation." He stated the Defendant did not name who he wanted to kill. He was not positive the Defendant said "kill" but thought he may have said "take them all out" or "get rid of them all." He said that the Defendant was angry with his former wife and the victim and that he did not know anyone else with whom the Defendant was angry. He said that after the Defendant made the statement about killing them all, he thought the situation was beyond his control as a supervisor. He talked to a friend at work about his concern for the Defendant and called a friend in Salt Lake City to find someone to talk to the Defendant.

Mr. Fleming, who was a National Rifle Association Instructor in rifles and pistols, testified that before the July 18 conversation, the Defendant asked him about a revolver the Defendant owned. He said that Bill Diggs, another employee of Ametek, reported that the Defendant showed him a revolver at work and placed the gun in Mr. Diggs's hand. He said that after Mr. Diggs saw on television that the Defendant was being questioned, Mr. Diggs reported that the Defendant had brought a gun to work. He said that as a supervisor, he felt he had a duty to report the information, that he reported it to his superiors, and that they reported it to human resources.

Mr. Fleming testified that he saw the Defendant in the early morning hours of July 21, 2005, when he came to work and that the Defendant was "pretty normal." He said the Defendant was not unusually animated, sullen, or quiet. He said that the Defendant's shift was generally from 3:00 to 11:00 p.m. and that the Defendant came at 2:00 p.m. He said that the Defendant's shift changed depending on the day's requirements and that the Defendant was not required to arrive at an exact time. He said that as the supervisor, he was only there between 3:30 and 4:30 p.m. when the Defendant worked. He said he did not recall what the Defendant wore.

On cross-examination, Mr. Fleming testified that he became the Defendant's supervisor in March 2005. He said they were friends before March 2005 but did not remember their confiding in each other before then. Mr. Fleming testified that the Defendant began confiding in him about his domestic issues shortly after he became the Defendant's supervisor and that the discussions were typically informal and in the hallway. He said the Defendant's job was not a dirty job, that his clothes would not get dirty, and that the clothes he wore a few days in a row were not dirty. He said that the Defendant was unshaven frequently but that no company policy about shaving existed. He said that he did not know the date the Defendant asked him about the revolver and that the conversation was casual. He said the Defendant brought the gun to show Mr. Diggs in July about two weeks before it was reported.

Mr. Fleming testified that he did not know the Defendant's termination date and did not know if the Defendant filed for or received unemployment benefits. He said the Defendant worked on July 20 and 21 but did not remember what time the Defendant arrived or left on July 20. He said that in 2005, Ametek employees did not create written time records. He thought the Defendant was intelligent and meticulous.

William Diggs testified that he and the Defendant worked together at Ametek from January to July 2005. He said that although they did not socialize outside work, the Defendant told him about a pistol and leather holster he found in a ditch while walking in Rockwood and brought the pistol to work. He said the Defendant took Mr. Diggs's hand and said, "[T]ake a look at this." He said the middle of his hand touched the pistol. He said that weapons were not allowed at work and that he told the Defendant not to bring the gun back. He denied that he reported the incident to his supervisor and said the Defendant was a new employee and might not have known the company firearms policy. He did not know what kind of pistol it was but said it was large.

Mr. Diggs testified that before the Defendant brought the pistol to work, the Defendant told him that he had recently bought a shotgun and that he was going to follow the victim to work and kill him. He did not recall if the Defendant referred to the victim by

-22-

name but understood the Defendant was referring to the Defendant's former wife's boyfriend. He said he "never really established the relationship." He said that the Defendant appeared aggravated and frustrated and that the Defendant said he was going to follow the victim to work the next morning and kill him in the parking lot. He said that the Defendant and the victim were "hot at each other," that they fought multiple times, and that the police were called at least once. He said the Defendant mentioned taking his child to the victim's home in Norris. He said the Defendant told him the victim walked onto the porch at 5:00 every morning.

On cross-examination, Mr. Diggs testified that the Defendant did his job well and that the job required attention to detail. After reading his statement to the TBI, he agreed it did not mention any fights between the Defendant and the victim.

On redirect examination, Mr. Diggs testified that the day the media reported the victim's killing, he told the human resources department that the Defendant brought the pistol to work. He recalled touching the gun and thought his fingerprints might have been on it. He did not recall if the TBI agent who interviewed him asked about the Defendant and the victim's fighting. He said he dismissed the Defendant's statement that he was going to kill the victim because the Defendant had been talking about the victim, his divorce, and his child for weeks.

On recross-examination, Mr. Diggs testified that the morning after the Defendant said he was going to follow the victim to work and kill him, the Defendant told him the victim "never came out." He denied the Defendant said he was going to wait for the victim the following night. He agreed his TBI statement showed that these events occurred sometime in April 2005.

Jon Kidder testified that he was the Vice President and General Manager of Ametek and that the Defendant worked there for a few years. He said that on July 21, 2005, he learned the Defendant was questioned by the TBI and arrested for murder. He said the Defendant came to work that afternoon. He said that he and the human resource manager spoke with the Defendant and that the Defendant seemed detached.

Mr. Kidder testified that the Defendant admitted being questioned by the police but denied being arrested. He learned that day that the Defendant brought a gun to work a couple of weeks earlier, which was against company policy. He said that he confronted the Defendant about the allegation and that the Defendant denied it. The Defendant told him that he was careful when he had a gun in his car and that he parked his car in the adjacent parking lot to avoid violating company policy. He said that based on the seriousness of the

allegation, he suspended the Defendant pending an investigation and that the Defendant was terminated the next week for bringing a firearm on company property.

On cross-examination, Mr. Kidder testified that the Defendant's job required someone of reasonable intelligence and about six months of training. He agreed that he spoke to the TBI agent who interviewed the Defendant and that the Defendant was truthful when he said he was not arrested. He denied knowing Ametek opposed the Defendant's application for unemployment benefits.

On redirect examination, Mr. Kidder stated that although the Defendant claimed to have taken a walk at 5:00 the morning the Defendant was questioned by the TBI, he did not know if the Defendant took the walk. On recross-examination, he said his interaction with the Defendant was limited to two previous occasions.

Kingston Police Officer Thomas Melton testified that he knew the Defendant from investigating child custody and visitation problems when he worked for the Rockwood Police Department. He said that on July 5, 2004, he responded to a "custody battle" between the Defendant and his former wife at the Defendant's home. He said that the Defendant and his former wife had child custody papers but that they were not signed by a judge. He said the Defendant told him about the ongoing custody problems. He said he noticed the Defendant had a video camera on the front porch and was recording the confrontation. When he asked the Defendant about the camera, the Defendant said he recorded his visitations with his daughter.

Officer Melton testified that around June 11, 2005, the Defendant called the police station to ask a child custody question, although he did not recall the subject of the question. He said the Defendant told him that his former wife had custody of their daughter, that she lived with the victim, and that the victim looked at the Defendant with a "s--- eating grin" when the Defendant returned his daughter to the victim's house. He said the Defendant angrily stated, "[B]efore [it is] over with I'm going to have to kill that son of a b----." He advised the Defendant to call the police if any additional issues arose. He said he never saw the Defendant walking in Rockwood.

On cross-examination, Officer Melton testified that he never saw the Defendant at the grocery store or city hall. He agreed his TBI statement did not show his telling the investigators that the Defendant threatened to kill the victim. He agreed the statement showed that on June 11, 2005, the Defendant said he might have to take matters into his own hands.

Rockwood Police Officer Kelly Pittman testified that on July 18, 2005, she received a call requesting her to meet the Defendant at the police station regarding a custody issue. The Defendant told her that his former wife took his daughter out of the state and was preventing him from seeing his daughter. The Defendant requested that she issue an arrest warrant for custodial interference, but she did not. She said the Defendant became upset because he believed no one was willing to help him. The Defendant told her that he was "fed up with getting the run around" and mentioned getting a shotgun that would hold magnum shells. He told her that if no one would help him, he would take care of the problem. She said the Defendant was upset and crying when he made these statements. She said she calmed the Defendant and explained that if he took matters into his own hands, he would probably never see his daughter again.

On cross-examination, Officer Pittman testified that although she told the Defendant that his legal problems were outside Rockwood's jurisdiction, she helped him contact the Roane County District Attorney's Office. She did not know if the Defendant already had the shotgun or was going to buy it. She agreed the Defendant said he thought and prayed about what to do and concluded that he would make matters worse if he "did something." She suggested the Defendant return to the police station to speak with another officer on July 21. On redirect examination, she said she had never seen the Defendant walking or exercising in the early morning hours.

Teresa Majors testified that she worked the night shift from 10:00 p.m. to 6:00 a.m. at Victorian Square Assisted Living Center in Rockwood. She said that when she left work the morning of July 21, 2005, she saw a man in jogging pants and a dark shirt walk casually through the parking lot and that they greeted each other. She did not see where he went and said she probably could not identify him. She said that she punched her time card at 6:23 that morning and that she probably saw him about one minute later. She said that she saw the man again about one week later and that he asked her if she was the woman who saw him in the parking lot on July 21 and if she recalled the time she left work that morning. She denied seeing the man again.

On cross-examination, Ms. Majors testified that she did not recall the man's wearing a hat or sweating when she saw him on July 21. She said that when she saw the man about one week later, she noticed he was bald but did not recall his age or if he had facial hair. She could not determine whether the man looked like the Defendant. She denied that the police talked to her. On redirect examination, she stated that during her conversation with the man one week after July 21, the man said, "[T]here is a guardian angel," when he approached her. She said he mentioned being accused of something and needed to know the time they saw each other in the parking lot on July 21.

-25-

Sandra Ellison testified that she and Ms. Majors worked the night shift together on July 21, 2005, and that they walked to the parking lot together after their shift. She said she saw a Caucasian man, whom she did not know, walking through the parking lot. She said that they spoke to the man and that the man said, "[G]ood morning." She said they got into their cars and left. She denied knowing from where the man came or where he went. She said she did not recognize the man because she did not pay attention.

Ms. Ellison testified that she attended high school with the Defendant, that she had seen him once since graduation, and that she recognized the Defendant when she saw him. She said it was possible that the man she saw walking through the parking lot was the Defendant. She denied seeing the man walk through the parking lot before July 21.

On cross-examination, Ms. Ellison testified that she reviewed her time card for July 21 the day before her testimony. She agreed her statement to the TBI stated that she finished her shift at 6:15 a.m. She said the man she saw walking through the parking lot looked old enough to be a resident at the nursing home, although she knew he was not.

James Davis testified that he lived in the Rockwood area and that he had a daily walking routine, although he did not exercise if it was raining. He said that he walked after arriving at work at Rockwood Electric Utility around 6:30 a.m. and that his route varied. He said the Defendant was an acquaintance.

Mr. Davis testified that during his routine walk on July 21, 2005, he saw the Defendant between 6:45 and 7:00 a.m. He said that the Defendant was walking, that they passed each other, and that they exchanged pleasantries. He said he saw the Defendant later that day when the police arrested the Defendant. He said that he had been walking five days per week for ten years and that he had not seen the Defendant walking before that day.

On cross-examination, Mr. Davis testified that he was not sure about the date he saw the Defendant during his morning walk, although he was certain of the time frame. He agreed he told the TBI that he saw the Defendant on July 25 around 6:30 a.m. He said he arrived at work around 6:30 a.m., began his walk without entering the building, walked for thirty minutes, and socialized with the other employees before his shift began at 7:30 a.m. He agreed that based on his walking route, he would not see the Defendant if the Defendant walked from the Defendant's house to the nursing home.

Charles Edwards testified that on July 21, 2005, he worked at the Rockwood Post Office and that the Defendant had rented a house he owned. He said that he usually arrived at the post office around 6:30 or 7:00 a.m. He said that on July 21, 2005, he saw the Defendant in the post office parking lot around 6:25 or 6:30 a.m. He said that he took a bag

of trash to the dumpster in the parking lot and that the Defendant walked from behind the dumpster. He said the Defendant rubbed his stomach and stated, "And they say this is good for you." He said the Defendant walked slowly and wore a lime green knit shirt and dark pants. He denied seeing the Defendant again that day and said he had never seen the Defendant walking before that morning.

On cross-examination, Mr. Edwards testified that he had seen one or two other people walking for exercise. He identified a photograph of the dumpster and said that people frequently came through a hole in the fence behind the dumpster. He said that he knew Mr. Davis but that he did not see Mr. Davis walking that morning. He agreed that July 21 was a Thursday and that the dumpster was emptied the following Tuesday. On redirect examination, he stated that ten apartments were located across the street from the house the Defendant rented and that the apartments had several parking spaces.

Rockwood Police Sergeant Steven Bryant testified that on July 21, 2005, he worked the night shift from 11:00 p.m. to 7:00 a.m. and that he received a be-on-the-lookout (BOLO) communication from Anderson County 9-1-1 dispatch asking Rockwood Police to look for a red Toyota truck that might have been involved in a homicide. He said that he was provided the Defendant's address and that he and other officers drove to the address. He said that the officers parked in an alley behind the property and that they could see the back of the house. He said they parked in the alley, rather than in front of the house, for their safety because a possible homicide had occurred. He thought three officers were in the alley. He said that when they were in the alley, he told them that "someone needed to watch the back door and secure that area and we would go around from the alley way to the front." He said that from the alley, he saw a light inside the house but did not see movement or a person. He said that he and Officer Capps went to the front door and rang the doorbell but that no one answered. He said that when he and Officer Capps were at the front door, other officers were "watching the back." He said he did not see a Kia at the house. When asked if he saw a car in the driveway or near the home, he said an older-model blue car was there. He said he had to go near the car in the carport to reach the porch but did not enter it or check whether it was warm.

Sergeant Bryant testified that when he and Officer Capps stood on the front porch of the Defendant's house, they saw the Defendant walking up the sidewalk. He denied seeing the Defendant walking before that morning. He said the Defendant was wearing jogging pants and a light-colored shirt with something red on the shirt. He said he saw the Defendant remove his watch when he approached the house. The Defendant told him that he was out for a walk. The Defendant denied owning a red Toyota truck and motioned toward the older-model blue car to indicate it was his.

On cross-examination, Sergeant Bryant testified that he could not recall the names of the two people who routinely walked in the mornings. He said one of them was an "RU worker." He said he received the BOLO between 5:00 and 6:00 that morning. He said that he only knocked on the Defendant's front door, that there were two additional doors to the home, and that he did not recall any officer knocking on the additional doors. He said that he did not touch the hood of the older-model car but that he had to go near it to reach the front porch.

Sergeant Bryant testified that Officer Capps took the Defendant's keys before the Defendant was placed in the police car. He said he told Officer Capps that the Defendant was only being detained, not arrested. He denied telling Officer Capps to handcuff the Defendant but said it was for his and the officers' safety. He did not recall the Defendant's name being included in the dispatch call. He did not obtain the Defendant's shirt for analysis or test the Defendant's hands for gunshot residue.

Michael Capps testified that on July 21, 2005, he worked for the Roane County Sheriff's Department and that he knew the Defendant, who had worked at Radio Shack in Harriman. He said his officers received a BOLO from Anderson County to look for a red truck. He said that Anderson County said a shooting suspect lived in Rockwood and that he was told to attempt to find the Defendant. He said he and three or four other officers went to the Defendant's house. He said he was told to be on the lookout for a red truck and a car but did not recall the description of the car.

Mr. Capps testified that he parked in the alley behind the Defendant's house and walked along a sidewalk and a road to the front. He thought Sergeant Bryant parked in the alley and walked with him to the front. He said that he and other officers walked onto the Defendant's porch, identified themselves as police officers, and knocked on the door. He said nobody answered. He recalled a car parked in the driveway, although he did not think it was included in the BOLO. He said that on the rear driver's side floorboard, he saw about ten shotgun shells in an open box of twelve-gauge ammunition. He did not state where he was when he saw the ammunition inside the car, and although he did not state whether he initially saw it during his first trip to the property or later, his testimony about it was during his testimony about the knock and talk during the first trip. He did not recall if he saw a Kia Spectra at the Defendant's house that morning.

Mr. Capps testified that as they were leaving, he saw the Defendant walking toward the house and recalled his wearing black jogging pants. He said the Defendant's t-shirt was wet from perspiration. He said he placed the Defendant in handcuffs and took him to the Roane County Sheriff's Department. He denied questioning the Defendant and said the Defendant did not ask why he was being detained. The Defendant told him that he would

not answer many questions but that his answers would be truthful. He said that when he transported the Defendant to the police station, the police radio inside his cruiser was on and that other officers discussed a red truck. He said the Defendant "chuckled" after he heard the officers talking about the truck.

On cross-examination, Mr. Capps testified that he did not recall the type of car in the Defendant's driveway or if the engine was warm. He thought he would have made a note if the engine had been warm. When asked if he "walked all around" the car, he said, "Yes." He was not asked when he walked around the car.

Mr. Capps testified that he was on patrol when he received the BOLO. He said he arrived at the Defendant's house before 7:00 a.m. He said that he told Sergeant Bryant to go to the Defendant's house to determine if he was there and that he drove to the Defendant's house and parked in the nearby alley. He agreed he made no effort to hide his police car.

Mr. Capps testified that he saw the Defendant walking up the sidewalk as though he was out for a morning walk. He did not recall seeing a stain on the Defendant's shirt. He did not know the amount of time between the shooting and his seeing the Defendant. He did not use a gunshot residue kit. He said his sole responsibility was to detain the Defendant for questioning by the TBI and the Norris Police Department.

Mr. Capps testified that he thought he told Special Agent Callahan about the box of shotgun shells inside the car in the Defendant's driveway but that his statement to the TBI did not mention it. He said it was daylight when he saw the box. He thought he showed the box to Sergeant Bryant and knew he spoke with someone about it while they were at the Defendant's house. He said that he found keys in the Defendant's pants pocket and that the keys were given to the Norris Police Department. He said he did not find a wallet and did not recall finding any money. He said that he sat with the Defendant at the police station until someone arrived from the Norris Police Department, that they talked about the weather, that he got the Defendant a drink, and that he removed the handcuffs.

Rockwood Police Sergeant Jason Halliburton testified that on July 21, 2005, he received a BOLO for a red truck and that he was instructed to look for the truck at the Defendant's address. He did not see the truck there and notified his supervisor by radio. He said that he met his supervisor and another officer and that they decided to go to the Defendant's house and knock on the door. He said that they knocked at a side door, which he thought was underneath a carport, but that it was not shown in "the photograph." Previously, he had identified a photograph of the Defendant's house taken from the street, in which the front porch was visible but the carport was obscured. He said that although he could not recall who knocked on the door, no one answered. He said that they decided to

return to their cars and that as they were walking to their cars, they saw the Defendant on the sidewalk. He said the Defendant stated, "[B]oy, you all sure are out in force this morning." He said the Defendant was sweating profusely. He said that he commented on the Defendant's sweating and that the Defendant said Sergeant Halliburton would sweat, too, if he were overweight like the Defendant. He said that he wore his bulletproof vest that morning, that he was not sweating, and that the weather was cool.

Sergeant Halliburton testified that the Defendant was told he was wanted for questioning and that the Defendant only asked if there was a warrant for his arrest. He said that he was familiar with the people in Rockwood who walked for exercise between 5:00 and 7:00 a.m. and that he had never seen the Defendant walking during that time.

On cross-examination, Sergeant Halliburton testified that he had never seen the Defendant outside the Defendant's house and did not know how long the Defendant had lived there. He said he might have seen the Defendant at Radio Shack about ten to fifteen years previously. He did not recall when he received the BOLO for the red truck or when he arrived at the Defendant's house. He said that to his knowledge, he was the first officer to drive by the Defendant's house. He agreed that when he parked in the alley, he did not attempt to hide his police cruiser. He recalled a blue car in the driveway, although he could not recall the make and model. When asked if he did a "walk around" the house, he said, "No sir. Best I can remember, all I did was go to that side door where the carport was." When shown a photograph depicting the carport, two doors to the house in the carport, and part of the porch but not the door at the porch, he agreed he went to the "middle" door but did not remember if he knocked. He did not remember if Sergeant Bryant went to the door at the porch. He did not remember but said he "probably" walked around the blue car. He said that the Defendant was wearing blue jeans or something similar and that the Defendant's shirt was stained. He denied testing the Defendant or his clothing for the presence of gunshot residue. He said that he frisked the Defendant, that he found a set of keys in the Defendant's pants pocket, and that he returned the keys when he found them.

Susan Hall testified that in July 2005, she worked from 10:00 p.m. to 6:00 a.m. at Rocky Top Market in Rockwood. She said that a man came to the register and asked if she remembered seeing him on a specific day, although she did not recall the day. She told the man that unless he was a regular customer, she could not remember. She said the man asked her to think about it and attempted to convince her that she saw him. She stated that she told the man she did not remember him, that the man became angry and slammed his hands on the counter, and that he leaned toward her. She said she became nervous, backed away from the counter, and yelled for her supervisor. She said she suggested that the man return the next morning to speak with the store manager about viewing the video recordings. She

described the man as a Caucasian male, who was "kind of tall" with gray hair.  She did not recall his age and denied she would be able to identify the man if she saw him again.

Ms. Hall testified that the man told her that he was accused of "something very bad" and needed her cooperation.  She said that the man thought she had waited on him at the store but that it was possible Sherry Ward or "Michael" waited on him.

On cross-examination, Ms. Hall testified that to her knowledge, she was at the counter when the man approached her, not outside smoking a cigarette.  She agreed the man told her that she was outside smoking when he came to the store the first time, although she did not recall seeing the man.  After reviewing her TBI statement, she agreed she did not mention the man's slamming his hands on the counter.  On redirect examination, she stated that she talked to the TBI and that the agent wrote down her statement.  She said that the statement was correct, except that it excluded the man's slamming his hands on the counter.

Christina Miller testified that in July 2005, she worked as an assistant manager for Rocky Top Market in Rockwood.  She said she recalled a man's asking Ms. Hall whether Ms. Hall remembered seeing him on a particular day, although she did not recall the date.  She said Ms. Hall explained that she only remembered regular customers, and the man became upset and slammed his hands on the counter.  She said Ms. Hall told the man to speak with Ms. Miller or the store manager.  She denied she could identify the man.

On cross-examination, Ms. Miller testified that Ms. Hall smoked cigarettes.  She denied mentioning to the man there might be a recording if he was inside the store previously.  She did not recall if she mentioned the man to the store manager.  She agreed she might have told the TBI that the man grabbed Ms. Hall's arms.

Bobbie Pendleton testified that in July 2005, she worked at Victorian Square Assisted Living Center in Rockwood.  She said that when she arrived on July 28, 2005, she saw a man on the outside patio.  She asked the man what he needed, and he said he needed to talk to the woman standing inside.  She said the man told her Ms. Majors was his alibi for a murder.  She said Ms. Majors looked as though she did not want to come outside.  She told the man that he needed to leave and denied his request to use the telephone.  She told the man that he needed to speak with Executive Director Kipper Melmige.  She said that the man left and that she reported the incident to Mr. Melmige.  She did not recall seeing the man before that day and denied she could identify him if she saw him again.

On cross-examination, Ms. Pendleton testified that she did not recall the man's clothing and that she did not watch him leave.  She said she entered the building after asking

him to leave. She agreed she told the man that he might need to leave and return later to speak with Mr. Melmige.

Kipper Melmige testified that in July 2005, he was the executive director at Victorian Square Assisted Living in Rockwood and that he was familiar with all the residents and their vehicles. He said that on July 25, 2005, he saw a blue Buick LeSabre he did not recognize in the parking lot and determined it did not belong to anyone connected to Victorian Square. He said he called the Roane County Sheriff's Office to have the car removed and provided them the license plate number. He also provided the information to the TBI. He said he looked inside the car and saw a letter addressed to James M. Flinn, who was not a resident of the facility. He said Ms. Pendleton mentioned a man outside the facility.

On cross-examination, Mr. Melmige testified that he usually worked between 7:30 a.m. and 7:00 p.m six days per week. He agreed that he noticed the car in the parking lot on Monday, July 25, 2005, and that if it was there before July 25, he overlooked it. He said the car was backed into a parking space. He did not recall if the letter inside the car showed Mr. Flinn's address and denied telling the Rockwood Police Department about the letter, although he told the Roane County Sheriff's Department about it. He said he did not recognize Mr. Flinn's name.

Rockwood City Police Chief Billy Eugene Stinnett, Jr., testified that he went to the Defendant's house around 7:30 to 7:45 a.m. on July 21, 2005. He said that when he arrived, the Defendant had already been detained. He said his officers secured the home until the TBI could arrive. He saw a blue car in the carport, which he thought was a Buick. He did not note the license plate number but said he saw the Defendant driving the car several months before the killing. When asked if he "walk[ed] around the property personally," he said he did. He said another officer, who he thought was Officer Capps, stood at the side of the house by the carport and notified him that the officer saw a box of ammunition in the rear floorboard of the car. Chief Stinnett went to the officer's location and saw the box but did not recall if the box was open.

On cross-examination, Chief Stinnett testified that he was standing at the passenger-side window when he saw the ammunition. He recalled telling a TBI agent that the box was tan or bronze and green or blue. He agreed he did not mention the box containing red. He said the box was "more toward the center" of the floorboard and was unsure to which side it was closer. He said he looked through the window but denied examining the car's contents or opening the door. He identified a photograph of the car showing the door and window closed. He agreed the license plate was visible from the street, although he denied looking at it. When asked if he "walk[ed] around the house from the direction of the chain link fence in the back" and "walked right beside the carport," he said, "Yes." He said that when he

arrived at the Defendant's house, he asked what had happened and was told the officers had detained the Defendant until the TBI and Norris police arrived.

Chief Stinnett testified that he would expect Sergeant Bryant and Officer Halliburton to collect a stained shirt from a suspect. He said, though, that the officers were only there to detain the Defendant, not to investigate the victim's shooting. He said the officers never asked him about a gunshot residue test. On redirect examination, he said that he looked at the ammunition box for "a second" but did not recall whether it was open or closed. He said he notified Special Agent Corbitt about the box.

Earl Bruce Parker was deposed before the trial because of an illness, and the video recording of the deposition was played for the jury. Mr. Parker testified that he lived in Harriman, that he previously owned a Radio Shack in Harriman, and that he and the Defendant had been friends since 1983. He said the Defendant was a former employee at his Radio Shack and last worked for him in the late 1990s.

Mr. Parker testified that he knew the Defendant had a contentious relationship with the victim and that the Defendant told him during one of their last conversations around June 10 or 15, 2005, that the victim infuriated him. The Defendant told him that he purchased a gun and intended to kill the victim. He denied the Defendant told him that he bought ammunition, described the gun, or stated how he intended to kill the victim.

Mr. Parker testified that he heard about the victim's death on the morning news. He told the police that the Defendant did not have a red truck and that the Defendant purchased a gun. He was unsure if he told the police that the Defendant bought the gun at Walmart. He said he never knew the Defendant to hunt. He denied the Defendant's showing him the gun he purchased and said he never knew the Defendant to walk or have an exercise routine but thought the Defendant might have played tennis.

On cross-examination, Mr. Parker testified that when the Defendant told him about the gun, the Defendant was not upset or angry. He said that he and the Defendant did not discuss guns before that day and that he did not call the police to report the Defendant's statements about the victim. He said he knew the Defendant had calmed down, and he did not think the Defendant intended to kill the victim.

Mr. Parker testified that he saw the Defendant at the local rehabilitation center before the killing, that the Defendant's hand or finger was bandaged, and that the Defendant said the victim attacked him when the Defendant picked up his daughter. He said the Defendant complained that although he filed various complaints, the police did nothing. He said the Defendant did not threaten the victim with violence.

Mr. Parker testified that he saw the Defendant a couple months before his testimony but denied that he asked the Defendant about the gun the Defendant purchased. On redirect examination, he stated that the Defendant did not tell him where the gun was kept or what the Defendant did with it after the killing.

Kenneth Miget testified that he was the store manager at Walmart in Rockwood, that he was the custodian of records for the store, and that the police requested information about the Defendant's purchasing a firearm. He said his records showed that the Defendant bought a pump-action Maverick twelve-gauge shotgun on June 12, 2005. The gun was manufactured by Mosberg, and its serial number was MV49529K. A copy of the Bureau of Alcohol, Tobacco, and Firearms' transaction form was received as an exhibit. Mr. Miget identified a copy of the receipt, which showed the Defendant bought the shotgun, a machete, and twelve-gauge, double-aught shotgun shells. He identified a copy of Walmart's receipt and acquisition book, which showed that the Defendant bought the shotgun on June 12, 2005. He identified a copy of the Defendant's TBI background check receipt, which was dated June 12, 2005. He stated that the Defendant purchased twelve-gauge, double-aught pump Federal premium ammunition and that the shells were three-inch magnum size.

On cross-examination, Mr. Miget testified that the serial numbers were maintained by the gun manufacturers, who were required to maintain records regarding where a particular gun was shipped and when it was received by the recipient. He said that firearms shipped to Walmart were stored in a secured warehouse and that Walmart completed and maintained the proper documentation. He said that when a background check was complete, the TBI called the seller with the results. He agreed that with the proper documentation, the Defendant could have bought the shotgun in any Walmart store in Tennessee or the surrounding states.

Mr. Miget testified that the Defendant provided his driver's license during the sale but that a copy was not made. He said the fingerprints obtained during the sale were maintained by Walmart and were not sent to the TBI. He agreed Walmart sold Remington ammunition, which came in a yellow and green box. He did not know if any of the ammunition sold was in a red or blue box.

Ron Brown testified that he went to the Defendant's home around 9:00 p.m. on July 19, 2005. He said the Defendant showed him a long gun and a holstered handgun in the trunk of a car, which he thought was a Kia. He thought an inoperable, older car was also in the driveway. He said he did not see any ammunition and did not know if the guns were loaded.

On cross-examination, Mr. Brown testified that he was a mechanical designer and had worked with the Defendant. He said the Defendant's employment involved a detailed, proprietary process for growing crystals. He said that since 2003, he had not heard the Defendant talk about retaliating against anyone other than through the courts. He said he never heard the Defendant talk about physically harming anyone. He said he and the Defendant were "reasonably" close. He did not know whether the long gun was a shotgun or a rifle. He agreed that he went to a sporting goods store and asked to see a Mosberg 88 and that it did not look like the long gun in the Defendant's trunk.

On redirect examination, Mr. Brown testified that the long gun was not removed from the trunk, that he did not touch it, and that it was not in a case. He said he saw the guns briefly. He said the Defendant talked about the handgun but did not say anything about the long gun. He said he went to the sporting goods store after a July 2008 interview with the prosecutor.

Lynn Raines testified that he was retired from Ametek. He said that he trained the Defendant for about a year on the first shift and that after the training, the Defendant worked on the second shift. He said the Defendant would have worked on the second shift in July 2005. He said that he usually left work around the time the Defendant arrived and that the Defendant often parked in the same parking space. He said the Defendant drove a small, blue Kia on July 20, 2005.

On cross-examination, Mr. Raines testified that he met the Defendant when the Defendant was hired around 2002 or 2003. He said the Defendant's job took time to learn but was not complicated. He never had problems with the Defendant's work. He thought that besides the Kia, the Defendant had an older car, possibly a Pontiac. He said he was never inside the Kia and never looked at it closely.

Anderson Count District Attorney's Investigator Gracie Jones testified that she drove from the victim's house to Victorian Square Assisted Living Center using two different routes and driving each twice. She said she began at the victim's address at 5:18 a.m. and drove the speed limit. She said the two times she drove the first route, it took sixty-eight and sixty-nine minutes. She said she drove the second route two mornings, taking sixty-five minutes each time. She identified exhibits depicting the routes and recording her arrival and departure times for each drive. She said there were other possible routes between the addresses.

On cross-examination, Investigator Jones testified that she drove the routes in February, not July. She said that each morning was clear and cold and did not remember driving in rain or fog. She said she stopped at traffic lights but did not recall stopping for

specific traffic lights.  She said she did not make other stops during the drive.  She did not know if there was a deep body of water along the route.

TBI Special Agent William Andrew "Andy" Corbitt[1] testified that on July 21, 2005, around 6:00 a.m., he responded to a possible homicide at 88 West Norris Road.  He said other officers secured the scene before he arrived.  He said that a shotgun shell was on the driveway, that a coffee cup was beside a rock walkway, and that the victim's body was on the porch.  He assigned TBI Special Agent James Whitson and Norris Police Officer Homer Bean to collect evidence.  He went to the Roane County Sheriff's Department upon learning that a person of interest had been detained.

Special Agent Corbitt testified that multiple agencies were involved in the investigation.  He said the use of different radio frequencies might explain why Roane County authorities and Anderson County authorities were looking for different cars driven by a suspect.  The rescue squad left the scene before he arrived.  He understood that they were not the first responders to the scene and that they waited to approach.  Regarding a red truck the rescue squad saw, he believed it was seen traveling near the city limits on East Norris Road away from the scene.  He was aware that neighbors heard a vehicle going up a hill in the opposite direction as the red truck.

Special Agent Corbitt testified that he arrived at the Roane County Sheriff's Department in Kingston with Norris Police Investigator Gary Wood.  He said the Defendant wore nylon jogging pants and a sage green t-shirt.  He thought the pants were blue.  The Defendant was not sweating, and his shirt was not stained.  He said that he did not have an arrest warrant and that he spoke with the Defendant and allowed him to leave.  He did not collect evidence from the Defendant for gunshot residue testing because he did not think he had the legal authority.

Special Agent Corbitt testified that he returned a telephone call from the general manager at Ametek.  He said the manager knew the Defendant had been detained by the TBI, said the Defendant reported to work, wanted more information about the investigation, and reported his observations.  Although he did not recall whether he gave the Defendant a business card, he said the general manager would not have known to ask for Agent Corbitt otherwise.  He said he was unsuccessful in obtaining a video recording from a Rocky Top Market in Rockwood.  He said the manager told him the tapes were reused after a short time.

---

[1] The agent's name is spelled Corbitt and Corbit in the transcript.  For consistency, we have used the former.

Special Agent Corbitt testified that he spoke with the Defendant in February 2006. He said they discussed "teenage travel," a family death, soft drinks, and coffee. He said the Defendant stated that "he envisioned someone coming to the door saying arrest him in the name of the crown." He said he had not asked the Defendant anything that prompted the statement. He stated that the Defendant held up his hand, indicated his pinky finger, and said it ached as a result of the victim.

Special Agent Corbitt testified that he drove multiple times from the victim's house to Victorian Square Assisted Living Center. He said that the first time was in March 2007 and that he began around 8:30 a.m. He said the route he followed took sixty-two minutes. He said he drove the speed limit and stopped at traffic lights and stop signs. He drove between the two points again, using a different route, on February 4, 2008, beginning at 5:18 a.m., and took sixty-five minutes. He drove the second route again on February 8, beginning at 5:18 a.m., and took sixty-two minutes. He drove a third route on February 12, leaving at 5:18 a.m., and took sixty-three minutes. He drove the third route again on February 15, leaving at 5:18 a.m., and took sixty-two minutes. He identified exhibits containing charts of his travels and maps of the routes. He began his travels at 5:18 a.m., the time witnesses heard a vehicle drive west on West Norris Road. He chose the various routes based upon his personal knowledge of the area from an online mapping service. He agreed there were many ways to travel between the crime scene and the address in Rockwood.

On cross-examination, Special Agent Corbitt testified that he arrived at the Roane County Sheriff's Department around 8:45 a.m. on July 21, 2005, and that the Defendant was handcuffed. He said the Defendant declined to speak with him about "these matters" without an attorney. He acknowledged he did not ask for the Defendant's clothing and said he did not see anything that would justify seizing them.

Special Agent Corbitt testified that he first talked to Special Agent Callahan approximately after 12:00 p.m. on July 21. He asked Agent Callahan to contact the officers who detained the Defendant and to ensure that other information was documented. He did not think he saw Sergeant Halliburton that morning. He did not think he asked any of the Roane County Sheriff's employees if the Defendant had been allowed to change his shirt. He did not ask the Defendant's permission to send his clothes to the laboratory. He thought he told the Defendant he could leave the Roane County Sheriff's Department around 11:15 to 11:20 a.m. He said that in the approximate two-hour period between the Defendant's refusing to speak with him and his telling the Defendant he could leave, he worked on other investigative matters outside the Defendant's presence.

Special Agent Corbitt testified that the Defendant was driving the Kia at the time of his arrest in February 2006. Agent Corbitt thought that Sergeant Halliburton impounded and

processed the Kia and did not recall if the Kia had a manual transmission. He said that on February 4 and 12, 2008, he and Investigator Jones drove separately from the scene to the assisted living facility. He said there was no fog. He said Investigator Jones took a narrower, more curvy route than he did. He said he did not back into a parking space at the assisted living facility and did not recall walking about one hundred yards. He said the distance from the assisted living facility and the Defendant's home was one-half mile. When asked if he investigated suspects other than the Defendant, he said the evidence discovered in the investigation pointed to the Defendant. He said door-to-door canvasses were done in Rockwood and Norris seeking information about the case.

TBI Regional Crime Laboratory Supervisor Kelvin Woodby testified as an expert in serology and DNA analysis. He said that he performed serology and DNA testing on stains on rocks and leaves, which he compared with a known blood sample from the victim. He said the victim's DNA was the only DNA found in his testing. His report was received as an exhibit. On cross-examination, he said that aside from the information in the report, he did not know the location at the crime scene from which the evidence was collected.

TBI Special Agent Forensic Scientist Charles Hardy, an expert in serology and DNA testing, testified that he examined "shot shell wadding" and found the victim's blood. His report was received as an exhibit. On cross-examination, he said that a sample from the same shot shell wadding was tested at the Knoxville laboratory but that a second sample was analyzed by the Nashville laboratory due to the unavailability of a medical examiner to testify about collecting the sample. He said it might be possible to obtain a partial DNA profile of the person who loaded a shotgun from a shell casing found at a crime scene. He said that although DNA testing and latent fingerprint testing were not mutually exclusive, they did not go hand-in-hand because the techniques used for each might make it more difficult to obtain a reliable result for the other.

TBI Special Agent Steve Scott, an expert in firearms identification, testified that oily residue in a shotgun chamber could be deposited on a cartridge that was loaded into the chamber and could mix with oily residue from any fingerprints on the cartridge. He said that residue on a cartridge could be obscured by contact between the cartridge and the chamber when a shot was fired.

Special Agent Scott testified that a positive gunshot residue analysis finding required the presence of barium, antimony, and lead at threshold and proportional levels. He said the presence of gunshot residue on a person's hand did not necessarily mean the person fired a gun. He said he would not necessarily expect to find gunshot residue if a person fired a pump-action shotgun twice. He said gunshot residue might be removed by a person's placing his hands in his pants pockets, wiping his hands, or washing his hands.

Regarding the Defendant's case, Special Agent Scott testified that he analyzed a fired shell casing, fired pellets, and wadding from the scene and the victim's body. Agent Scott stated that shotgun wadding did not have the same flight characteristics as pellets and that the location of the wadding was not indicative of the shooter's location. He said a cartridge might contain as many as four pieces of wadding.

Special Agent Scott testified that a drawing he prepared was consistent with Federal premium double-aught buckshot magnum and explained its components. He said he disassembled a cartridge of this specification and described its components by referring to them. The components were received as exhibits. He said that in twenty years, he had only seen one case in which specific pellets could be identified as having been fired from a specific shotgun. He said that unlike guns that used solid bullets, shotguns were "smooth bore" weapons with no rifling in the barrel that would leave distinctive markings. He also said that due to the design, the "shot" of a shotgun cartridge never came in contact with a shotgun's barrel.

Special Agent Scott testified that he identified a shell case recovered from the scene as a Federal premium three-inch magnum shell. He said its markings indicated it had contained fifteen-pellet double-aught copper-plated lead buckshot. He said a buckshot pellet recovered from the scene was copper-plated double-aught buckshot but could not say whether it was from a Federal cartridge. He said other pellets recovered from the victim's body were copper-plated lead pellets that were consistent with the load markings on the shell recovered from the scene. He said the pellets recovered from the victim's body were consistent with Federal premium twelve-gauge double-aught buck magnum ammunition. He said the wadding recovered from the victim's body was the same general design and color as the wadding in the cartridge he disassembled. He said it was also consistent with the type of wadding that would have been in the shell casing from the crime scene. He said the two shot cups he examined were twelve gauge and of the same type and design as the Federal shot shell from the scene. He said a flash would be visible from the muzzle of a shotgun fired in darkness.

Special Agent Scott testified that a pump-action shotgun must be pumped, or racked, in order for a cartridge to be loaded into the chamber for firing. He said that after the weapon was fired, the shot shell case would remain in the gun until a person pulled back the pump arm and allowed the case to eject. He said that in order to fire two shots, one shell would have to be ejected. Using a Mosberg Maverick Model 88, he demonstrated loading and racking a shotgun and ejecting a shell case. He said that typically in Tennessee, as many as three cartridges could be loaded into a shotgun but that a rod could be removed to allow additional cartridges.

-39-

Special Agent Scott testified that sometimes, the extractor mechanism inside a shotgun made identifiable marks on an ejected shell. He said identifiable ejector marks were also possible. He said that if extractor and ejector marks were present, this indicated a semi-automatic shotgun. He said that bolt-action shotguns did not have extractor or ejector marks and that double-barreled shotguns sometimes had extractor but not ejector marks. Regarding the fired shells examined in this case, he said the extractor and ejector marks were consistent with Mosberg Model 500A and Maverick Model 88 twelve-gauge, pump-action shotguns. He said that he was not provided with a shotgun collected as evidence and that his comparison was based upon shotguns he had at his laboratory. He did not know the age of the Mosberg Model 88 he used for his comparison.

Special Agent Scott testified that based upon several factors, it was his opinion that at least one shot was fired at the victim from within thirty feet. He said that shot patterns similar to those on the victim's shirt and overalls could be produced if the muzzle-to-target distance was more than ten but less than thirty feet. His reports were received as exhibits. He was unable to reconstruct how the crime occurred based upon information he was given.

Special Agent Scott identified exhibits consisting of an "over powder wad" and pellet fragments from the victim's body. He said they were consistent with Federal premium double-aught buckshot twelve-gauge ammunition. He identified a box of shotgun shell cartridges, from which he had taken the cartridge he disassembled. He identified the t-shirt he analyzed, which he said was the victim's. He said there was a large defect slightly to the right of the midline of the chest, a series of holes on the side of the chest and sleeve, and several holes on the back and sleeve. He identified fine particulate buffer material on the shirt, which he said indicated the shot was from less than thirty feet. He said weather conditions might affect the amount of buffer material deposited.

On cross-examination, Special Agent Scott said a properly-maintained firearm would have oil on its mechanism. He did not know if Mossberg and Remington used the same type of oil. He thought a shotgun was legally required to have a barrel of at least sixteen inches and said the muzzle of the Mossberg Model 88 he used for his demonstration had a barrel of about eighteen inches. He said that the Mossberg Model 88 he used in court was not a semi-automatic weapon and that the action had to be opened manually. He said that there were different configurations of Mossberg Model 88 shotguns but that they were built on the same frame. He said variations included a shoulder stock or pistol grip. He said there were field versions and security versions. He said Mossberg was a common brand. He said that at least twenty but less than thirty brands of pump-action shotguns were currently in production and that additional manufacturers produced automatic shotguns. He fired four brands of shotguns other than the Mossberg Model 500 and the Mossberg Model 88 when comparing the markings on the shotgun shell from the scene. He acknowledged that an extractor would

wear over time and that he did not know the ages of the guns kept at the laboratory for comparison purposes.

Special Agent Scott testified that he could not tell the location of the person who shot the victim based upon the location of the shotgun shell case and the wadding. He said that if two cartridges were fired, there would have been thirty pellets. He said shot pellets could penetrate a wooden door, a thin sheet metal door, or siding on a house through insulation and sheetrock on the interior. He said shot pellets would not fall to the ground within sixty-five feet. He said that the most common brands of shotgun cartridges were made by Federal, Remington, and Winchester, and that all three companies used copper-jacketed buckshot pellets inside their cartridges.

Special Agent Scott acknowledged that he did not fire any automatic shotguns as part of his analysis, even though he knew they had extractors and ejectors. He said that every shotgun left a mechanical fingerprint from the contact of the firing pin with the primer surface of the ammunition. He said no set number of matching points was required to classify a match between fired ammunition and a particular shotgun.

On redirect examination, Special Agent Scott testified that Federal, Remington, and Winchester also made shotgun cartridges that contained all-lead pellets. He said the shot shell casing recovered from the crime scene had a Federal logo that was adopted in 2003.

On recross-examination, Special Agent Scott testified that the Mossberg Model 88 had been labeled Maverick Mossberg 88, Maverick, and Mossberg Model Maverick 88. He said there was no "Mossberg 88" other than the Maverick line. He said, though, the Mossberg Model 500A appeared to be the same weapon.

Dr. Darinka Mileusnic-Polchan, an expert in forensic pathology, testified that she reviewed autopsy documentation of Dr. Cleland Blake's autopsy of the victim and formed her own conclusions from the information. She said the cause of the victim's death was multiple shotgun wounds. She said the victim had two shotgun wounds. In her opinion, the wound to the victim's left chest was inflicted first. She said an abrasion indicated that the wadding did not enter the body. She said the pellets fractured several left ribs, entered the left chest cavity, perforated the left lung, moved across the middle of the chest, tore the right ventricle of the heart, and spread in a wider pattern and exited the right chest. She said some of the pellets re-entered the right arm. She identified a photograph taken during the autopsy that showed entrance and exit wounds.

Dr. Mileusnic-Polchan estimated that based upon the size of the cluster of pellets in the victim's body and the wad retained in the heart, the victim was shot from a distance of

five to ten feet. She said that in her experience, most shotgun wounds involved nine pellets but that the buckshot from the victim's body and the crime scene showed the ammunition had more than nine pellets. She identified a photograph of the victim's wounds with probes inserted to show the entrance, exit, and direction that the pellets traveled. She said that two pellets were retained in the right chest wall and two were retained in the right arm. She identified x-rays depicting the pellets in the victim's body. In her opinion, the trajectory of the shot to the chest was direct, left to right, and very slightly back to front. She said a second shot hit the victim's left back and arm and that some of the pellets exited the front of the left arm. The trajectory was back to front and steeply upward. She said the trajectory of the first shot indicated the shooter and the victim were at the same level but that the trajectory of the second shot indicated that the victim was either at a higher level or bent. She identified photographs and x-rays depicting the injuries. In her opinion, the shot to the back was fired from ten to thirty feet away. She said that the shot to the chest, which penetrated the heart, was the more serious wound and that wounds of this nature were fatal, although a victim might not die for three to five minutes. She expected that a victim with a right-sided heart injury would lose consciousness, collapse, and die after several minutes and that the victim might be able to run 100 feet or more. She expected the victim gasped for air before death and said the victim could not have survived the heart wound. She said that other than the gunshot wounds, the only injury the victim had was "dicing" of his forehead, which she said was explained by broken glass at the scene.

Dr. Mileusnic-Polchan testified that according to the death certificate, the victim died from hemopericardium, which was accumulation of blood surrounding the heart, and hemothorax, which was bleeding to the chest, from the twelve-gauge buckshot wounds. She said that upon review of the autopsy findings, she reached the same conclusions as Dr. Blake regarding the victim's cause of death. Her report was received as an exhibit.

On cross-examination, Dr. Mileusnic-Polchan testified that the information in her report identifying the brand of ammunition was based upon the ballistics expert's report and information about evidence from the crime scene. Regarding a statement in Dr. Blake's report that the trajectory of the chest wound was right to left, she said it was "definitely" left to right and that Dr. Blake was wrong. She said Dr. Blake was "already getting sick" at the time he prepared the report. She also disagreed with the statement in Dr. Blake's report that the glass dicing and the pellet pattern strongly suggested that the gunshot pattern was inflicted through the glass door. She thought the evidence indicated that the victim fell through the door. She said Dr. Blake's report contained no information about the victim's clothes. She said that based upon the victim's injuries, she did not expect a lot of blood spatter at the scene. She said she expected blood on the victim's clothing and a trail of blood on his path. She said that based upon a diagram of the scene, it was her opinion that the victim walked toward his car, was shot from a slight left direction, turned and ran toward the

house, was shot from behind from the right when he was bent, ran toward the porch, collapsed, and broke the glass door.

On redirect examination, Dr. Mileusnic-Polchan testified that Dr. Blake's report stated that the victim was six feet tall. When asked to examine the victim's shirt, she stated that it showed a distribution of wounds similar to that on the victim's body. She said ammunition packing material was on the shirt.

Melissa Beggs Ludlow testified that the victim was her husband of almost twenty years. She said the victim was employed as a mechanical maintenance engineer and worked from 6:00 a.m. to 3:00 or 3:30 p.m. She said the victim usually awoke around 5:00 a.m., let the dog out, and made coffee. She identified a photograph that depicted the victim, the dog, their cars, and their house. She said her niece, Niki Buss, and Ms. Buss's daughters lived with them. She said that she introduced her niece to a manager at her employer, American Magnetics, and that her niece was hired. She said Ms. Buss met the Defendant at American Magnetics and began dating him. She said she tried to talk Ms. Buss out of marrying the Defendant. She thought that the relationship developed too quickly and that Ms. Buss did not have the opportunity to know him well. She said that after Ms. Buss and the Defendant were married, Ms. Buss called from a hotel where Ms. Buss and one of her children were staying. Ms. Ludlow said she and the victim allowed them to come to their home. She said she told Ms. Buss to call the Defendant and tell him where she was but did not know if Ms. Buss called him.

Ms. Ludlow testified that the Defendant came to her house and spoke to her about Ms. Buss. She said that he wanted her to convince Ms. Buss to reconcile with him, that he became angry when she said she could not, and that he accused her of taking away his family. She said Ms. Buss and her daughters lived with them during and after Ms. Buss's divorce from the Defendant.

Ms. Ludlow testified that she and the victim were like grandparents to Ms. Buss's children. She said she often accompanied Ms. Buss when Ms. Buss dropped off or picked up Ms. Buss's child with the Defendant. She said she went to provide moral support and to be a witness to anything that was said or seemed inappropriate.

Ms. Ludlow testified that the victim was charged with assault in September 2002, but that the charge was dropped at the grand jury, and that a civil lawsuit was dismissed. Relative to the event, she said she and the victim heard a car approach their house. The victim went outside and was gone for a few minutes. She said that she went outside and that the victim told her to call the police because he had hit the Defendant. She said, though, that there were no other hostilities between the victim and the Defendant.

-43-

Ms. Ludlow testified that Ms. Buss spent time in Ohio when Ms. Buss's mother was receiving cancer treatments. She stated that Ms. Buss's older child was school age and stayed with Ms. Ludlow and the victim and that Ms. Buss took her younger child with her. She said that in Spring 2005, Ms. Buss was in Ohio with her mother but sometimes came home for the Defendant's week of visitation with their child. She said the Defendant never talked to her about any missed visitation.

Ms. Ludlow testified that in April 2005, Ms. Buss was with her mother, and Ms. Ludlow and the victim took Ms. Buss's children to Chattanooga for the weekend. She said that when they returned home, her bedroom window and a window of the victim's truck were broken. She said that the police were notified but that they were unable to determine who caused the vandalism. She said they did not have problems with neighbors or have enemies at work. She said the victim was "easy going" and helpful to others. She said he was not argumentative.

Ms. Ludlow testified that the victim, Ms. Buss, and she were leaving a July 18, 2005 meeting regarding Ms. Buss's younger child when they saw the Defendant at a window looking at them. She said that they waved at him and that it was "childish." She said the Defendant did not contact anyone at her home between July 18 and 20, 2005. She said the victim awoke at 5:00 a.m. on July 21. She said he let the dog outside, made coffee, dressed and groomed, let the dog inside, kissed her goodbye, and went out the front door. She heard him close and lock the door. She said she heard a gunshot and saw a flash out her bathroom window. She said the victim screamed. She grabbed the telephone to call 9-1-1 and went to the door. She said the victim was face down on the porch and was "gurgling breathing."

Ms. Ludlow testified that initially, she thought there was one shot, but after she thought about it, she remembered hearing two and possibly three shots. She recalled hearing the victim's footsteps on the sidewalk after the first shot. She did not hear any shots after she opened the door. She was not wearing her contacts and did not see anything beyond the victim. She did not hear cars. She said it was dark, and she did not remember the weather. She said she told the police that the Defendant killed the victim. She did not see if the victim had anything in his hands when he left the house but said he usually took a coffee cup, keys, and a cell phone. She identified a photograph of the victim's coffee cup and cell phone on the ground.

On cross-examination, Ms. Ludlow testified that the Defendant and Ms. Buss began dating in February 2000, that they married in March 2000, that Ms. Buss returned to live at her house in April 2000, and that the Defendant and Ms. Buss's child was born November 27, 2000. She said the conversation with the Defendant in which he asked her to encourage Ms. Buss to pursue the relationship was shortly after Ms. Buss and the Defendant separated

in Spring 2000. She denied any arguments or disputes between the Defendant and the victim. She said the victim stayed away from the Defendant. She did not know if her insurance company made the Defendant a settlement offer for a civil lawsuit. She did not recall but did not deny telling Special Agent James Whitson that her insurance company offered the Defendant $5000 in the civil case. She said it was her understanding that the Defendant's attorney told her insurance company that the Defendant would no longer pursue the case.

Ms. Ludlow testified that she and the victim had an agreement with Ms. Buss that Ms. Buss would quit her job and take care of the children and their household duties in order for them to have more family time. Ms. Ludlow said she worked full time and did not often go with Ms. Buss to see Ms. Buss's mother in Ohio. She said she never had any conversations with the Defendant after 2002, although she saw him at visitation and court hearings. She said that when the car window was vandalized, a rock was found in the front seat. She did not know if anything was taken from the car. She said the windows to her bedroom and bathroom were broken. She said that the doors were locked and that nothing was missing from the house.

Ms. Ludlow testified that she, Ms. Buss, and Ms. Buss's children were in Ohio for most of the week before Ms. Buss's mother's death on July 1, 2005. She said that they stayed for the memorial service and that she and Ms. Buss stayed to go through Ms. Buss's mother's belongings but that the victim went home. She said Ms. Buss and the children came home from Ohio the weekend before the victim was killed and thought they came home on July 17 or 18. She said the victim went home about July 10. She did not know if the Defendant was supposed to have visitation with his child on July 22. She said she routinely saw Ms. Buss send the Defendant letters about the dates she would be out of town but did not recall if she sent one when she left in June 2005 to be with her mother. She agreed that all three of their cars would have been gone from the house from at least July 8 until July 10. She agreed there would have been one to one and one-half weeks when the victim's car was the only one at the house.

Ms. Ludlow testified that she did not recall telling Special Agent Whitson that she heard three shots. She said she saw the flash with the first shot but that she was out of bed and away from the window before the second. She said her written statement incorrectly stated she heard the victim moan after he was shot but that she heard him yell and heard his footsteps on the sidewalk. She did not recall hearing a gunshot after she heard a person running. She said that after she opened the door, she did not try to pull the victim into the house. She did not know if the victim was leaning on the door and did not remember if his body moved or fell when she opened the door. She said that prior testimony from an officer stating that the top part of the victim's body was inside the door was not consistent with her

memory. She said she had to unlock the deadbolt to open the door. She said that to her knowledge, the victim and the Defendant did not have any face-to-face contact after 2002.

On redirect examination, Ms. Ludlow testified that the victim helped Ms. Buss move her furniture when Ms. Buss moved out of the marital home. She said the victim helped Ms. Buss move Ms. Buss's mother's belongings from Ohio.

The Defendant testified that he lived in Rockwood from December 2001 until March or April 2007. He said he knew the victim before September 8, 2002, but did not have frequent contact with him. He said that when he and Ms. Buss were together, he went to the Beggses' house twice for dinner. He said that between his separation from Ms. Buss and September 2002, he saw the victim at least two or three times when he returned his daughter after visitation. He said the victim hit him in September 2002 when the Defendant was holding his daughter. He said a police officer took a statement from him and took out a warrant. He said that between the incident and January 2003, when the victim's case went to the grand jury, things were going well and that he told the district attorney general's office that he did not want to pursue the case. He said that after the incident, they changed the location of the visitation exchange from the Beggses' house to the Norris Police Department and later to the Anderson County Detention Facility. He said he also told his lawyer not to pursue the civil case. He said he had received a settlement offer in the civil case that was "much more" than what he heard in earlier testimony. He did not recall seeing the victim or Ms. Ludlow after the 2002 incident. He said that although there was a schedule for visitation, they did not follow it for holidays or summer. He did not recall ever arguing with the victim.

The Defendant testified that in July 2005, he owned a 1991 Buick LeSabre and a 2002 Kia Spectra. He said the Kia had a five-speed, manual transmission. He said that the Buick had a transmission from a junkyard, that it sometimes would not shift out of the parking gear, and that the key sometimes would not turn in the ignition. He said his "best guess" was that the Kia was in his driveway or backyard on July 21. He said he did not drive the Kia on the morning of July 21. He said that on July 25, he parked at Victorian Square Assisted Living Center because he hoped to see two women he had seen there when he walked by on July 21. He said he waited about an hour but did not see them. He said that he was unable to shift the car out of the parking gear and that he left a note stating that he would return the following day.

The Defendant testified that on July 21, 2005, he awoke around 5:00 a.m. He said he typically made coffee. He said he went for a walk. He remembered generally the route he took but was not sure "step-by-step." He described his typical route. He said he walked past Victorian Square and stopped at a market to buy a cup of ice water. Referring to photograph

exhibits, he identified the location he saw a police car beside the post office. He said he walked beside and in front of the police car on his way home. He said that when he turned a corner, he saw several officers, who took his arms and put them behind his back. They stated that the Norris authorities wanted to see or speak to him and asked him repeatedly for the location of a red Toyota 4x4 pickup truck. He thought he was being accused of stealing a truck from Norris and said they did not tell him any other reason the Norris authorities wanted to speak to him. He said the officers held him on either side, walked him to a police car, and took him to the sheriff's department in Kingston. He said that after he was released from the Roane County Sheriff's Department, Tammy Coleman picked him up around 12:30 p.m. He said that he went with her when she attended a medical appointment and that she took him to work at Ametek. He said he did not leave Rockwood from the time he came home around midnight on July 20 until being taken to Kingston on July 21.

The Defendant testified that he had an appointment scheduled on July 21 with a Rockwood officer regarding his child visitation but that he was unable to attend because he was in the Kingston jail. He said that he appeared at the Anderson County Detention Facility on July 22 to pick up his child but that Norris Officer Gary Wood served him with legal papers.

The Defendant denied that he killed the victim. He said he never struck or argued with the victim. He said that if he was upset with anyone, it was with Ms. Buss. He agreed he accused her of custodial interference. He said Ms. Buss did not abide by the court's orders regarding visitation and determined when he could see their child. He said she took the child out of the state for long periods of time. He said that she sometimes notified him by letter that she was leaving town but that she did not tell him when they returned. He denied blaming the victim for Ms. Buss's behavior.

On cross-examination, the Defendant testified that his height was 6'1" or 6'2" and that he weighed between 240 and 250 pounds in 2005. He said that at the time, he drove the Buick more than the Kia. He said he drove the Buick to Victorian Square Assisted Living Center on July 25. He thought he parked the Kia across the street from Victorian Square once or twice. Regarding testimony that he was a hunter, the Defendant stated that he had not hunted since the early 1970s. Regarding testimony that he showed guns in the trunk of his car to Ron Brown in July 2005, he stated that he did not recall showing them to him but that he held up a gun to get to a briefcase that contained paperwork he needed. Regarding testimony that he came to work with a gun, he said he told John Kidder that he came to work once with a gun in the trunk of his car and parked it off his employer's property because he knew the gun policy. Regarding testimony that Ms. Buss's letters stated that she and their daughter were in Ohio, he said she did not tell him her mother was ill. Regarding his dismissal of the civil lawsuit, he stated that he was not aware of a lien for unpaid child

support against any proceeds he might recover and that a document purporting to be a lien had nothing to do with the dismissal.  He denied he ever told "Tammy" he was angry at the victim.

The Defendant testified that he went to the market where he bought ice water on July 21 and talked to Susan Hall and Christina Miller.  He admitted he went to Victorian Square Assisted Living Center to talk to Teresa Majors and Sandra Ellis.  He said that he talked to a woman who he thought was one of the women he saw on July 21 and asked her to check her time card, that she went inside, and that another woman came outside to talk to him.

The Defendant testified that he purchased a Mossberg Model 88 twelve-gauge shotgun at Walmart and paid $10 for a background check.  He said he purchased some ammunition that a store clerk selected but did not know its specifications.  He said he asked for the smallest quantity and least expensive double-aught buckshot.  When shown a box of ammunition, he did not recall if he purchased it.  He said he assembled the shotgun and fired it a couple of times to see if it worked.  He agreed he purchased a machete at Walmart when he purchased the shotgun.   He said that on July 21, 2005, the shotgun was at his house.  He said he wished he still had the shotgun.  He said he sold the shotgun in late 2005 by leaving a note on a community bulletin board and did not know the name of the person who bought it.  He claimed that when he sold the shotgun, he was unaware he was accused of killing the victim.  He said that no one from law enforcement asked to see the shotgun until Summer 2007 and that he would have gladly agreed had State asked sooner.

The Defendant testified that he and Ms. Buss had an ongoing disagreement about child visitation.  He said he last saw the child on Father's Day 2005.  He said it was upsetting any time he did not get to visit the child.

The Defendant testified that if Lynn Raines said he saw the Defendant's Kia at their workplace on July 20, 2005, Mr. Raines was mistaken because he drove the Buick to work that day.  He said that when he was detained by the Rockwood police on July 21, the Kia would have been in his front driveway or backyard unless it was in a repair shop.  He said that Bill Diggs lied about the Defendant's talking at least twice a week about the visitation dispute and about his bringing a gun to work.  He said it was possible he told Mr. Diggs that he purchased a shotgun.  He said Mr. Diggs lied about the Defendant's saying that he was staking out the victim's home and watching the victim's habits and that he was going to follow the victim to work and kill him in the parking lot.  He did not think John Fleming ever counseled him not to become violent toward the victim and the victim's family but said Mr. Fleming may have thought he counseled him.  He said he never told Mr. Fleming that he stayed up all night watching the victim's house but that the victim did not come out the next morning.  He acknowledged he sometimes went to work unshaven.  The Defendant claimed

that Mr. Fleming lied when he testified that he told the Defendant a day or two before the victim's death that he was worried by the Defendant's sudden calmness that the Defendant had decided to do something. The Defendant said he told Mr. Fleming about his July 19 conversation with Rockwood Police Officer Pittman and thought Mr. Fleming misunderstood. He said Mr. Fleming extrapolated from the conversation that the Defendant was going to "clean them all out" at the victim's house. He said Mr. Fleming cried and asked him to talk to a counselor by telephone.

The Defendant testified that he told John Kidd about being detained by the Rockwood Police on July 21. He said he did not know at the time about the victim's homicide and learned of it that afternoon when Mr. Kidd and Ms. O'Connor gave him a copy of a news report. He denied telling Earl Parker that he was mad at the victim and was going to kill him with a shotgun he bought. Regarding a statement that he was going to have to kill the victim, the Defendant stated that he did not remember ever talking to Officer Melton. Regarding the incident when the victim waved at him, he said that it occurred in early June and that he was not angry with the victim. When asked if Special Agent Corbitt lied when he testified that the Defendant told him that his pinky finger ached for the victim, the Defendant stated, "My finger ached for Greig Beggs. My hand aches. And if I told Officer Corbitt that my hand ached as a result of being attacked, that's quite possible." He acknowledged making a statement to Agent Corbitt that someone would show up to arrest him.

When asked if he cried and told Rockwood Officer Pittman that he bought a shotgun that used magnum shells and that he was going to kill the victim, the Defendant testified that the only time he said anything in anger about the victim was on the morning of July 19 when he spoke with Officer Pittman. He did not recall if he told Anderson County Sheriff's Deputy Carr that he was going to take matters into his own hands relative to his child custody dispute. He did not recall speaking with Deputy Carr about getting a custodial interference warrant against Ms. Buss days before the victim's homicide and thought it was a year or two earlier. When asked about a conversation with Anderson County Sheriff's Sergeant Therman Baird regarding a custodial interference warrant against Ms. Buss, he stated that he did not recognize the officers who testified previously. He admitted he spoke with Assistant District Attorney General Jan Hicks about a custodial interference order days before the victim's homicide. He said that he had several conversations with officers from different agencies on a single day because the officers directed him to different agencies and that it was frustrating. He said that although he did not think he asked Officer Pittman for a custodial interference warrant, if he did, it would have been on July 19. He said that Officer Pittman scheduled an appointment for him to meet with Officer Nance on July 21 at 10:00 a.m. and that he intended to attend the appointment. He said Officer Nance may have previously responded to a situation when his child did not want to leave his house after visitation. He

-49-

said it was possible he contacted the TBI but denied he tried to get the TBI to issue an Amber Alert. He denied seeking assistance from the FBI.

The Defendant acknowledged that he never went back to Victorian Square Assisted Living Center to speak with the executive director after his July 28 visit. He agreed he never went to the market a second time seeking to talk to the employees who were there when he bought a cup of water.

On redirect examination, the Defendant testified that if the receipt for the shotgun showed he paid with a credit card, it was his own card. He said that Bill Diggs was not his friend and that he had no reason to confide in him. He agreed Mr. Diggs reported him to his employer for bringing a gun to work. He said he received unemployment benefits after his employment with Ametek was terminated and identified a letter from the Department of Labor and Workforce Development stating that it did not find he was discharged for misconduct.

The Defendant testified that when he went for his walk on July 21, he took a watch, twenty-seven cents, and his keys. He said he did not have his driver's license or wallet. He said it was possible he told Officer Pittman that he had prayed and that it would only make matters worse if he did anything about the visitation with his child. He said he had no reason to be angry at the victim, Ms. Ludlow, or Ms. Buss. He did not recall telling Officer Pittman that he reported to the TBI that his child was missing but said he may have. He said he was worried about the child.

On recross-examination, the Defendant testified that he bought the shotgun for home security. He said he sold the shotgun in July 2005 because he needed money for groceries and his electric bill. He said he sold the shotgun and another gun for $125.

Teri Stephens, an investigator for the Anderson County Public Defender, testified that she drove from the road where the victim lived to Victorian Square Assisted Living Center the morning of her testimony. Referring to an exhibit, she explained her route. She said it was raining lightly but was not foggy. Traveling the speed limit, it took her one hour and thirteen minutes. On cross-examination, she said she it would have taken longer if she traveled to Harriman, Kingston, Athens, Tennessee, or entered Kentucky as part of the trip.

On rebuttal proof, Officer Steven Bryant testified that he was at the Defendant's house on July 21, 2005, and that the only car he saw was a Buick. He said he looked in the backyard but did not see a Kia. On cross-examination, Sergeant Bryant said he could "somewhat" see the house due to vegetation. He said he looked as far as he could around an out-building and could see most of the backyard. He said he was there around daybreak. He

said a light was on in the house. He did not recall a double gate behind the house but thought there was a chain link fence. He said he "just looked" in the backyard from the alley and did not go into the backyard or check to see if the out-building was locked. He did not recall there being three out-buildings and said he would be surprised if there were three. He denied that he did a "whole lap around the house."

Special Agent Corbitt testified that he was at the Defendant's house on July 21, 2005, from 11:00 a.m. until noon and again after 5:00 p.m. He said he went into the backyard and did not see a Kia anywhere on the property, although he was not asked on which occasion he went into the backyard. On cross-examination, he thought there were three out-buildings. He did not know if they had been locked but said they were not locked when he was there. He said that they knew the license plate number of the Kia and that other officers were looking for it. He agreed that earlier that morning the Rockwood Police were looking for a red Toyota.

The jury found the Defendant guilty of first degree murder. The trial court imposed a life sentence. After the notice of appeal was filed, the Defendant filed a pro se motion requesting that he be allowed to proceed pro se on appeal. This court remanded the case to the trial court for a hearing to determine whether the Defendant knowingly and intelligently waived his right to counsel. After the trial court conducted the hearing and the Defendant executed a written waiver of the right to counsel, this court relieved trial counsel and allowed the Defendant to proceed *pro se*.

# I

## A. Whether the Evidence is Sufficient to Sustain the Defendant's Conviction

The Defendant contends that the evidence is insufficient to prove that he was at the scene of the crime when it occurred. The State counters that the evidence is sufficient to support the Defendant's conviction. We agree with the State.

Our standard of review when the sufficiency of the evidence is questioned on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). We do not reweigh the evidence but presume that the trier of fact has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. *See State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984); *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Questions about witness credibility are resolved by the jury. *See State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997).

"'A crime may be established by direct evidence, circumstantial evidence, or a combination of the two.'" *State v. Sutton*, 166 S.W.3d 686, 691 (Tenn. 2005) (quoting *State v. Hall*, 976 S.W.2d 121, 140 (Tenn. 1998)). Circumstantial evidence alone may be sufficient to support a conviction. *State v. Richmond*, 7 S.W.3d 90, 91 (Tenn. Crim. App. 1999); *State v. Buttrey*, 756 S.W.2d 718, 721 (Tenn. Crim. App. 1988). The standard of proof is the same, whether the evidence is direct or circumstantial. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011). Likewise, appellate review of the convicting evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'" *Id.* (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

Relevant to this case, first degree murder is defined as the unlawful, intentional, and premeditated killing of another. T.C.A. §§ 39-13-201, -202(a)(1) (2010). Intentional is defined as the "conscious objective or desire to engage in the conduct or cause the result." *Id.* § 39-11-106(a)(18). "Premeditation" is defined as

> an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

*Id.* § 39-13-202(d). The determination of whether a defendant acted with premeditation is a question of fact for the jury and may be established by direct and circumstantial evidence. *See State v. Davidson*, 121 S.W.3d 600, 614 (Tenn. 2003); *see also State v. Brown*, 836 S.W.2d 530, 541 (Tenn. 1992).

In the light most favorable to the State, the evidence shows that the Defendant's child and former wife lived in the victim's household, and the Defendant was upset about child custody and visitation issues and sought help from the authorities several times. The Defendant filed motions for changes in the parenting plan from the time of his divorce until the time of his murder trial. The Defendant talked to Mr. Fleming, his supervisor, several times per week about the custody issues, and Mr. Fleming said the Defendant was angry with his former wife and the victim about the custody issues. When Officer Melton worked for the Rockwood Police Department, he investigated the Defendant's child custody and visitation problems. Investigator Wood had telephone conversations with the Defendant concerning his child custody issues. Officer Foust said that he had two or three conversations with the Defendant in 2004 and 2005 and that the Defendant was frustrated the Norris police would not do anything for him when he complained about custody and

visitation issues. When Trooper Carr would not help the Defendant file a complaint against his former wife for custodial interference about one week before the shooting, the Defendant stated he "would take care of it himself."

The Defendant and the victim had a contentious relationship. On September 8, 2002, the victim was arrested for assaulting the Defendant during the exchange of the child at the victim's house. The Defendant told Mr. Fleming about an argument between him and the victim during which the victim struck the Defendant when he was holding his child and broke the Defendant's finger. The grand jury did not return an indictment for the charges, and the civil complaint concerning the argument was dismissed. The victim antagonized the Defendant by waving at him on July 18, 2005, shortly before the murder, when the victim saw the Defendant looking at him through a window as he was leaving a meeting with his wife and Ms. Buss. Ms. Ludlow described the event as childish.

The Defendant made several statements to multiple individuals that he was going to kill the victim. He told Mr. Fleming that he watched the victim's house overnight, that he bought a shotgun at Walmart, and that the solution might be to "just take them all out or to kill them or something, that killing all of them would resolve the situation." He told his coworker, Mr. Diggs, that he had recently bought a shotgun and was going to follow the victim home and kill him. When he called the police station with a child custody question, he told Officer Melton that he was "going to have to kill that son of a b----." When Officer Pittman refused to issue a warrant for his former wife for custodial interference, he mentioned getting a shotgun that would hold magnum shells and told her that if no one would help him, he would take care of the problem. He told Mr. Parker that the victim infuriated him and that he purchased a gun and intended to kill the victim.

The evidence shows that the Defendant bought a shotgun at Walmart on June 12, 2005. The Defendant testified that he purchased a Mossberg Model 88 twelve-gauge shotgun and paid for a TBI background check at the Rockwood Walmart on June 12, 2005. The Defendant told several people that he bought the shotgun.

Although the shotgun was not recovered, the evidence against the Defendant included forensic proof that ammunition material recovered from the victim's body and the crime scene was the same type of ammunition found in the Defendant's car and was consistent with having been fired from the type of gun the Defendant bought before the shooting. Deputy Bean found a shell casing at the scene that read, "Federal premium double aught buck three-inch Magnum," the same type the Defendant bought at Walmart. Special Agent Scott identified the fired shotgun shell Deputy Bean recovered and said its markings showed it had contained fifteen-pellet double-aught copper-plated lead buckshot. Agent Scott said that a shotgun wad and pellet fragments from the victim's body were consistent with Federal

premium twelve-gauge double-aught buck magnum ammunition. He said the pellets recovered from the victim's body were consistent with the load markings on the shell recovered from the scene. Dr. Mileusnic-Polchan said the cause of the victim's death was multiple shotgun wounds and found bleeding to the chest from twelve-gauge buckshot wounds.

The Defendant argues that he had an identity defense because no one saw his vehicle leave the crime scene and that the only vehicle seen leaving was a red Toyota truck to which he was never linked. He argues that neighbors heard two gun shots and a vehicle leaving the scene but that no one saw the person who fired the shots or the vehicle that left the scene. Circumstantial evidence alone may be sufficient to support a conviction. *Richmond*, 7 S.W.3d at 91; *Buttrey*, 756 S.W.2d at 721. The victim's neighbors heard two shots and a vehicle leave the scene at the time the victim was shot. Mr. Forbes, the victim's neighbor heard a small car leave the scene, and the Defendant drove a small Kia. Nothing in the record shows that the Defendant was seen in Norris at the time the victim was shot, and he was not seen until over one hour after the shooting. This evidence along with that stated above is sufficient to support the jury's finding that the Defendant was at the scene.

Regarding the Defendant's assertion that he had an alibi because he was seen on his morning walk at the time of the shooting, he argues that although the State proved he had the opportunity to commit the crime by showing the drive from Norris to Rockwood could be made in the time frame, the opportunity was not enough to prove he was at the scene of the crime. In the light most favorable to the State, evidence in the record shows that the Defendant did not regularly take morning walks, that his Kia was not at his house when police arrived, and that he parked his car earlier in the Victorian Square Assisted Living Center parking lot, which was in the direction from which he walked the morning of the shooting. The jury had sufficient evidence to discredit the Defendant's alibi, and we will not reweigh the question of credibility. *See Bland*, 958 S.W.2d at 659 (Tenn. 1997) (stating that questions about witness credibility are resolved by the jury).

The Defendant argues that although he purchased a Maverick Model 88 shotgun and ammunition at Walmart, no evidence in the record shows that the waddings and the pellets found at the crime scene were fired by his gun or that the fired shell found came from the box of ammunition he bought. The Defendant's shotgun was not recovered and could not be tested to determine if the ammunition found was fired from his gun. However, as stated above, the evidence against the Defendant included forensic proof that ammunition material recovered was the same type of ammunition as was found in the Defendant's car and was consistent with having been fired from the same type gun the Defendant bought shortly before the shooting. The evidence is sufficient to support the jury's finding that the shots were fired from the Defendant's gun.

The Defendant and the victim had a contentious relationship because of custody and visitation issues with the Defendant's daughter. The Defendant discussed the issues with several people, including the police, and told many of these people that he intended to kill the victim. He purchased a shotgun shortly before the shooting, and forensic evidence showed the ammunition material found at the scene and on the body was consistent with having been shot from the type of gun the Defendant purchased. This evidence is sufficient to support the Defendant's first degree murder conviction. He is not entitled to relief.

## B. Whether the Murder Occurred Before the Return of the Indictment

The Defendant argues that his due process rights were violated because the State failed to prove that the offense was committed before he was indicted. *See* T.C.A. § 39-11-201(a)(4) (2010). He argues that the record does not show the jury was present when the indictment was read and that the reading of the indictment did not make the indictment date evidence because it was hearsay and read by the prosecutor, not a witness. The State claims that sufficient proof exists to show that the crime was committed before the Defendant was indicted. We agree with the State.

Tennessee Code Annotated section 39-11-201(a)(4) (2010) provides that no person may be convicted of an offense unless the State proves beyond a reasonable doubt that the "offense was committed prior to the return of the formal charge." In *State v. Brown*, 53 S.W.3d 264 (Tenn. Crim. App. 2000), this court stated the following regarding this requirement:

> Granted, this is an easy matter to prove. . . . [The] indictment itself can establish the date upon which it was returned. Thus, the reading of the indictment to the jury, coupled with evidence of when the offense was committed, would establish that the offense was committed prior to the return of the indictment. Also, the State could merely ask an appropriate witness whether the actions of the defendant constituting the offense occurred before the defendant was charged with that offense. This would satisfy the requirements of the statute as well.

*Id.* at 279. In *Brown*, this court reversed the defendant's convictions because there was "no evidence that the indictment was ever read to the jury or shown to the jury, and no witness was asked whether the offense occurred prior to the return of the indictment." *Id.* at 279-80. This court concluded, though, that the State's failure to prove the offense occurred before the return of the indictment did not prevent the retrial of the defendant. *Id.* at 280.

As a preliminary matter, we note the Defendant's argument that *Brown* is wrong and inconsistent with the laws of this state. "Opinions reported in the official reporter . . . shall be considered controlling authority for all purposes unless and until such opinion is reversed or modified by a court of competent jurisdiction." Tenn. S. Ct. R. 4(G)(2). The opinion is published and remains the controlling precedent.

According to the trial transcript, the prosecutor read the indictment to the jury. The record shows that the indictment was returned on February 7, 2006. During the trial, Special Agent Corbitt testified that he was assigned to investigate a homicide that occurred in Norris, Tennessee on July 21, 2005. Officer Foust testified that on July 21, 2005, he responded to a call that shots had been fired and that the victim had been shot at 88 West Norris Road. Trooper Carr testified that on July 21, 2005, he received a call over the radio about a shooting at 88 West Norris Road. Paramedics Shetterly and Sweet both testified about responding to a call for a shooting victim on July 21, 2005. The victim's neighbors testified about hearing shots the morning of July 21, 2005. We conclude that the evidence sufficiently shows that the offense was committed before the return of the indictment.

## II

The Defendant contends that a warrantless search of his fenced backyard and car parked in the carport violated the Fourth Amendment to the United States Constitution and article I, section 7 of the Tennessee Constitution. The State responds that the trial court properly denied the Defendant's motion to suppress. We agree with the State.

A trial court's factual findings on a motion to suppress are conclusive on appeal unless the evidence preponderates against them. *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996); *State v. Jones*, 802 S.W.2d 221, 223 (Tenn. Crim. App. 1990). Questions about the "credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." *Odom*, 928 S.W.2d at 23. The prevailing party is entitled to the strongest legitimate view of the evidence and all reasonable inferences drawn from that evidence. *State v. Hicks*, 55 S.W.3d 515, 521 (Tenn. 2001). The application of the law to the facts as determined by the trial court is a question of law, which is reviewed de novo on appeal. *State v. Yeargan*, 958 S.W.2d 626, 629 (Tenn. 1997). In reviewing the correctness of a trial court's ruling on a motion to suppress, this court is permitted to consider evidence presented at the trial and at the suppression hearing. *See State v. Henning*, 975 S.W.2d 290, 297-99 (Tenn. 1998); *see also State v. Williamson*, 368 S.W.3d 468, 473 (Tenn. 2012).

The Fourth Amendment to the United States Constitution protects against unreasonable searches and seizures, and "'article 1, section 7 [of the Tennessee Constitution]

-56-

is identical in intent and purpose with the Fourth Amendment.'" *State v. Downey*, 945 S.W.2d 102, 106 (Tenn. 1997) (quoting *Sneed v. State*, 423 S.W.2d 857, 860 (Tenn. 1968)). The analysis of any warrantless search must begin with the proposition that such searches are per se unreasonable under the Fourth Amendment to the United States Constitution and article 1, section 7 of the Tennessee Constitution. This principle against warrantless searches is subject only to a few specifically established and well-delineated exceptions. *See Katz v. United States*, 389 U.S. 347, 357 (1967); *State v. Tyler*, 598 S.W.2d 798, 801 (Tenn. Crim. App. 1980). Evidence discovered as a result of a warrantless search or seizure is subject to suppression unless the State establishes that the search or seizure was conducted pursuant to one of the narrowly defined exceptions to the warrant requirement. *State v. Binette*, 33 S.W.3d 215, 218 (Tenn. 2000).

An exception to the warrant requirement includes the plain view doctrine. This doctrine applies when (1) the items seized were in plain view, (2) the viewer had a right to be in the position to view the items, and (3) the incriminating nature of the object was immediately apparent. *State v. Cothran*, 115 S.W.3d 523, 524-25 (Tenn. Crim. App. 2003) (citing *State v. Hawkins*, 969 S.W.2d 936, 938 (Tenn. Crim. App. 1997)). Likewise, illegally seized evidence is admissible under the inevitable discovery doctrine when the evidence would have been discovered inevitably by lawful means. *State v. Patton*, 898 S.W.2d 732, 735 (Tenn. Crim. App. 1994) (citing *Nix v. Williams*, 467 U.S. 431 (1984)).

At the December 14, 2006 suppression hearing, Police Chief Stinnett testified that when he arrived at the Defendant's house after 7:00 a.m. on July 21, 2005, the Defendant had already been taken to the police station. He said his officers were standing in front of the house between the sidewalk and the carport "standing by for the TBI officers." He said his officers secured the backyard, the carport, and "walked around" the home to determine if anyone was in those areas. He agreed he walked around the house to ensure his officers had not missed anything. He said an officer told him that he saw a shotgun shell box in a car. He said that the box was in the floorboard behind the driver's seat of a blue Buick parked "in the driveway," "[i]n the driveway there at the carport," and "pulled up into the car port area." He said that he and his officers stayed at the house until a search warrant was obtained and that he was at the house "a good part of the day" and was there "until dark." He denied that he or his officers entered the house or opened the car before the search warrant was obtained. He estimated that the alley behind the house was 75 to 100 feet from the carport.

On cross-examination, Chief Stinnett testified that he did not recall anyone seeing papers through a house window before the search warrant was executed. He did not know if the car was unlocked. He said that when he saw the ammunition box in the floorboard, Captain Buck, Officer Capps, and two other officers were present. He said Investigator French from the Roane County Sheriff's Office was also there during the day.

Chief Stinnett testified that he parked his car in front of the Defendant's house, that a couple of police cars were already parked there, and that several officers may have parked in the alley. He did not know how long his officers had been at the Defendant's house when he arrived but estimated since 4:00 to 4:30 a.m. He said he arrived at 7:00 a.m.

Special Agent Andy Corbitt testified that he arrived in Kingston around 9:00 a.m. and attempted to question the Defendant, but the Defendant refused to speak without consulting an attorney. He said the Defendant was released around 11:00 a.m. He said that he obtained a search warrant for the Defendant's house after speaking with Roane County, Rockwood, and TBI officers.

Regarding the Defendant's house and property, Special Agent Corbitt testified that the ammunition box in plain view inside the car in the carport was the same type of ammunition used during the killing. He said that Officer French learned that the Defendant purchased a twelve-gauge shotgun at the Rockwood Walmart. He said he asked the sheriff's department to place officers at the Defendant's house to secure the property while he obtained a warrant. Regarding the officers who secured the crime scene, he said they did not receive orders to enter an out-building, car, or house. He said that according to the information he received, no one entered any of the Defendant's property, vehicle, out-buildings, or house before the search warrant was obtained. He denied knowing any reason to doubt the Rockwood Police officers' or the Roane County Sheriff's deputies' credibility.

Special Agent Corbitt testified that he learned about the Defendant's relationship with the victim through the previous complaints filed with the police. He said he spoke with Special Agent Tommy Callahan, who learned from local officers that the Defendant stated that he had a document in his pants pocket and asked an officer to retrieve it when the Defendant was detained outside his home. He said the document was a report related to a complaint the Defendant made about his child. Agent Corbitt said he was told the Defendant said, "He's been f------ her," accusing the victim of raping his daughter.

Special Agent Corbitt testified that he executed the warrant at 5:46 p.m. on July 21, 2005. He said Roane County Sheriff's Deputy Wampler provided a set of the Defendant's house keys. He denied the Defendant was present during the search. He left a copy of the warrant on the Defendant's living room table and took the return to the judge, who signed the warrant.

On cross-examination, Special Agent Corbitt testified that he arrived at the Defendant's home the first time around 11:40 a.m. and that he returned with the warrant around 5:20 p.m. He said he was there briefly and met with Detective French, who had been to Walmart and obtained information about the Defendant's shotgun purchase. He said

information that the Defendant purchased a shotgun at Walmart, that the Defendant and the victim had a contentious relationship, and that a shotgun shell box was seen inside the Defendant's car led to his obtaining a search warrant.

Special Agent Corbitt testified that a Walmart receipt was on a bedroom dresser. He learned from Officer Capps that when the police arrived earlier, they looked through a window on the front door and knocked on the front door. He said the officers left the property when no one answered the door.

Dennis Worley, a former Roane County Sheriff's deputy, testified that on July 21, 2005, he went to the Defendant's house around 8:00 or 9:00 a.m. He was there until about 3:30 p.m. when Sergeant Wampler arrived. He said he did not see anyone enter the house, out-buildings, or car, or go on the property.

Roane County Sheriff's Sergeant Donald Wampler testified that on July 21, 2005, he went to the Defendant's home around 3:30 p.m. and remained there until the TBI arrived. He denied seeing anyone enter the Defendant's house, car, or out-buildings. He said that after he returned to the police station, another officer gave him the Defendant's keys, although he did not recall who. He said that the keys were inside an envelope, that he took the keys with him to the Defendant's house, and that he gave them to the TBI agents when they arrived.

At the hearing, the parties introduced as collective exhibits two photographs of cars in the Defendant's driveway and carport. The witness who identified the photographs was not asked if they were taken on the date of the search. Both photographs showed a blue Kia backed into the carport. One of the photographs also showed a blue Buick in the driveway that led to the carport, parked nose-to-nose with the Kia. At the trial, the State offered as an exhibit a photograph showing the carport side of the Defendant's house and a gated fence between the back corner of the Defendant's house and a neighbor's out-building. The photographs showed two exterior doors to the house in the carport. The carport was small and sized for one car. The photograph of the house showed an elevated porch with steps near but not inside the carport. It did not show whether there was an exterior door from the porch to the house, although testimony established that the front door was out of the photograph at the porch area. A driveway led from the street to the carport. The porch steps led from the driveway. The long side of the carport not bordered by the house was next to a grassy strip at the side of the house. The grassy strip extended beyond the carport to the gated fence to the backyard.

In denying the motion to suppress, the trial court found that the Defendant was detained and taken into police custody around 6:00 a.m., that the house and the area

-59-

surrounding the house were secured by the police, and that the police did not enter or search the house. The court found that the police did not gain information by looking into the house through the window to determine if anyone was home. The court found that the car was parked in the carport, that the police looked inside the car through the windows, that they saw a box of ammunition, and that they did not enter the car. The court found that before the search warrant was obtained, the TBI learned the victim was killed by a twelve-gauge shotgun, that a box of shotgun ammunition was inside the Defendant's car, that a spent shotgun shell was found at the victim's house, and that the victim and the Defendant had a contentious history.

The trial court stated that regardless of whether the police engaged in a warrantless search, "the officers had ample information already outside the fact that the officer had seen the box . . . in the car." The court concluded that the officers had ample information to obtain a search warrant. It found that the police would have searched the curtilage and found the box of shells based on the probable cause the police had to obtain the warrant. The court also found that the box of ammunition was in plain view and was open and accessible to the public.

The evidence shows that during the officers' first visit to the Defendant's property, some parked in an alley behind the house, viewed the backyard and house from the alley, walked along a street and a sidewalk to the Defendant's front porch, and knocked on the door. This court has approved "knock and talk" investigations on the basis that a person has no reasonable expectation of privacy in a pathway or sidewalk leading to the front door of a home. *State v. Cothran*, 115 S.W.3d 513 (Tenn. Crim. App. 2003). Sergeant Bryant, Officer Capps, and Sergeant Halliburton testified that they went to the Defendant's front door and knocked, but no one answered. During his testimony about going to the porch to knock on the door, Officer Capps said he saw the box of shotgun ammunition in the car in the carport. He did not identify where he stood when he saw the box, but Sergeant Halliburton testified that they knocked at a side door, which he thought was underneath a carport, but that it was not shown in "the photograph." Previously, he had identified a photograph of the Defendant's house taken from the street, in which the front porch was visible but the carport was obscured. The record, therefore, fails to show clearly whether the officers saw the box of ammunition from a vantage point in which they had the right to be. *See Cothran*, 115 S.W.3d at 524-25; *see also State v. Hurley*, 876 S.W.2d 57, 67 (Tenn. 1993) ("Authorities may take note of anything evident to their senses so long as they have a right to be where they are and do not resort to extraordinary means to make the observation.").

In any event, we conclude that the ammunition box would have been inevitably discovered during the execution of the search warrant. The trial court found that before the search warrant was obtained, the TBI learned the victim was killed by a twelve-gauge

shotgun, that a spent shotgun shell was found at the victim's home, and that the victim and the Defendant had a contentious history regarding the Defendant's daughter.

The officers' return to the property to secure it after detaining the Defendant is more problematic. The evidence reflects that at a minimum, they walked in the side yard, looked into the car in the carport from the side yard, and viewed the back yard. The Defendant contends that they entered the fenced backyard, as well. We note there is evidence that Officer Capps "walked all around" the car in the carport.

Police officers are permitted to temporarily seize property to secure a scene while awaiting a search warrant when probable cause exists and there is a "need for immediate action to prevent the departure" of evidence from the jurisdiction. *State v. Hawk*, 688 S.W.2d 467, 471 (Tenn. Crim. App. 1985). In essence, probable cause and exigent circumstances are required to justify this temporary warrantless seizure. *Id.* The mere possibility, though, that evidence will be removed or destroyed does not permit such a seizure. *Id.* Our supreme court has said, "[T]he curtilage [of residential property] is entitled to the same constitutional protection against ground entry and seizure as the home." *State v. Prier*, 725 S.W.2d 667, 671 (Tenn.1987).

We conclude that the officers unlawfully entered the curtilage when they walked in the side yard and to the fenced backyard. Given the unlawful entry, resolution of its extent is not necessary. We note that despite the recent homicide and the Defendant's suspected involvement, the officers had knocked at the house, had not received an answer, and knew that the Defendant had been taken to another location for questioning. No probable cause to enter the property existed, nor was there an exigency that might justify the officers' entry into the curtilage.

As we have stated, however, Officer Capps saw the shotgun ammunition box during a previous trip to the property, and although the evidence is unclear whether he was standing in a location where he was entitled to be, the box of ammunition would have been inevitably discovered pursuant to a search warrant. *Cf. State v. Carter*, 160 S.W.3d 526, 532 (Tenn. 2005) (stating that evidence discovered in an unlawful search is not subject to suppression if it is later discovered upon execution of a valid warrant). Likewise, officers had viewed the backyard and the back of the house from the alley. The trial court did not err in denying the motion to suppress, and the Defendant is not entitled to relief.

### III

The Defendant contends that he was unlawfully detained on July 21, 2005, after being arrested without a warrant and argues that the detention violated his rights under the Fourth

Amendment to the United States Constitution and article I, section 7 of the Tennessee Constitution. The State does not address this issue separately. We conclude that the Defendant is not entitled to relief.

We note that the Defendant raised a similar issue in a previous appeal. *See Flinn v. State*, 354 S.W.3d 332 (Tenn. Crim. App. 2010). There, the Defendant contended that the trial court erred by denying his motion for a preliminary hearing after his July 21 arrest and argued that Tennessee Criminal Procedure Rule 5 entitled him to a hearing to determine whether his warrantless detention was supported by probable cause. *Id.* at 333. This court concluded that Rule 5 did not apply to the Defendant's detention because he was taken to the sheriff's department for questioning only and was released hours later. *Id.* at 334. It stated that the Defendant was not under arrest, that an affidavit of complaint was not filed at that time, and that the Defendant was not entitled to a hearing. *Id.*

In the present appeal, the Defendant contends that this warrantless arrest and detention violated his constitutional right to be free from unreasonable searches and seizures. The record shows the Defendant was not under "arrest" or "imprisoned" but was detained for investigative purposes. The officers' detaining and transporting the Defendant to the police station for questioning was a seizure. *See State v. Johnson*, 980 S.W.2d 414, 422 (Tenn. Crim. App. 1998) (concluding that the police officers' handcuffing and transporting the defendant to the police department for questioning was a seizure). This court has stated that "detention for custodial interrogation – regardless of its label – intrudes so severely on interests protected by the Fourth Amendment as necessarily to trigger the . . . safeguards against illegal arrest." *Id*. As a result, probable cause was required before detaining the Defendant for questioning. *Id.*

The record shows that Rockwood Police Officer Steven Bryant was suspicious of the Defendant's early morning walk because he had been a police officer for seventeen years, knew who was "out and about" in the early morning hours, and had never seen the Defendant out for a morning walk. Special Agent Corbitt considered the Defendant a suspect in the victim's killing after learning that the Defendant and the victim had a contentious relationship, which prompted his desire to question the Defendant. Although the Defendant's early morning walk and contentious relationship with the victim might have been suspicious to the officers, "[p]robable cause must be more than mere suspicion." *Id*. at 423 (citing *State v. Melson*, 638 S.W.2d 342, 350 (Tenn. 1982)). This court has stated that "subjective motivations and characterizations by the police officers are not determinative as to the legitimacy of an arrest, search or seizure." *Johnson*, 980 S.W.2d at 423 (citing *Whren v. United States*, 715 U.S. 806 (1996); *State v. Vineyard*, 958 S.W.2d 730, 736 (Tenn. 1997)). We conclude that these suspicions did not result by themselves in probable cause to justify the Defendant's detention. We conclude, though, that the unlawful detention was harmless

beyond a reasonable doubt. The Defendant refused to answer questions related to the victim before consulting an attorney. As a result, the Defendant did not provide an illegally obtained statement that might be subject to suppression.

## IV

The Defendant contends that the trial court denied his Sixth Amendment right to counsel at the September 1, 2006 motion hearing. He argues that the trial court constructively denied him counsel at a critical stage in the proceedings. The State responds that the Defendant was properly represented by counsel at every critical stage in the proceedings. We agree with the State that the Defendant is not entitled to relief on this issue.

On March 3, 2006, the trial court set the Defendant's bond at $125,000. On September 1, 2006, a hearing was held in which the trial court revoked the Defendant's bond. Neither the Defendant nor the Defendant's attorney was present at the hearing. The court stated on the record it had advised counsel that counsel's presence was not necessary at the hearing. The court summarized the recent events that led to the September 1 hearing. The court explained that the Defendant was originally represented by Mr. Ritter, who was retained for the purpose of representing the Defendant at the bond hearing. Mr. Ritter told the court that he and the Defendant were in the process of reaching an agreement regarding Mr. Ritter's representing the Defendant. The court gave the Defendant thirty days to finalize their agreement. After thirty days, Mr. Ritter told the court that he and the Defendant were unable to reach an agreement and that the court should appoint other counsel. At a subsequent hearing, the Defendant was declared indigent, and Mr. Marshall, an assistant public defender, was appointed to the case. The court explained that approximately thirty to forty-five days later, Mr. Vogel contacted the court and stated that he had been retained by the Defendant. The court said that not long afterward, Mr. Vogel contacted the court stating that the Defendant "probably would not retain" him but agreed to be appointed to the Defendant's case. The court appointed Mr. Vogel.

The trial court stated it received a letter from the Defendant ten days before the September 1 hearing instructing the court not to allow Mr. Vogel or Mr. Marshall to perform any further work on his behalf. The court stated that the Defendant declined their services but that the Defendant did not explain if he was going to hire an attorney. The court said it wrote the Defendant a letter on August 23, 2006, confirming the September 1 hearing for the court's considering the Defendant's request. The court called the Defendant and "confirmed that it was necessary for [the Defendant] to be in court" for the hearing. The court said that on August 31, it received a letter from the Defendant stating,

Due to transportation problems, I will not be able to meet with Judge Blackwood tomorrow. Please allow me to contact your office upon my acquiring transportation. It may be possible for me to find transportation to the Roane County Courthouse in Kingston if agreeable with Judge Blackwood, and all other interested parties. Please halt all actions by Mr. Vogel until this issue is settled.

The trial court found that the Defendant disobeyed the court's instructions to attend the September 1 hearing, revoked the Defendant's bond, and issued a capias for his arrest because of his failure to appear, his constant difficulty in cooperating with his attorneys, and the seriousness of the offense. The court set the Defendant's bond at $1 million and ordered Mr. Vogel to continue representing the Defendant.

The Sixth Amendment right to counsel attaches upon an arrest warrant, a preliminary hearing if no warrant is issued, an indictment or presentment, or when a charge is initiated by a grand jury. *State v. Mitchell*, 593 S.W.2d 280, 286 (Tenn. 1980). Because the Defendant was indicted on February 7, 2006, the Sixth Amendment right to counsel attached before the September 1, 2006 hearing. After the right to counsel attaches, the "actual or constructive denial of the assistance of counsel altogether is legally presumed to result in prejudice." *Strickland v. Washington*, 466 U.S. 668, 692 (1984). When there is no actual or constructive denial of counsel, a defendant must establish prejudice. *Id.* at 693-96; *United States v. Cronic*, 466 U.S. 648, 659 n.25-26 (1984). Prejudice is presumed in situations involving "the complete denial of counsel," when a defendant is denied the presence of counsel "at a critical stage" in the proceedings. *Cronic*, 466 U.S. at 659-60.

We note that the Defendant failed to cite any authority stating that the September 1 hearing was a critical stage in the proceedings. Although preliminary, sentencing, and probation revocation hearings are critical stages in criminal proceedings, our appellate courts have not had the opportunity to determine whether a hearing to consider a defendant's motion to prevent counsel from representing him and to determine the status of a defendant's representation is a critical stage in the proceedings. *See Moore v. State*, 578 S.W.2d 78, 80 (Tenn. 1979) (stating that the preliminary hearing is a critical stage); *see also Mempa v. Rhay*, 389 U.S. 128 (1967) (concluding that a probation revocation hearing is a critical stage). Our supreme court has concluded that post-indictment lineups and post-indictment proceedings on motions for court-ordered mental evaluations are critical stages that entitle a defendant to counsel. *State v. Blye*, 130 S.W.3d 776, 780 (Tenn. 2004). An arraignment might be a critical stage in the proceedings depending upon the circumstances. *See Hamilton v. Alabama*, 368 U.S. 52 (1961) (concluding that an arraignment was a critical stage because defenses not raised at that stage were waived).

The test for determining whether a particular pretrial event is a critical stage requires this court to determine whether the "'presence of counsel is necessary to assure fairness and the effectiveness of counsel at trial.'" *Id*. at 782 (quoting *Green v. State*, 872 S.W.2d 717, 720 (Tex. Crim. App. 1994)). In essence, the issue is whether the defendant's right to a fair trial is diminished without the presence of counsel. *Id.*

The record shows that the Defendant failed to attend a scheduled hearing designated to address his request for the trial court to prohibit counsel's further representation and to determine the status of the Defendant's counsel. The court suspected that the Defendant would not appear at the hearing based on the letter it received from the Defendant and told counsel that his presence was not necessary.

Although we do not condone the trial court's telling counsel that his presence was not required, nothing in the record shows that counsel's presence was necessary to a fair trial or the effectiveness of counsel at the trial. Counsel's absence did not diminish the Defendant's right to a fair trial, and counsel had ample opportunity to move the trial court to reconsider its ruling and seek appellate relief under Tennessee Rule of Appellate Procedure 8. We note that the Defendant, through counsel, moved the court to reconsider its decision to institute new bond in the amount of $1 million, that the court reduced his bond twice, and that the Defendant was released on bond on October 27, 2006, less than two months later.

We note, too, that the purpose of the hearing was to address the Defendant's request for counsel to be relieved of his representation but that the Defendant now contends he was denied his right to counsel at the hearing. We conclude that the September 1 hearing was not a critical stage in the proceedings, that the Defendant is not entitled to a presumption of prejudice, and that he failed to establish that he was prejudiced at the trial as a result of counsel's absence from the hearing.

**V**

The Defendant contends that the trial court violated his Fourth Amendment right to be free from unreasonable searches and seizures by denying him hearings after his September 1, 2006 and March 22, 2007 arrests. The State has not addressed this as a separate issue. We conclude that the Defendant is not entitled to relief.

The Defendant states in his brief that he was arrested on February 7, 2006, that he was released on bond on March 8, 2006, that a capias was issued on September 1, 2006, and that he was arrested again on September 1, 2006. He states that he was held in confinement for fifty-seven days without a hearing. He states that he was released on October 27, 2006, that he was arrested again after a third capias was issued on March 22, 2007, and that he was

confined for seventy days without a hearing. He states that while acting pro se, he asked the trial court for a hearing pursuant to *Gerstein v. Pugh*, 430 U.S. 103, 125 (1975) (a hearing held to determine if "the evidence justifies going to trial under an information or presenting the case to the grand jury" when a defendant is arrested on criminal charges without a warrant or charging instrument), regarding the arrests but that his requests were denied. The court entered an order on December 17, 2008, stating that the Defendant did not have the right to a hearing and that the Defendant was arrested on a capias after he was indicted. The court found that the Defendant's arrests did not violate double jeopardy principles.

Regarding the September 1, 2006 arrest, the record shows that the trial court issued a capias for the Defendant's arrest because he failed to appear at a scheduled hearing. The record does not contain information related to the March 22, 2007 arrest. The record shows, though, that the Defendant was indicted on February 7, 2006, and that the charges were pending at the time the capias was issued for the March 22 arrest. We conclude that the Petitioner's reliance on *Gerstein* is misplaced.

*Gerstein* applies when a defendant is arrested on criminal charges without a warrant or charging instrument, and its purpose is to have an independent judicial magistrate determine if "the evidence justifies going to trial under an information or presenting the case to the grand jury." *Gerstein*, 420 U.S. at 119, 125. Here, the Defendant was arrested pursuant to a capias issued by the trial court after he failed to appear at a scheduled hearing. The two arrests cited by the Defendant were not the product of warrantless arrests and were not subject to the requirement that a defendant be brought before a magistrate for a probable cause determination. *See id.* at 119. The Defendant is not entitled to relief.

## VI

The Defendant contends that the trial court violated his due process rights under the Fourteenth Amendment to the United States Constitution by revoking and then raising his bond. He argues that the court denied him fair notice and a fair hearing before depriving him of his liberty. The State has not addressed this as a separate issue. We conclude that the Defendant is not entitled to relief.

On September 1, 2006, a hearing was held for the trial court to address the Defendant's request for counsel to be relieved from representing him. Neither the Defendant nor counsel was present. The court noted that it received a letter from the Defendant stating he would not appear for the hearing. The court stated that it told counsel it did not think counsel's presence was necessary at the hearing based on the Defendant's letter stating he would not appear. The court found that the Defendant disobeyed the court's instructions to attend the hearing, revoked his bond, and issued a capias for his arrest. The court set the

Defendant's bond at $1 million and ordered counsel to continue representing the Defendant.

On September 13, 2006, the Defendant asked the court to reconsider its order revoking his bond. Mr. Vogel explained that the Defendant did not understand that his presence was required at the September 1 hearing and that the Defendant's failure to appear violated the conditions of his bond. Counsel stated that the Defendant understood that a meeting was scheduled with counsel and the court to discuss counsel's representing the Defendant. Counsel denied that the Defendant understood it was a formal court appearance. The State presented evidence that the Defendant's vehicle was located at the Rockwood Police Department and could have been retrieved by the Defendant upon payment of the towing fee. Counsel told the court that the Defendant's previous attorney told him the police would not release his vehicle and that the Defendant had not been told otherwise. Counsel admitted that the Defendant owned a second car but said that the tags were expired and that the car had not been driven for more than one year. Counsel stated that the Defendant did not have the financial means to pay the towing or the tag renewal fees.

The court explained that its decision to revoke the Defendant's bond was not solely based upon the Defendant's failure to appear on September 1 but based on a pattern of behavior. The court mentioned the Defendant's letter indicating that he did not want any attorney the court appointed and the letter stating he could not attend court when the purpose of the hearing was to clarify the status of Defendant's representation for the trial. The court stated that it became concerned about the Defendant's appearance at the trial and noted that the witnesses who testified on his behalf at the bond hearing were absent. The court noted the Defendant's lack of employment, although it conceded the Defendant attempted but failed to find employment. The court reduced the bond from $1 million to $500,000.

The Defendant, pro se, filed an application seeking an extraordinary appeal pursuant to Tennessee Appellate Procedure Rule 10 regarding the trial court's revoking his bond and resetting it to $500,000. This court denied the application because the Defendant was represented by counsel. The Defendant also sought appellate relief based on Tennessee Appellate Procedure Rule 8, and this court declined to consider the appeal because the Defendant was represented by counsel. On October 25, 2006, after this court ruled on the Defendant's Rule 10 and 8 applications, a hearing was held regarding the Defendant's second request for the trial court to reduce his bond. The Defendant was represented by a new attorney at this hearing, and counsel told the court that communication issues existed between the Defendant and his previous attorneys. He said the communication problems led to the Defendant's contacting the trial judge before the September 1, 2006 hearing and stating that he could not attend the hearing. Upon counsel's argument, the court reduced the bond to $300,000.

Tennessee Appellate Procedure Rule 8 states that before a defendant may appeal a trial court's alteration of release, a defendant must file a written motion for relief in the trial court. Our supreme court has stated that a defendant must comply with Rule 8 promptly rather than wait until after conviction. *State v. Melson*, 638 S.W.2d 342, 358 (Tenn. 1982). By waiting until after the trial, a defendant "gains nothing by appealing the amount of the bail. There is no ground for holding that the amount at which bail was set, even if it was excessive, more probably than not affected the outcome of the case." *Id.*

Although there is evidence that the Defendant filed a pro se motion for relief under Rule 8, he was not permitted to do so because he was represented by counsel. Counsel did not file an application for relief under Rule 8. The Defendant's raising on appeal the issue of whether the trial court properly revoked the Defendant's bond is of no practical consequence because he has already been convicted. Even if the Defendant's allegations were true, no relief is available, and no prejudice has been shown.

## VII

The Defendant contends that his rights under the Confrontation Clause were violated by the admission of the victim's death certificate. He acknowledges that there was no objection at the trial and requests relief as a matter of plain error. The State contends that the Defendant has not demonstrated that plain error relief is required. We agree with the State.

Our supreme court has adopted the factors developed by this court to be considered

> when deciding whether an error constitutes "plain error" in the absence of an objection at trial: "(a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is 'necessary to do substantial justice.'"

*State v. Smith*, 24 S.W.3d 274, 282 (Tenn. 2000) (quoting *State v. Adkisson*, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)). The record must establish all five factors before plain error will be recognized, and "complete consideration of all the factors is not necessary when it is clear from the record that at least one of the factors cannot be established." *Smith*, 24 S.W.3d at 283. In order for this court to reverse the judgment of a trial court, the error must be "of such a great magnitude that it probably changed the outcome of the trial," and "recognition should be limited to errors that had an unfair prejudicial impact which undermined the fundamental fairness of the trial." *Adkisson*, 899 S.W.2d at 642.

The victim's death certificate was offered by the State as a self-authenticating public document and received as an exhibit. *See* Tenn. R. Evid. 902 (admission of self-authenticating documents). Defense counsel objected to the admission of another document offered at the same time but not to the death certificate. The death certificate was read to the jury. Dr. Miluesnic-Polchan testified about Dr. Blake's conclusions regarding the cause and manner of death as stated in the death certificate and stated that she saw no basis to disagree with his conclusions.

In *Crawford v. Washington*, 541 U.S. 36, 68 (2004), the Supreme Court concluded that the standard for the admissibility of hearsay statements under the Confrontation Clause is that "testimonial" hearsay is admissible when the declarant is unavailable and there was a "prior opportunity for cross-examination." Although this court has not addressed confrontation issues involving death certificates post-*Crawford*, the court has concluded that an autopsy report may contain testimonial hearsay subject to the Confrontation Clause. *See, e.g.*, *State v. John Todd*, No. W2010-02640-CCA-R3-CD, slip op. at 33 (Tenn. Crim. App. June 14, 2012).

The Defendant contends that the death certificate was testimonial because it identified the victim, stated that he died from two gunshot wounds, and classified the death as a homicide. He argues that the trial court erred in admitting the death certificate without the testimony of its author, Dr. Blake. The State argues that the death certificate was offered to show the cause of death but not an essential element of the crime.

A physician preparing a death certificate in a homicide case could reasonably conclude that the certificate would be available for use at a trial. We conclude that the death certificate was testimonial. We note that although the record established that Dr. Blake was unavailable, there was no evidence of a prior opportunity for cross-examination.

We conclude, though, that the Defendant has not established a case for plain error relief. The victim's wife, Ms. Ludlow, testified as to the victim's identity, hearing gunshots, and finding the injured victim outside. Emergency personnel testified about attending the injured victim at the victim's address. Dr. Mileusnic-Polchan testified that she reached independent conclusions from reviewing the evidence from the autopsy. She testified that the victim suffered two gunshot wounds and that the cause of death was multiple gunshot wounds. The parties stipulated to the chain of custody of the victim's body, which included its transfer to Dr. Blake for autopsy, and the chain of custody of the evidence collected from the body. At the trial, the Defendant did not contest the identity of the victim or that his death was a homicide, only whether the Defendant committed the crime. Consideration of the Defendant's issue regarding admission of the death certificate is not necessary to do substantial justice. The Defendant is not entitled to plain error relief.

# VIII

The Defendant contends that the trial court improperly limited him from testifying about the reason behind his statement to Mr. Parker that the Defendant wanted to kill the victim. He seeks relief as a matter of plain error. The State contends that the Defendant waived the issue by failing to raise it at the trial and in the motion for a new trial and that plain error relief is not warranted. We agree with the State.

The Defendant contends that the State falsely represented to Judge Hayes, who conducted the trial, that Judge Meares, who heard some of the pretrial matters, had entered an order suppressing any evidence of abuse of the Defendant's child by the victim. The Defendant argues that he should have been allowed to testify that he told Mr. Parker he wanted to kill the victim because the victim abused the Defendant's child. He argues that due to the State's misrepresentation about the prior judge's ruling, the trial judge did not allow him to testify about the reason he told Mr. Parker he wanted to kill the victim.

The Defendant filed motions in this court seeking supplementation of the record with the State's written motion in limine relative to this matter. He also sought production of the purported written order of Judge Meares granting the State's motion in limine. Pursuant to an order of this court seeking to resolve the state of the record, the trial court clerk filed an affidavit stating that the trial court's record did not contain a motion in limine regarding abuse by the victim against the Defendant's child. The clerk stated, "The only Motion concerning child abuse has been filed in one of the many Supplements requested by the Defendant . . . dated November 17, 2008."

The record contains several items relevant to the child abuse allegation. On January 11, 2008, the State filed a motion in limine seeking that the witnesses be instructed not to testify about the Defendant's allegations of child abuse. The motion stated that the request was "consistent with Judge Meares' ruling that the defendant's allegations of 'child abuse' by [the victim] . . . were not relevant." The record does not contain any earlier motion, transcript of a hearing, or order addressing the issue.

On January 11, 2008, Judge Meares considered several pending motions, including the State's motion for a mental evaluation of the Defendant and the State's request for an order excluding any evidence of the alleged abuse. At the hearing, the State noted the possibility that the Defendant might seek to establish a diminished capacity or justification defense based upon his belief that the victim abused the Defendant's daughter. Defense counsel stated that he did not intend to present a justification defense as an alternative to an alibi defense. Defense counsel stated, though, that if the court allowed the State to present evidence that the Defendant was asked, "[W]hat's going on here?" and responded, "He's

been f------ her," when he was taken into custody, the defense might offer contextual evidence of the Defendant's efforts through official channels to have the alleged abuse addressed. Judge Meares denied the motion for a mental evaluation but withheld a ruling on the motion in limine regarding evidence of alleged abuse. Verbally and in a written order, Judge Meares ordered the defense to provide the State with a list of witnesses it intended to offer to show the context of the Defendant's statement about the alleged abuse. No witness list of this nature appears in the record.

The record reflects that on November 19, 2008, Judge Hayes considered preliminary matters. He stated that he did not know whether the evidence of alleged abuse would be relevant to the defense. The prosecutor told the court that based upon the Defendant's notice of alibi, the State would no longer seek admission of the Defendant's statement "He's been f------ her." Judge Hayes stated that if the Defendant offered an alibi defense, child abuse allegations were not relevant. Judge Hayes ruled that the attorneys should caution their witnesses not to mention child abuse but that the issue might become relevant, in which case the court would address it. Judge Hayes entered a written order stating, in part:

> The court . . . considered a Motion in Limine regarding exclusion of any testimony or evidence regarding alleged physical or sexual abuse of the [Defendant's] child . . . whereupon the parties agreed that no such evidence was relevant or if relevant would be unfairly prejudicial to be admissible.
>
> It is therefore ORDERED, ADJUDGED and DECREED, that there shall be no testimony or other evidence of any allegations of, or in fact, any physical or sexual abuse of [the child].

The record contains several pro se motions filed by the Defendant on December 4, 2008. These motions included a motion for appointment of different counsel, a motion in limine seeking exclusion of evidence of child abuse, and a "Motion for Order of Protection" seeking an order prohibiting disclosure, based upon federal and state statutes, of any information of abuse of the Defendant's child and sealing any documents filed related to child abuse. The pro se motions also include a motion to dismiss the indictment because the State's witnesses illegally testified before the grand jury about the Defendant's belief the victim abused the Defendant's daughter.

Before the Defendant testified, the court advised the Defendant that it had granted a motion in limine related to "issues of child abuse involving sexual or physical abuse" and asked defense counsel to confer with the Defendant regarding its parameters. When asked, the Defendant advised the court that he did not have any questions about the parameters.

To the extent Judge Meares ruled on the admissibility of the evidence, his ruling was not determinative at the trial because Judge Hayes later considered the issue on its merits. Judge Hayes initially excluded evidence of child abuse as not relevant to an alibi defense but stated that the evidence might become relevant during the trial. The Defendant never sought to introduce the evidence as relevant to some issue other than alibi, and Judge Hayes was never asked during the trial to rule on its admissibility for some other purpose.

In this appeal, the Defendant contends that the trial court should have admitted evidence of his belief the victim abused the Defendant's child to explain why he told Mr. Parker he wanted to kill the victim. We acknowledge that the evidence of the Defendant's reason for his statement to Mr. Parker might be relevant to show the Defendant committed voluntary manslaughter rather than first degree murder. We cannot conclude, however, that consideration of the issue is necessary to do substantial justice. We note, first, that defense counsel advised the court that he did not intend to offer the evidence and that the Defendant filed a pro se motion seeking exclusion of the evidence he now argues should have been admitted. The court was never asked to consider the evidence as relevant to the question of the Defendant's lesser culpability for an offense other than first degree murder. Even if the defense had requested the court admit the evidence as relevant to the Defendant's guilt of voluntary manslaughter but the court had excluded the evidence, the need to do substantial justice would not require plain error relief. The jury considered other evidence of the past tension between the Defendant and the victim and the Defendant's emotional state in the weeks and days before the crime regarding child visitation. The jury could have concluded that the Defendant was guilty of a lesser-included offense, but it did not. The Defendant is not entitled to relief on this basis.

## IX

The Defendant contends that the trial court erred in admitting evidence of his purchase of a shotgun and ammunition. He contends, first, that he had a constitutional right to privacy in his purchasing the shotgun and ammunition on June 12, 2005, and claims that details of the purchase were admitted in violation of this right. He also contends that the receipt showing his purchase of the items should not have been admitted because it was seized in an illegal search of his home. The State contends that the trial court did not err in admitting the evidence. We agree with the State.

### A. **Right to Privacy**

Regarding the Defendant's claim that the evidence was admitted in violation of his constitutional right to privacy, the Defendant cites to sections of the federal Gun Control Act (GCA) as a basis for contending that his privacy rights were violated. See 18 U.S.C. § 922,

923 (2012). He claims that the GCA was amended to restrict state law enforcement and public access to licensed firearm dealers' records and that Congress intended information regarding the sale of firearms to be confidential from state law enforcement unless obtained through the Federal Bureau of Alcohol, Tobacco, and Firearms (ATF). We disagree.

The GCA addressed "widespread traffic in firearms and . . . their general availability to those whose possession thereof was contrary to the public interest." *Huddleston v. United States*, 415 U.S. 814, 824 (1974). The GCA's purpose is to lower crime "by keeping firearms out of the hands of those not legally entitled to possess them because of age, criminal background, or incompetency." *Id.* (internal quotation and citation omitted). Section 922(d) prohibits licensed dealers from selling firearms to convicted felons, fugitives, drug addicts, and the mentally ill. 18 U.S.C. § 922(d). Section 923(g) requires licensed dealers to maintain records of the sale or disposition of firearms and makes those records "available to inspection at all reasonable times." 18 U.S.C. § 923(g)(1)(A); *see United States v. Marchant*, 55 F.3d 509, 513 (10th Cir. 1995). The GCA also permitts ATF agents to conduct warrantless inspections of the records. 18 U.S.C. § 923(g)(1)(A); *see Marchant*, 55 F.3d at 513. Likewise, upon request by a State agency or subdivision, the ATF may "make available . . . any information . . . with respect to the identification of persons . . . who have purchased or received firearms or ammunition." 18 U.S.C. § 923(g)(1)(A); *see Marchant*, 55 F.3d at 513. The GCA "did not grant unrestrained access to [firearm records] to other law enforcement agencies or the public at large." *Marchant*, 55 F.3d at 515. As a result, the characterization that "Congress created a privacy interest in FOPA by greatly restricting public and state law enforcement access to firearms records" is incorrect. *Id.*

The Firearms Owners Protection Act of 1986 (FOPA) clarified aspects of the GCA and directs ATF's enforcement of the GCA "toward what Congress perceived as more 'serious, intentional criminals.'" *United States v. Cassidy*, 899 F.2d 543, 546-47 (6th Cir. 1982) (internal citation omitted). The FOPA generally requires a warrant for the inspection of firearm records, but the Act also permits inspection without a warrant, in relevant part, during "the course of a criminal investigation" and when "tracing a firearm in the course of a bona bide criminal investigation." 18 U.S.C. § 923(g)(1)(B). The FOPA permitts the ATF to make available to State and local law enforcement information it learns during an investigation. 18 U.S.C. § 923(g)(1)(D).

We disagree with the Defendant's argument that Congress "manifested an intent to protect the privacy interests of firearms owners in maintaining the confidentiality of their ownership and possession of a firearm." He argues that FOPA's amendments severely curtailed law enforcement and public access, which manifested Congressional intent to create a reasonable expectation of privacy in firearm sales records. The GCA did not permit state law enforcement officers or the public to inspect firearm sales records maintained by

federally licensed dealers. The ATF, though, was permitted to conduct warrantless searches of sales records maintained by licensed dealers. Likewise, FOPA directed attention to serious criminals and generally required a warrant, but the amendment created an applicable exception to the warrant requirement. Pursuant to FOPA, inspection of firearm records of licensed dealers was permitted without a warrant during the course of a criminal investigation and when tracing a firearm in the course of a bona bide criminal investigation. The purpose of the Acts was to prevent firearms from being sold to "those whose possession . . . was contrary to the public interest." *Huddleston*, 415 U.S. at 824.

The Defendant also claims that the state law enforcement agencies that investigated his case violated his privacy because they failed to obtain the sales records directly from the ATF and directly from the firearm dealer. The State responds that the Defendant disregards the significance of his being a person prohibited from purchasing a gun by the GCA and the FOPA. Although we disagree with the State's argument that the Defendant was prohibited from purchasing a gun by the GCA and the FOPA, we agree the Defendant is not entitled to relief.

The Defendant's argument was previously presented in *United States v. Marchant*, 55 F.3d 509 (10th Cir. 1995). The State relies on *Marchant*[2] to support its contention that the Defendant was prohibited from purchasing a firearm under the Acts and that as a result, possessed no privacy rights in the purchase of the shotgun. There, the court rejected the notion that the defendant's privacy rights were violated by local law enforcement officers' obtaining firearm sales records directly from federally licensed dealers rather than from the ATF because the defendant was a convicted felon and was prohibited from purchasing a firearm. The court reasoned that although the ATF's "ability to release information . . . to state or local law enforcement agencies" was restricted under the GCA, the FOPA authorized the release of "any information . . . with respect to the identification of persons prohibited from purchasing or receiving firearms." *Id.* at 516 (citing 18 U.S.C. § 923(g)(1)(D)). The court concluded that the ATF was permitted to release relevant information regarding persons who were prohibited from purchasing firearms "without regard for privacy or confidentiality." *Id.* at 516. The court also concluded that Congress did not intend the Acts to "establish procedures to benefit persons . . . who are prohibited from owning firearms" under the Acts. *Id.* The court rejected the notion that the FOPA's restriction on state and local law enforcement officers' ability to obtain information regarding firearm sales from federally licensed dealers "create[d] a reasonable expectation of privacy . . . that inures to the benefit of persons prohibited from possessing firearms. . . ." *Id.*

---

[2] This court notes that the State's argument on this issue consists almost entirely of a lengthy, verbatim recitation of the opinion in *Marchant*, absent various citations, without any source attribution.

Under the FOPA, anyone who has been convicted of a felony, is a fugitive from justice, is an unlawful user of or addicted to any controlled substance, has been adjudicated mentally defective or been committed to a mental institution, is a legal or illegal alien, has been dishonorably discharged from the Armed Forces, has renounced his or her United States citizenship, or has been convicted of misdemeanor offenses involving domestic violence is prohibited from purchasing a firearm. *See* 18 U.S.C. § 922(g)(1)-(9). Although the State argues that the Defendant is a prohibited person because he was a convicted felon at the time of the victim's death, the record does not show that the Defendant was a convicted felon or satisfied any category that would have rendered him a prohibited person under the Acts. As a result, we conclude that the Defendant had a reasonable expectation of privacy from state and local law enforcement's ability to obtain sales record information directly from a federally licensed dealership.

The TBI agents and the local police officers who investigated the victim's death violated FOPA by failing to obtain records of the firearm sale from the ATF and by obtaining the information directly from Walmart. We conclude, though, that the violation was harmless. The TBI could have obtained the information without a warrant because the information was being sought during the course of a criminal investigation. Special Agent Corbitt simply had to contact the ATF to obtain the information in the same fashion as it was obtained by local law enforcement officers. In any event, the Defendant told witnesses about his purchasing a firearm and his intent to kill the victim. This information provided the basis for investigating whether the Defendant was involved in the victim's death and, in part, would have provided a basis for state and local law enforcement officers' requesting the information from the ATF. Moreover, the sales forms entered as exhibits were unnecessary to show that the Defendant bought a shotgun at Walmart before the victim's death. Mr. Miget testified about the sale of the shotgun at the trial and could have done so without the federal forms and the Walmart receipt that were entered into evidence. We conclude that the violation of the Defendant's statutory rights was harmless and that the information regarding the gun sale would have been inevitably discovered through proper channels and witness testimony at the trial. *See State v. Hill*, 333 S.W.3d 106, 122-23 (Tenn. Crim. App. 2010). The Defendant is not entitled to relief.

## B. Illegal Search and Seizure

The Defendant contends that the trial court erred by admitting the Walmart receipt showing his purchase of a Maverick twelve-gauge shotgun, a machete, and shotgun shells. He argues that the trial court erred in admitting the receipt because his copy of the receipt was illegally seized during a search of his home and the evidence from that search was suppressed by the trial court. He argues that the State learned of the transaction through the illegal search and seizure and that it should not have been allowed to benefit from knowledge

gained in violation of his constitutional rights. We note that the Defendant raised an issue regarding admission of this evidence in his motion for a new trial, although he challenged the admissibility based upon federal statutory law regarding privacy of firearms purchasers, not the search of his home. As the parties have suggested, we will consider the question as one of plain error.

The manager of the Rockwood Walmart identified a copy of an electronic receipt of the Defendant's purchase of the items. He testified that the records were kept by Walmart in the ordinary course of its business. The trial court received the receipt as an exhibit on the basis that it was a business record of Walmart. *See* Tenn. R. Evid. 803(6) (hearsay exception for records of regularly conducted activity).

Despite the general rule that "evidence obtained as a direct or indirect result of unconstitutional police conduct will be excluded," illegally obtained evidence may be admitted if the State establishes the inevitability that the evidence would have been discovered through lawful means. *Hill*, 333 S.W.3d at 122-23. Mr. Fleming testified that the Defendant told him the Defendant purchased a shotgun at Walmart. The Defendant's home was in Rockwood, and he bought the gun from the Rockwood Walmart. Mr. Parker testified in his deposition that the Defendant told him the Defendant purchased a shotgun, although Mr. Parker was unsure if it was purchased at Walmart. We note that at the suppression hearing, Special Agent Corbitt testified that Roane County Detective John French went to Walmart to confirm the Defendant's purchase of a shotgun after receiving information from Earl Parker. Mr. Diggs testified that the Defendant told him the Defendant had recently purchased a shotgun and planned to follow the victim to work and kill him. Before the crime, the Defendant made statements about "taking matters into his own hands." He mentioned a shotgun and magnum shells to Officer Pittman while he was emotional over his child visitation issues. Based upon this evidence, we conclude that the police had sufficient information from which they would have inevitably discovered the receipt through lawful means, and we cannot conclude that a clear and unequivocal rule of law has been breached or that consideration of the Defendant's issue regarding the admission of the Walmart receipt is necessary to do substantial justice. The Defendant is not entitled to relief as a matter of plain error.

## X

The Defendant contends that the trial court erred by admitting evidence of the vandalism at the victim's home in April 2005, three months before the crime. Because there was no objection at the trial and the issue was not raised in the motion for a new trial, he seeks relief as a matter of plain error. The State contends that the Defendant waived the issue

by failing to raise it in the trial court, and that in any event, the Defendant is not entitled to plain error relief. We agree with the State.

Investigator Wood testified that on March 19, 2005, the Norris Police were asked by the Campbell County Police to conduct a welfare check on a child at the victim's house. When he went to the victim's house, he noticed that windows of the house and a truck were broken. The damage appeared to be deliberate because the windows had been broken with landscaping rocks from the front of the house. Ms. Ludlow testified that although the police were unable to determine who vandalized the house and truck, the people in the household did not have any problems with neighbors or co-workers. Ms. Buss testified that she was out of the state at the time of the vandalism, although her and the Defendant's child remained at home with the victim and Ms. Ludlow. She said the Defendant missed one of his scheduled visitation periods around the time of the vandalism.

The Defendant argues that evidence of the vandalism was barred by Rule 404(b) of the Tennessee Rules of Evidence. The State counters that the evidence was relevant and showed the Defendant's pattern of animosity toward the victim.

Rule 404(b) prohibits evidence of other crimes, wrongs, or acts offered to show a character trait in order to prove that a defendant acted in conformity with that character trait. Tenn. R. Evid. 404(b). Evidence of other crimes, wrongs, or acts, though, may be admissible for other purposes, such as establishing identity, motive, common scheme or plan, intent, or absence of mistake. *Id.*; *State v. McCary*, 119 S.W.3d 226, 243 (Tenn. Crim. App. 2003). The rule lists four requirements that must be satisfied before a court determines admissibility:

(1) The court upon request must hold a hearing outside the jury's presence;

(2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issues, the ruling, and the reasons for admitting the evidence;

(3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and

(4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b)(1)-(4).

We acknowledge that there is not clear and convincing evidence that the Defendant committed the vandalism, but we conclude that consideration of the issue as a matter of plain error is not necessary to do substantial justice. The vandalism occurred in a separate incident three months before the victim was shot, and no physical evidence linked the Defendant to the vandalism. We note, though, that the State presented strong proof of the Defendant's identity as the perpetrator of the victim's homicide. In the days before the killing, the Defendant was frustrated over child visitation issues and made statements to several people that he was going to kill the victim or take care of the situation himself because the police had not acted to his satisfaction. He purchased a shotgun shortly before the crime, and the ammunition material found at the scene and with the victim's body was consistent with having been shot from the type of gun the Defendant purchased and with the ammunition recovered from the Defendant's car. Other than his history of disagreement with the Defendant, the victim had no known enemies. The Defendant drove a small car, and one of the victim's neighbors heard a small car leave the scene after the shooting. The State presented proof that the Defendant could have driven from the victim's house to Rockwood within the time between the shooting and when the Defendant was seen that morning. Given the strength of the State's proof, consideration of the issue is not necessary to do substantial justice, and the Defendant is not entitled to plain error relief.

## XI

The Defendant contends that the trial court erred in admitting evidence of two no true bills returned by the Anderson County Grand Jury relative to the 2002 altercation in which the victim hit the Defendant. He contends that the no true bills were not probative and alternatively, that any probative value was substantially outweighed by the danger of unfair prejudice. *See* Tenn. R. Evid. 403. The State contends that the Defendant waived the issue because he did not raise it in the motion for a new trial and that in any event, the trial court did not abuse its discretion in admitting the evidence. We conclude that the Defendant is not entitled to relief.

The record reflects that the issue was not raised in the motion for a new trial. Tennessee Appellate Procedure Rule 3(e) requires that issues regarding the admission or exclusion of evidence be raised in a motion for a new trial and that such issues not raised are waived. As the State correctly contends, the Defendant is limited to plain error review.

The State offered as exhibits several documents to show that the Defendant bore animosity toward the victim. In addition to the no true bills for two counts of assault, the State offered the affidavit of complaint for the incident that was the subject of the bills and pleadings regarding a civil complaint filed in 2002 by the Defendant against the victim and Ms. Ludlow related to the 2002 altercation.

The no true bills were relevant to show that the Defendant bore animosity toward the victim. The State did not contend that the victim did not hit the Defendant or that the Defendant fabricated the account. Ms. Ludlow testified that when she went outside, the victim said he had hit the Defendant. The jury could infer that the grand jury's choice not to indict the victim fueled the Defendant's anger into filing a civil lawsuit and caused the Defendant to hold a grudge against the victim. The Defendant's anger grew over time and was fed by his frustration with the child visitation arrangements. He purchased a shotgun and ammunition, made statements of intent to kill the victim, and eventually killed the victim. Regarding the possible prejudicial value of the evidence, we note that the victim, not the Defendant, was the accused in the 2002 bills. We note that the trial court admitted the affidavit of complaint for the underlying incident, to which there was no objection in the trial court, nor has an issue been raised in this appeal. The affidavit states that the affiant arrested the victim for assault and that he noticed markings on the Defendant, who stated that he had been assaulted. We conclude that any prejudice from the evidence of the no true bills did not substantially outweigh the probative value of the evidence. The trial court did not abuse its discretion in admitting the evidence. The Defendant is not entitled to plain error relief on this basis.

## XII

The Defendant contends that the prosecutor violated his rights to not incriminate himself and to due process by commenting on his silence after he was detained by the police. The State counters that the Defendant waived the issue by failing to object at the trial or raise the issue in the motion for a new trial and that in any event, no plain error exists. The Defendant agrees with the State that if he is entitled to relief, it is as a matter of plain error. Because the Defendant did not object at the trial or raise the issue in the motion for a new trial, we agree. We conclude, though, that plain error has not been shown.

The Defendant identifies in his reply brief the following statements of the prosecutor in her opening statement:

[The police] surrounded [the Defendant's] house, observed the lights on, knocked on the door, rang the doorbell, no one was there. As they're trying to decide what to do and looking for this red truck that got BOLOed out they see him walking up the street. And they approach him, because one of the officers recognizes him, and they say we're going to take you to the sheriff's office for questioning. He kind of makes small talk with the officers, although law enforcement said there was a shooting in Norris[. H]e never asks who was shot or why they want to talk to him about it. He inquired do they have a warrant.

The Defendant also identifies the following statements during the prosecutor's closing argument:

> [While the Defendant is outside walking on the morning of the homicide,] he comes this way and runs into law enforcement and that's when you have that conversation with them. You know, they talk about telling him that Norris police want to talk to you. They did ask him about where was the red Toyota. They did put him in handcuffs, but he never inquired: what have I done? What do you think I have done?
>
> Now put yourself in those shoes. If you were an innocent person having done nothing wrong, just out for a morning walk, if the police come up to you and say: Norris wants to talk to you, [are you] going to say, Norris? What's Norris [want]? What did I do? What do they think I did? Murder–you think I committed murder? No, no. You look at my hands. You know, I will give you that gun. That's what an innocent person reacts to this sort of thing. Which vehicle is yours? He gestured with his eyes pointing to that blue one. And what about the Kia? Those police, all of them, the only car they told you about was the blue Buick LeSabre. We hear today from Mr. Flinn, well, the Kia was in his backyard. Where was the Kia? . . . [In this encounter with the police, t]hey see Flinn walking down the sidewalk toward them. . . . The cops put handcuffs on him and that's when you had that kind of peculiar statement: well, I'm not going to answer many questions but those that I do I will be truthful.

The Defendant also complains of the following from the rebuttal argument:

> What's very, very revealing [about the Defendant's statements to the police and his employer on the day of the crime] is the things he did not say. And I suggested this to you earlier: Don't you think that if he was an innocent man just out for a walk that he would have said, me? You think I've done what? You know, come in and I'll give you my gun. Check my gun and see if it has recently been fired. Check me for anything. You think I've been to Norris, check my car. He didn't say anything about a gun, didn't offer up anything, didn't even ask for why he was taken into custody. Instead, he takes off his watch and then he sits there because the questions he's going to answer were few in number. But those he will answer, he will be truthful.

A defendant has a constitutional right to remain silent, upon arrest, while in custody, and at his trial. *See* U.S. Const. amend. V; *Miranda v. Arizona*, 384 U.S. 436 (1966). The

prosecution may not use the fact of a defendant's silence against him at a trial. *Miranda*, 384 U.S. at 468 n.37. As a general rule, the State should neither comment on a defendant's post-arrest, post-*Miranda* silence nor use it to impeach a defendant's testimony during trial. *Doyle v. Ohio*, 426 U.S. 610, 618 (1976); *cf. Griffin v. California*, 380 U.S. 609 (1965) (stating that the Fifth Amendment, applicable to the states through the Fourteenth Amendment, prohibits the prosecutor from commenting on the defendant's failure to testify).

We note that in this case, the State did not impeach the Defendant's credibility with his pretrial silence. Rather, it argued that his silence was circumstantial evidence of guilt. The State's inappropriate use of the evidence of the Defendant's pretrial silence as substantive evidence of his guilt violated the Defendant's Fifth Amendment privilege against self-incrimination, and it was prosecutorial misconduct to refer to the Defendant's silence as evidence of his guilt. We conclude that a clear and unequivocal rule of law was breached and that a substantial right of the Defendant's was adversely affected. We note, as well, that the record does not contain any indication that defense counsel failed to object or raise the issue for tactical reasons.

Prosecutorial misconduct does not constitute reversible error unless it affected the outcome to the defendant's prejudice. *See State v. Bane*, 57 S.W.3d 411, 425 (Tenn. 2001); *Judge v. State*, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976). In determining whether improper prosecutorial conduct could have affected the verdict to the prejudice of the defendant, the conduct must be viewed in context and in light of the facts and circumstances of the case, including whether the remarks were lengthy or repeated, or whether the statement was single or isolated. *State v. Goltz*, 111 S.W.3d 1, 6 (Tenn. Crim. App. 2003), *Judge*, 539 S.W.2d at 344. A court should also consider whether curative measures were taken by the trial court and the prosecution, the intent of the prosecutor in making the statement, the cumulative effect of the improper conduct and any other errors in the record, and the relative strength or weakness of the case. *Id.* In assessing prosecutorial misconduct that violated a defendant's privilege against self-incrimination, the defendant is entitled to relief unless the error was harmless beyond a reasonable doubt. *See, e.g.*, *State v. Transou*, 928 S.W.2d 949, 960 (Tenn. Crim. App. 1996). "To find harmlessness beyond a reasonable doubt [the court] would have to conclude that absent the evidence of pretrial silence and the closing argument, 'no juror could have entertained a reasonable doubt' as to [the defendant's] guilt." *Braden v. State*, 534 S.W.2d 637, 661 (Tenn. 1976) (citing *United States v. Matos*, 444 F.2d 1071 (7th Cir. 1971)).

We conclude that the Defendant has failed to show that consideration of any error is necessary to do substantial justice. We note that although the prosecutor made more than one inappropriate remark, her remarks were brief in the context of the entire argument. Her intent was to convince the jury that the Defendant's failure to ask questions or offer his gun

as evidence demonstrated his guilt. We note that the statements and arguments of counsel were not evidence. As we have noted previously, the Defendant and the victim had a history of disagreement. Shortly before the killing, the Defendant made statements that he was going to kill the victim or "take care" of the situation. He bought a shotgun and ammunition, and the victim was killed with the same type of ammunition. A box of the same ammunition was found inside one of his cars. Upon our review of the proof of the Defendant's guilt, we conclude that the prosecutor's inappropriate argument was harmless beyond a reasonable doubt, and therefore, consideration of the issue is not required to do substantial justice. The Defendant is not entitled to plain error relief.

## XIII

The Defendant contends that the prosecutor misstated evidence multiple times during the State's closing argument and invited the jury to "speculate" the Defendant into prison, which rendered his trial fundamentally unfair and violated his due process rights. The State contends that the Defendant has waived the issue by failing to object contemporaneously and failing to include the issue in his motion for new trial. In the alternative, the State contends that the closing argument was proper. Although the State does not address each statement with which the Defendant took issue, it asserts that the prosecutor was arguing the State's theory of the case, that the statements do not rise to the level of plain error, and that the statements directly related to the evidence in the record.

The Defendant failed to object at the trial to any of the prosecutor's statements. By not objecting contemporaneously, he has waived our review of this issue. *See* T.R.A.P. 36(a); *see also State v. Little*, 854 S.W.2d 643, 651 (Tenn. Crim. App. 1992) (stating that the failure to object to the prosecutor's alleged misconduct during closing argument waived later complaint). The Defendant also failed to include this issue in his motion for a new trial. *See* T.R.A.P. 36(a). We are limited to plain error review as detailed above.

Our supreme court has stated that "closing arguments are a valuable privilege that should not be unduly restricted." *Terry v. State*, 46 S.W.3d 147, 156 (Tenn. 2001). The State and the Defendant "must both be given the opportunity to argue the facts in the record and any reasonable inferences that may be drawn therefrom." *State v. Seay*, 945 S.W.2d 755, 763 (Tenn. Crim. App. 1996). "Argument must be temperate, predicated on evidence introduced during the trial, relevant to the issues being tried, and not otherwise improper under the facts or law." *State v. Middlebrooks*, 995 S.W.2d 550, 557 (Tenn. 1999). There is "greater leeway in arguing their positions before the jury, and the trial court has significant discretion in controlling these arguments." *Terry*, 46 S.W.3d at 156. A trial court's decision regarding closing arguments will be reversed only upon an abuse of discretion. *Smith v. State*, 527 S.W.2d 737, 739 (Tenn. 1975).

When a statement made during a closing argument is improper, "the test for determining if reversal is required is whether the impropriety 'affected the verdict to the prejudice of the defendant.'" *State v. Cribbs*, 967 S.W.2d 773, 783 (Tenn. 1998) (quoting *Harrington v. State*, 385 S.W.2d 758, 759 (Tenn. 1965)). The factors to consider include the conduct at issue viewed in light of the facts and circumstances of the case, any curative actions by the trial court, the intent of the prosecutor's improper statement, the cumulative error of the improper statement and any additional errors in the record, and the strength or weakness of the case. *Id.*

Regarding the Defendant's argument that the prosecutor misstated the evidence given in Earl Parker's deposition testimony, the prosecutor reminded the jury in the State's closing argument of the videotaped testimony of Mr. Parker. The prosecutor argued the Defendant told Mr. Parker he was angry with the victim and had purchased a shotgun at Walmart to "kill the uncle." The record shows Mr. Parker's testimony was that he knew the Defendant and the victim had a contentious relationship and that the Defendant told him the victim infuriated him during a conversation around June 10 or 15, 2005. The Defendant told Mr. Parker he purchased a gun and intended to kill the victim, but Mr. Parker said he did not remember if he told the police the Defendant purchased the gun at Walmart.

The Defendant argues Mr. Parker never stated that the Defendant told him he purchased a shotgun nor that the Defendant purchased the gun at Walmart. Although the record reflects that Mr. Parker stated the Defendant purchased a gun, not specifically a shotgun, it contains evidence that the Defendant purchased a shotgun. In this sense, although Mr. Parker was not the source, an evidentiary basis for the State's argument remained. Likewise, after reminding the jury of Mr. Parker's testimony, the prosecutor reviewed the Rockwood Walmart store manager's testimony that the Defendant purchased a shotgun. The receipt was entered as an exhibit. Although Mr. Parker was unsure if the Defendant told him where the gun was purchased or if he told the police the gun was purchased at Walmart, the record contains evidence supporting the State's argument. The Defendant also argues Mr. Parker never stated that the Defendant expressed anger with the victim, which is contrary to the evidence. Mr. Parker stated the Defendant told him that the Defendant and the victim had a contentious relationship. The argument was proper.

Regarding the Defendant's argument that no evidence in the record supports the prosecutor's statements that the Defendant's Kia was parked at Victorian Square Assisted Living Center the morning of the murder, the prosecutor submitted to the jury that the Defendant committed the murder in Norris and returned to the area of Victorian Square to look for a place to leave his car where the police would not find it. The Defendant argues that Teresa Majors and Sandra Ellison, employees of Victorian Square, saw him the morning of the murder in the parking lot of Victorian Square around 6:23 a.m. and that Ms. Majors

testified that no cars were in the parking lot other than those belonging to the employees and patients. He also argues that Kipper Melmige did not notice his car in the parking lot when Mr. Melmige arrived at Victorian Square for work between 7:30 and 8:00 a.m. He said that he was arrested twenty minutes after speaking to Ms. Majors and Ms. Ellison, that he was at the Roane County jail until 11:30 a.m., and that a friend picked him up at the jail and took him to work around 1:00 or 2:00 p.m. He argues that Mr. Melmige would have noticed the Defendant's car if it was in the Victorian Square parking lot from 6:20 a.m. until that afternoon.

The record shows that Tammy Coleman testified that the Defendant sometimes parked his car at Victorian Square Assisted Living Center and that the Defendant admitted parking his Kia across the street from Victorian Square a couple of times. Ms. Majors and Ms. Ellison both testified they saw an unknown man walking across the parking lot of Victorian Square on the morning of the murder. The Defendant's Buick was located in the parking lot on July 25, 2005. The prosecutor's statements regarding the Defendant's parking his Kia at Victorian Square were reasonable inferences drawn from the evidence in the record and were not improper. *See Seay*, 945 S.W.2d at 763. It was within the trial court's discretion to allow the State to proffer this theory during its closing argument.

Regarding the Defendant's argument that no evidence in the record supports the prosecutor's statements that someone saw a vehicle leaving the scene of the murder, the prosecutor told the jury that "we know that the killer came to the crime scene by car." He explained that although no one saw the car, it was a car because neighbors testified they heard a car door slam, a car pull out, and a car travel up the hill and that the "young college student" testified that the car had an automatic transmission. The prosecutor told the jury the Defendant had an economy-type, small car that was not found at his home. The Defendant argues that the evidence shows a vehicle was heard, that it may have been a car or a truck, and that no one saw a car.

The victim's neighbors testified that they heard a car pull out and drive up the hill away from the victim's house. Daniel Forbes, a college student, testified that he thought the vehicle was "a car as opposed to a large truck or a diesel engine" and that it was not a loud vehicle. Contrary to the Defendant's argument that there was no substantive evidence that the murder was committed by someone driving a small, economy-style car, Mr. Forbes said the car he heard was "something like an economy car or close" and explained that "an economy car" was "like a small car." The prosecutor's statements were based on evidence in the record.

Regarding the Defendant's argument that no evidence in the record supports the prosecutor's statements that the Defendant worked until after midnight on the night of July

20, 2005, the prosecutor submitted to the jury that the Defendant drove the Kia to work on July 20 and "worked until late in the evening after midnight." The Defendant argues that the only evidence about what time he left work that night was his uncontradicted testimony that he left work and arrived home around midnight where he stayed until the next morning when he left for work.

The record shows John "Duke" Fleming testified that the Defendant's shift was generally from 3:00 to 11:00 p.m., that the Defendant came to work at 2:00 p.m. on July 21, and that Mr. Fleming was not there when the Defendant left. Williams Diggs testified that the Defendant had been granted overtime several times to finish work. Evidence in the record shows that his shift ended "late in the evening" at 11:00 p.m., that he had been granted overtime before, and that he came to work early on July 21. Although there is no evidence the Defendant left work "after midnight" that night, the trial court's allowing the prosecutor's statement was harmless in light of the evidence presented. *See* T.R.A.P. 36(b).

Regarding the Defendant's argument that no evidence in the record supports the prosecutor's statements that the Defendant had guns in his Kia, the prosecutor told the jury that Ron Brown saw guns in the Defendant's Kia after 9:00 p.m. on July 19. The Defendant argues that Mr. Brown was uncertain which of the Defendant's cars held the guns, could not recall which car was parked on the Defendant's carport, and did not believe the "long gun" he saw was a Maverick Model 88. The record shows Mr. Brown testified that on July 19, 2005, around 9:00 p.m., the Defendant showed him a long gun and a holstered handgun in the trunk of a car. He said that when he gave his statement to the TBI, he was unsure which car contained the guns but believed it was the Kia. The prosecutor's statements regarding the car in which Mr. Brown saw the guns were reasonable inferences drawn from the evidence in the record and were not improper. *See Seay*, 945 S.W.2d at 763. It was within the trial court's discretion to allow the State to proffer this theory during its closing argument.

Regarding the Defendant's argument that no evidence in the record supports the prosecutor's statements that shotgun shells were found in the Defendant's car, the prosecutor told the jury that Chief Stinnett and Officer Capps saw shotgun shells in plain view on the rear floorboard on the Defendant's car. Chief Stinnett testified that he could see through the back glass of the Defendant's car "some type of an ammunition box" lying on the back floorboard. He believed the ammunition was "Federal ammunition." Officer Capps testified that "a box of ammunition, twelve-gauge shotgun ammo" was on the back floorboard of the Defendant's car. He said he thought it was "Federal twelve-gauge doubt-aught buck shot." The Defendant's argument is contrary to the evidence because Chief Stinnett and Officer Capps testified that they saw shotgun ammunition in the back floorboard of the Defendant's car.

-85-

Regarding the Defendant's argument that the prosecutor misstated Mr. Diggs's testimony, the prosecutor argued to the jury that the Defendant told Mr. Diggs he was going to kill the victim. The Defendant argues that Mr. Diggs never testified that the Defendant told him the name of the person he intended to kill. The record shows Mr. Diggs testified that the Defendant told him he purchased a shotgun and was going to follow the victim to work and kill him. He said he did not remember if the Defendant referred to the victim by name but understood the Defendant was referring to his former wife's boyfriend. He said, though, he "never really established the relationship" but knew that the man was from Norris and that the Defendant and the man were angry with each other. Although Mr. Diggs did not testify with certainty that the Defendant's anger and threats were directed at the victim, he testified that he knew the Defendant was angry at a man who lived in Norris and had an unknown relationship to the Defendant's former wife. He said the Defendant told him he was going to follow a man to work and kill him. The prosecutor's statements were reasonable inferences drawn from the evidence and were not improper. *See Seay*, 945 S.W.2d at 763. It was within the trial court's discretion to allow the State to proffer this theory during its closing argument.

Regarding the Defendant's argument that the prosecutor misstated John Fleming's testimony, the prosecutor argued to the jury that the Defendant told Mr. Fleming he was going to "take them all out, kill all of them, and get rid of them all." The prosecutor told the jury that the Defendant's hostility was not directed at one person but all those in the Beggses' house. The Defendant argues that Mr. Fleming did not know to whom the Defendant was referring when he made the threat and that he never mentioned anyone by name.

The record shows that Mr. Fleming had discussions with the Defendant about his problems with the victim. Mr. Fleming knew about the victim's alleged assault on the Defendant and the Defendant's going to watch the victim's house one night. Mr. Fleming did not remember the Defendant's exact words but knew that on July 18, 2005, the Defendant told him he thought the solution might be to "just take them all out or to kill them or something, that killing all of them would resolve the situation." Although he did not know who "all of them" referenced, the prosecutor's statements were not improper and were reasonable inferences drawn from the evidence after previous conversations about the hostility between the Defendant and the victim and the Defendant's custody issues. It was within the trial court's discretion to allow the state to proffer this theory during its closing argument.

Regarding the Defendant's argument that the prosecutor misstated evidence about the Defendant's Kia, the prosecutor reminded the jury that all the officers who went to the Defendant's house the morning of the murder testified about the blue Buick LeSabre with no mention of the Kia. The prosecutor asked the jury, "Where was the Kia," and reminded

them the Defendant testified the Kia was in his backyard. The prosecutor also reminded the jury about the victim's neighbors' testimony that they heard a small, economy-type car leave the area after they heard the gunshots.

The Defendant claims the only vehicle the police looked for on the day of the murder and during the time before the trial was a red Toyota truck. He argues that he owned a Buick LeSabre and Kia Spectra in July 2005, that he testified the Kia was parked in his driveway or in his backyard the morning of the murder, and that he did not drive it that morning. He argues that Officer Steven Bryant did not see the Kia parked at his house because he only glanced at the yard, the foliage blocked his view, and the amount of light that morning made it difficult to see. He asserts that Special Agent Corbitt testified at the suppression hearing that he was only at the Defendant's house for twenty minutes on the morning of the murder to gather information from other officers for a search warrant and did not mention the Kia and that to his knowledge no one was on the Defendant's property before the search warrant was secured. The Defendant asserts that at the trial, Agent Corbitt testified that officers looked for a red truck on the morning of the murder because that was the information they had and that the police had no reason to eliminate the red truck as a lead. He argues that no one found the Kia on the day of the murder because no one looked for it and that the prosecutor asked the jury to speculate about where the Kia was.

The record shows that Officer Foust asked officers to look for multiple vehicles on the morning of the murder and that although one was for a red truck, one was for a dark-colored Kia. The Defendant testified that in July 2005, he owned a 1991 Buick LeSabre and a 2002 Kia Spectra. Ms. Coleman testified the Defendant sometimes parked the Kia at Victorian Square Assisted Living Center. Lynn Raines testified that the Defendant drove a small, blue Kia on the night of July 20, 2005. Sergeant Bryant testified that he was at the Defendant's house on July 21, 2005, and that the only car he saw was a Buick. He said that he looked into the backyard from the alley behind the Defendant's house but that he did not see a Kia. Special Agent Corbitt testified that he did not see a Kia in the Defendant's backyard that morning. Although he agreed the Rockwood Police were looking for a red Toyota truck earlier that morning, he said that officers had the license plate number of the Kia and were looking for it. Evidence in the record shows that officers looked for the Kia that morning and did not find it at the Defendant's house. The prosecutor's statements were not improper. It was within the trial court's discretion to allow the State to proffer this theory during its closing argument. As we noted above, the record includes testimony that the neighbors heard a small, economy-type car leave the neighborhood after they heard the gunshots, and the prosecutor's statements about such were proper.

Regarding the Defendant's argument that the prosecutor misstated evidence about the popularity of the shotgun shells the Defendant purchased, the prosecutor told the jury the

Defendant purchased "special cartridges" that were "Federal premium ammunition, Magnum sized, double aught buck, copper plated." The prosecutor stated that the manager from Walmart said the shotgun shells the Defendant purchased "were not a very common cartridge" sold at Walmart. The prosecutor told the jury that Walmart's ammunition sales were seasonal and that the type the Defendant purchased was sold around deer hunting season. The prosecutor then asked the jury to consider whether July 21 was deer hunting season and said that even considering the increased purchases of that type of ammunition during deer season, only one to one and one-half percent of the ammunition Walmart sold in one year was the type the Defendant purchased.

The Defendant argues that no evidence was presented that the ammunition he purchased was special or uncommon. He argues that the store manager never testified about the popularity of the ammunition and that he only said the ammunition was popular during certain times of the year. The Defendant argues that Special Agent Steve Scott testified that the ammunition the Defendant purchased was one of the three most popular brands of twelve-gauge, double-aught, copper-plated buckshot in the southern United States and that the ammunition he purchased was common.

Contrary to the Defendant's argument that the store manager did not testify about the popularity of the ammunition the Defendant purchased, the manager testified that one to one and one-half percent of all ammunition sales at the Rockwood Walmart were buckshot and that of that percentage, most was sold at certain times of the year during big game, like deer, hunting seasons. Although Special Agent Scott testified that the most common brands of shotgun cartridges were made by Federal, Remington, and Winchester, he explained that the magnum shells were different and said that three-inch magnum shells have fifteen pellets, two and three-quarter inch shells have eight or nine pellets, and two and three-quarter inch magnum shells have twelve pellets. He also said that not all buckshot pellets were copper plated and that most were just lead but that Federal, Remington, and Winchester used copper jacketed buckshot pellets inside their cartridges. It was not an abuse of discretion for the trial court to allow the State to argue its interpretation of the evidence.

Regarding the Defendant's argument that the prosecutor misstated the testimony of Officers Melton and Pittman, the prosecutor told the jury to focus on the testimony of the two officers. The prosecutor argued that the Defendant told Officer Melton he was going to kill the "SOB" before his issues were resolved and tearfully told Officer Pittman that he was going to kill the victim. The Defendant argues that Officer Melton was impeached on cross-examination and did not know the victim's name. He argues that Officer Pittman never testified that the Defendant stated he was going to kill the victim but said the Defendant stated he would take things into his own hands.

Officer Melton testified that the Defendant told him, "[B]efore it's over with I'm going to have to kill that son of a b----." Although defense counsel presented a previous statement from Officer Melton that did not match his trial testimony exactly, the prosecutor may state an ultimate conclusion which would necessarily follow if the testimony of the prosecution witnesses were believed by the jury. *See State v. Beasley,* 536 S.W.2d 328, 330 (Tenn. 1976). Officer Pittman testified that the Defendant was upset when Officer Pittman told him he could not issue a custodial interference warrant, that the Defendant said he was going to buy a magnum shotgun at Walmart, and that "if nobody else would help him then he would take care of the problem himself." The prosecutor's statements were reasonable inferences drawn from the evidence and were not improper. *See Seay*, 945 S.W.2d at 763.

Regarding the Defendant's argument that the prosecutor erred by arguing the jury should "fill in the blanks," the prosecutor reminded the jury of the Defendant's issues with his former wife, the victim, and the victim's wife concerning missed visitation and a child custody battle. She argued that the jury was probably thinking "gosh, that is troubling but its not worth killing anybody over it" and that the jury would have to use their "intuition" and "fill in the blanks." The Defendant argues that the prosecutor's argument suggested that the jury speculate evidence to support his conviction and create evidence the State could not prove.

The record shows that the prosecutor's statements considered in context asked the jury to take all the evidence of the Defendant's issues with the custody of his child collectively as the motive for the murder. The argument is based on reasonable inferences drawn from the evidence and was not improper. *See Seay*, 945 S.W.2d at 763. The Defendant has not shown that any of the prosecutor's closing argument was improper, and he is not entitled to relief on the issue.

## XIV

The Defendant contends that the trial court erred in its jury instruction on admissions against interest. He contends that (1) the instruction is unconstitutionally vague and (2) its language amounted to a comment on the Defendant's guilt. The State contends that the proof shows that the Defendant made the statements against interest and that the Defendant has failed to show prejudice. The State has not responded to the Defendant's second contention that the instruction was unconstitutionally vague. We conclude that the instruction was proper.

The Defendant complains of the following instruction:

Evidence has been introduced in this trial of a statement the defendant made outside the trial, to show an admission against interest. An admission against interest is a statement by the defendant which acknowledges the existence of truth of some fact necessary to be proven to establish the guilt of the defendant or which tends to show guilt of the defendant or is evidence of some material fact, but not amounting to a confession.

While this evidence has been received it remains your duty to decide if in fact such a statement was ever made. If you believe a statement was not made by the defendant you should not consider it. If you decide the statement was made by the defendant, you must judge the truth of the facts stated. In so determining, consider the circumstances under which the statement was made. Also consider whether any of the other evidence before you tends to contradict the statement in whole or in part. You must not, however, arbitrarily disregard any part of any statement, but rather should consider all of any statement you believe was made and is true. You are the sole judge of what weight should be given such statement. If you decide a statement was made, you should consider it with all other evidence in this case in determining the defendant's guilt or innocence.

In criminal cases, the trial court must give "a complete charge of the law applicable to the facts of the case and the defendant has a right to have every issue of fact raised by the evidence and material to his defense submitted to the jury upon proper instructions by the judge." *State v. Thompson*, 519 S.W.2d 789, 792 (Tenn. 1975). An erroneous jury instruction deprives the defendant of the constitutional right to a jury trial and is subject to a harmless error analysis. *See State v. Garrison*, 40 S.W.3d 426, 433-34 (Tenn. 2000). A jury instruction must be reviewed in its entirety and read as a whole rather than in isolation. *State v. Leach*, 148 S.W.3d 42, 58 (Tenn. 2004). "An instruction should be considered prejudicially erroneous only if the jury charge, when read as a whole, fails to fairly submit the legal issues or misleads the jury as to the applicable law." *State v. Faulkner*, 154 S.W.3d 48, 58 (Tenn. 2005) (citing *State v. Vann*, 976 S.W.2d 93, 101 (Tenn. 1998)).

The Defendant argues, first, that the instruction is unconstitutionally vague because the court failed to inform the jury of the specific statement the Defendant made or of the specific fact that he purportedly acknowledged. We disagree. The trial court's instruction closely follows an instruction that has been approved by this court and is a pattern instruction. *See State v. Litton*, 161 S.W.3d 447, 459 (Tenn. Crim. App. 2004); T.P.I.–Crim. 42.11. The trial court properly defined the term "admission against interest." *See, e.g.*,

-90-

*Helton v. State*, 547 S.W.2d 564, 567 (Tenn. 1977) (defining and distinguishing between an admission against interest and a confession), *overruled on other grounds by State v. Cabbage*, 571 S.W.2d 832, 836 (Tenn. 1978). As the second paragraph of the instruction states, the jury must determine whether an admission against interest was made by the Defendant, and if a statement was made, the jury must determine the truth of the facts stated and the weight to be afforded to the statement. It is a question of fact whether a specific statement qualified as an acknowledgment by the Defendant of the truth of a fact that was necessary to establish guilt, that showed guilt, or that was evidence of a material fact, and questions of fact are the province of the jury. The record reflects that the trial court also instructed the jurors that they were the exclusive judges of the facts and the law as it applied to the facts. Identifying specific evidence that should be considered as admissions against interest, as well as limiting the admissions against interest exclusively to that evidence, would usurp the jury's role as the trier of fact. The instruction is not unconstitutionally vague.

We turn to the Defendant's second argument that the instruction amounted to the trial court's commenting on the Defendant's guilt. He argues that the instruction had the effect of imposing a presumptive finding of the existence of an essential element of the offense. We disagree. As we have noted, the instruction correctly states the law. It does not impose a presumption on the jury or shift the burden to the Defendant to prove his innocence. The instruction was proper, and the Defendant is not entitled to relief on this basis.

## XV

The Defendant contends that the trial court denied his due process rights by entering the judgment on the same day the jury convicted him and the same day as the entry of the sentencing order. The State argues that the Defendant waived the issue because he did not raise it in the trial court or in his motion for new trial. In the alternative, the State contends that the court acted within its discretion.

Because the Defendant failed to raise the issue in the trial court or to include it in a motion for a new trial, we are limited to plain error review. *See* T.R.A.P. 3(e); T.R.A.P. 36(b). The Defendant argues that Tennessee Criminal Procedure Rules 29 and 33 do not authorize a trial court to vacate a judgment entered upon a jury's guilty verdict. His assertion is incorrect. Rule 29(e)(2) states, "If the defendant moves for a judgment of acquittal after the jury returns a verdict of guilty, the court may set aside the guilty verdict, dispose of a motion for new trial, and grant the judgment of acquittal." Rule 33(d) states, "The trial court may grant a new trial following a verdict of guilty if it disagrees with the jury about the weight of the evidence."

The Defendant argues that entry of the final judgment prematurely on December 17, 2008, rendered his motions for acquittal and new trial moot because the court had no authority to vacate the judgment after entry. The judgment states "Date of Entry of Judgment" as December 17, 2008. The file-stamp shows that the document was filed with the circuit court clerk on January 12, 2009. The Defendant's initial motion for new trial and for judgment of acquittal was filed January 7, 2009. Supreme Court Rule 17 provides that the date of the judgment shall be the date upon which the order of sentence was entered.

In this case, there was an oral pronouncement of sentence by the trial court on December 17, 2009, imposing an automatic life sentence. *See* T.C.A. § 39-13-208(c) (2010). However, "an oral pronouncement of sentence is not entry of the order of sentence for purposes of Rule 33." *State v. Stephens*, 264 S.W.3d 719, 729 (Tenn. Crim. App. 2007). Rule 33 does not speak in terms of when the sentence is ordered but rather when the order of sentence is entered. Tennessee Criminal Procedure Rule 32(e)(1) states, "A judgment of conviction shall be signed by the judge and entered by the clerk." The file-stamp date "provides evidence of when the order of sentence was entered by the clerk," and the "effective date for entry of a judgment or order of sentence is the date of its filing with the court clerk after being signed by the judge." *Stephens*, 264 S.W.3d at 729. The Defendant incorrectly argues that entry of the final judgment was on December 17, 2008. Instead, the judgment was entered on January 12, 2009, when it was received and stamped by the circuit court clerk. The Defendant's motion for a new trial and judgment of acquittal was filed on January 7, 2012, which was five days before the judgment was entered.

Contrary to the Defendant's argument that his due process rights were violated because his motion for a new trial and judgment of acquittal were rendered moot by the entry of the judgment, the date the judgment was entered began the thirty-day period in which the Defendant had to file his motion for a new trial. The Defendant filed his motion within that time period, and the trial court retained jurisdiction to rule on the motion. T.R.A.P. 4(c), (e) (stating that the trial court retains jurisdiction over the case pending the court's ruling on any timely filed motion under Rule 29(c) for a judgment of acquittal or under Rule 33(a) for a new trial). The court did not lose jurisdiction by entering the judgment. *Id.* The Defendant timely filed a motion for new trial and judgment of acquittal, which extended the court's jurisdiction until its ruling on the motion. *Id.* This issue is without merit.

In consideration of the foregoing and the record as a whole, the judgment of the trial court is affirmed.

_____
JOSEPH M. TIPTON, PRESIDING JUDGE